**ORIGINAL**

**HARWOOD FEFFER LLP**
Robert I. Harwood (RH–3286)
Samuel K. Rosen (SR–3287)
488 Madison Avenue
New York, New York 10022
Tel. (212) 935-7400

Attorneys for Plaintiff

**07 CV 2878**

**JUDGE BRIEANT**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SYLVIA B. PIVEN TRUSTEE under trust agreement dated April 3, 1973 f/b/o Sylvia B. Piven, derivatively on behalf of ITT CORPORATION, <br><br> Plaintiff, <br><br> -against- <br><br> STEVEN R. LORANGER, CURTIS J. CRAWFORD, CHRISTINA A. GOLD, RALPH F. HAKE, DR. JOHN J HAMRE, RAYMOND W. LEBOEUF, FRANK T. MACINNIS, LINDA S. SANFORD, and MARKOS I. TAMBAKERAS, <br><br> Defendants, <br><br> -and- <br><br> ITT CORPORATION, <br><br> Nominal Defendants. | Civil Action No.: <br><br><br> **STOCKHOLDER'S DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff, by and through her undersigned attorneys, alleges the following upon information and belief. Plaintiff also bases this Complaint on the investigation by her attorneys,

which included, among other things, review of the public documents and press releases of ITT Corporation ("ITT" or the "Company").  Except as alleged herein, the underlying information concerning defendants' misconduct, and the particulars thereof, are not available to plaintiff and the public and lie within the possession and control of defendants and other ITT insiders.  Based on the evidence already developed, plaintiff believes additional substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a stockholders' derivative action brought on behalf of nominal defendant ITT against the "Director Defendants," named in paragraphs 10 through 19, who served on ITT's board of directors (the "Board") during the acts complained of herein, for breach of their fiduciary duties of loyalty, candor and gross mismanagement.  Such breaches led to damages ITT suffered as a result of the Director Defendants' participation in, or reckless failure to prevent, the illegal export of technical data relating to military night vision goggle systems, and the illegal omission of material facts from required arms export reports causing those reports to be patently misleading.

2.       ITT was, at all relevant times, the leading manufacturer of night-vision equipment for the United States.  It is currently the 12th largest supplier of sophisticated defense systems to the U.S. military.  In a gross abuse of the trust and responsibility bestowed upon ITT to enhance our military's success and to preserve our nation's safety, ITT threatened our national security in a direct and substantial way by providing foreign countries with classified technical data relating to military night vision goggles.

2

3.    By sharing top secret military data relating to night vision equipment with foreign entities, ITT single-handedly threatened to strip our soldiers of the advantage they once had in combat operating against adversaries who did not have access to this equipment. As U.S. Attorney for the Western District of Virginia John L. Brownlee described, "The criminal actions of this corporation have threatened to turn on the lights on the modern battlefield for our enemies and expose American soldiers to great harm." ITT has therefore jeopardized our national security and the safety of our military men and women on the battlefield.

4.    Various U.S. government agencies, such as the Department of Justice, the Department of Defense, and the Bureau of Immigration and Customs Enforcement, and Homeland Security discovered that ITT disseminated defense-related technical data to Singapore, the People's Republic of China, and the United Kingdom, without notifying, or obtaining approval from, the State Department. This technical data related to laser counter measures for military night vision goggle systems, designated as defense articles on the United States Munitions List. Accordingly, this technology was classified as "Secret – No Foreign" by the State Department, meaning it could not be shared even with friendly governments like Britain, and certainly not with potential strategic threats, such as China.

5.    Although as U.S. Attorney Brownlee said, American soldiers were "the principal victims of ITT's crimes," and although the harm to the Company and its shareholders is monetary and not potentially fatal, the consequences of this conduct have been, and will continue to be, severe for the ITT and its shareholders. For example, in addition to the $100 million in penalties and forfeitures described below, the Company is now the subject of independent monitoring.

6.    As a result of defendants' misconduct, a criminal information, <u>United States of America v. ITT Corporation</u>, 7:07-CR00022, was filed against ITT in the United States District Court for the Western District of Virginia, Roanoke Division, charging it with three felony counts of violating the Arms Export Control Act of 1976, 22 U.S.C. §2778. The size of the penalties inflicted upon ITT demonstrate how severely the government regarded ITT's transfer of such sensitive military technology to foreigners.  On March 27, 2007, ITT agreed to a fine of $100 million with the U.S. Attorney's Office in connection with its guilty pleas to the below-described charges. The penalties are as follows:  ITT will pay an upfront $2 million criminal fine ($1 million for each felony charge), pay an upfront $20 million penalty to the State Department, and forfeit $28 million in proceeds of its illegal actions to the U.S. government, a portion of which will be shared with state, local and federal law enforcement agencies for their work during this investigation.  Within the next five years, ITT may either pay the remaining $50 million fine or invest dollar for dollar in the research of advanced night-vision technology, to which the United States government will obtain all rights, to ensure that members of the U.S. Armed Forces  will have access to "the most capable night vision equipment in the world." The $50 million will also be used to cover the cost of government monitors to make certain that ITT does not again disseminate sensitive technology.  Any amount of the $50 million penalty that remains unspent after five years must be immediately paid to the United States.  As U.S. Attorney Brownlee stated, ITT will pay this last $50 million "in restitution to the victims of their crimes – the American soldier."

4

## JURISDICTION AND VENUE

7.     This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332.  The amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States which it otherwise would not have.

8.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) insofar as a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.  In addition, nominal defendant ITT's principal place of business is located in this district.

## PARTIES

9.     Plaintiff is the owner of ITT common stock, which she has held at all times relevant hereto.  Plaintiff is a citizen of Maryland.

10.     Nominal Defendant ITT is a corporation organized under the laws of Indiana with its corporate headquarters located at 4 West Red Oak Lane, White Plains, New York 10604.  ITT supplies advanced technology products and services in several growth markets.  It plays a vital role in national and international security through its defense communications and electronic products; space surveillance and intelligence systems; and advanced engineering and related services.  ITT has become the leading manufacturer of night-vision equipment for the United States Armed Forces.

11.     Defendant ITT is named as a nominal defendant herein solely in a derivative capacity.  This action is brought on ITT's behalf and no claims are asserted against it.

12.     Defendant Steven R. Loranger ("Loranger") has served as Chairman of the Board, President and Chief Executive Officer of ITT since June 28, 2004.  He is a citizen of New York.

5

13.    Defendant Curtis J. Crawford has served as a director of ITT since 1996.  He is a citizen of California.

14.    Defendant Christina A. Gold has served as a director of ITT since 1997.  She is a citizen of Colorado.

15.    Defendant Ralph F. Hake has served as a director of ITT since 2002.  He is a citizen of Michigan.

16.    Defendant Dr. John J. Hamre has served as a director of ITT since 2000.  He is a citizen of the District of Columbia.

17.    Defendant Raymond W. LeBoeuf has served of ITT as a director since 2000.  He is a citizen of Florida.

18.    Defendant Frank T. MacInnis has served as a director of ITT since 2001.  He is a citizen of Connecticut.

19.    Defendant Linda S. Sanford has served as a director of ITT since 1998.  She is a citizen of New York.

20.    Defendant Markos I. Tambakeras has served as a director of ITT since 2001.  He is a citizen of Pennyslvania.

## Obligations of the Director Defendants

21.    The Director Defendants, by reason of their corporate directorship and/or executive positions, are fiduciaries to and for the Company's shareholders, which fiduciary relationship requires them to exercise their best judgment, and to act in a prudent manner and in the best interests of the Company's shareholders.

22.    According to ITT's most recent Schedule 14A filed with the SEC on April 14,

6

2006, the role of ITT's Board is "to oversee the actions and results of management. In discharging its responsibilities, the Board of Directors will act in the best interests of the Company and its shareholders." The Board also "sets policy for the Company and advises and counsels the Chief Executive Officer and senior executives who manage the Company's business and affairs."

23.    Accordingly, each Director Defendant owed to ITT and its shareholders the duty to exercise due care, diligence and loyalty in the management and administration of the affairs of the Company and in the use and preservation of its property and assets, and owed the duty of full and candid disclosure of all material facts related thereto.

24.    To discharge these duties, the Director Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of ITT. By virtue of this obligation of ordinary care and diligence, the Director Defendants were required, among other things, to:

(a)    manage, conduct, supervise, and direct the employees, business, and affairs of ITT in accordance with federal laws, rules and regulations;

(b)    ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by ITT;

(c)    remain informed as to how ITT was, in fact, operating, and upon receiving notice or information of unsafe, imprudent or illegal practices, to make reasonable investigation in connection therewith and to take steps to correct that condition or practice;

(e)    supervise the preparation, filing and/or dissemination of any SEC filings, press releases, audits, reports or other information disseminated by ITT and to examine

7

and evaluate any reports of examinations, audits, or other information concerning the financial state of ITT, and to make full and accurate disclosure of all material facts concerning, _inter alia_, each of the subjects and duties set forth above;

(f)    exercise reasonable control and supervision over the officers and employees of ITT;

(g)    maintain and implement an adequate system of internal controls at ITT, including financial, accounting and management information systems;

(h)    examine and evaluate any reports of examinations or investigations by government agencies concerning the practices, products or conduct of officers, directors or employees of ITT;

(i)    assure the assets of the Company and its subsidiaries are utilized most effectively and capital expenditures and appropriations are reviewed; and

(j)    preserve and enhance ITT's reputation as befits a public corporation and to maintain public trust and confidence in ITT as a prudently managed institution fully capable of meeting its duties and obligations.

**Obligations of the Corporate Responsibility Committee**

25.    In their capacities as directors, defendants Crawford, as Chair, Gold, Hamre and Tambakeras served on the Board's Corporate Responsibility Committee. The Corporate Responsibility Committee is responsible for, among other things:

(a)    reviewing and making recommendations concerning the Company's roles and responsibilities as a good corporate citizen;

(b)    reviewing and considering major claims and litigation involving the

Company and its subsidiaries;

      (c)    regularly assessing the adequacy and effectiveness of the Company's Code of Corporate Conduct and reviewing any violations of the Code; and

      (d)    examining the Company's programs and policies for effecting compliance with laws and regulations, including international and environmental laws and regulations.

    26.    Defendants Crawford, Gold, Hamre and Tambakeras are collectively referred to as the "Corporate Responsibility Defendants."

**Obligations of the Audit Committee**

    27.    In their capacities as directors, defendants Hake, as Chair, Gold, Hamre and LeBoeuf served on the Board's Audit Committee. The Audit Committee is responsible for, among other things:

      (a)    reviewing with management and the independent auditors the effect of regulatory and accounting initiatives on the Company's financial statements;

      (b)    reviewing and discussing with management the types of information to be disclosed and the types of presentations to be made with respect to the Company's earnings, press releases and rating agency presentations;

      (c)    monitoring and discussing with management and the independent auditors the quality and adequacy of the Company's internal controls and their effectiveness;

      (d)    updating the Board on a regular basis with respect to matters coming to its attention which may have a significant impact on the Company's financial condition or affairs and the Company's compliance with the legal or regulatory requirements and the

performance and independence of the independent auditors and the internal audit function;

(e)     reviewing all material related party transactions prior to initiation of the transaction and make recommendations to the Board for approval or disapproval; and

(f)     reviewing and approving procedures for receipt, retention and treatment of complaints received by the Company.

28.     Defendants Hake, Gold, Hamre and LeBoeuf are collectively referred to as the "Audit Defendants."

**Obligations of the Compensation and Personnel Committee**

29.     In their capacities as directors, defendants Tambakeras, as Chair, Crawford, MacInnis and Sanford served on the Board's Compensation and Personnel Committee.   The Compensation and Personnel Committee is responsible for, among other things:

(a)     approving and overseeing administration of the Company's employee compensation program including incentive plans and equity based compensation plans;

(b)     evaluating senior management and chief executive officer performance; and

(c)     evaluating and making regular reports to the Board on matters concerning management performance.

30.     Defendants Tambakeras, Crawford, MacInnis and Sanford are collectively referred to as the "Personnel Defendants."

**Obligations of the Nominating and Governance Committee**

31.     In their capacities as directors, Defendants MacInnis, as Chair, Hake, LeBoeuf and Sanford serve on the Board's Nominating and Governance Committee.   The Nominating and

Governance Committee is responsible for, among other things:

        (a)     developing, annually reviewing, updating and recommending to the Board corporate governance principles for the Company;

        (b)     evaluating and making recommendations to the Board concerning the composition, governance and structure of the Board; and

        (c)     determining desired Board skills and attributes and conducting searches for prospective board members whose skills and attributes reflect those desired for the Board.

32.     Defendants MacInnis, Hake, LeBoeuf and Sanford are collectively referred to as the "Governance Defendants."

## FUTILITY OF DEMAND

33.     Demand on ITT to bring this action has not been made and is not necessary because such demand would be futile. ITT is controlled by its Board, which is comprised of nine directors, all of whom have served as directors at all relevant times.

34.     Each Director Defendant either directly participated in the alleged wrongdoing or breached their fiduciary duties by abdicating their responsibilities of supervision and oversight of ITT's employees and business operations and/or by failing to disclose the wrongdoing to the Company's shareholders.

35.     The Corporate Responsibility Defendants either caused or recklessly ignored the misconduct described therein by failing regularly to assess the adequacy and effectiveness of the Company's Code of Corporate Conduct and to review any violations of the Code, all as mandated in its Board Charter. Proper assessment would have uncovered and led to correction of the

egregious misconduct described herein.

36.    The Audit Defendants either caused or recklessly ignored the misconduct described therein by failing to regularly monitor and discuss with management and the independent auditors the quality and adequacy of the Company's internal controls and their effectiveness.  Proper monitoring would have uncovered and led to correction of the egregious misconduct described herein.

37.    The Personnel Defendants either caused or recklessly ignored the misconduct described therein by failing regularly to evaluate senior management and chief executive officer performance and to evaluate and make regular reports to the Board on matters concerning management performance.  Proper evaluation would have uncovered and led to correction of the egregious misconduct described herein.

38.    The Governance Defendants either caused or recklessly ignored the misconduct described therein by failing regularly to develop, review, update and recommend to the Board corporate governance principles for the Company.  Proper development and review would have uncovered and led to correction of the egregious misconduct described herein.

39.    Upon learning of its violations of law and mismanagement of Company assets, ITT took no internal action against the Director Defendants to recover the $100 million their fiduciary breaches cost the Company.  Justice Department officials revealed that ITT was aware that it was violating its export licenses for night-vision goggles but failed to take significant corrective action.  John Schoeneweiss, a senior agent of the Defense Department's Defense Criminal Investigative Service, declared that the Company's "serious violations" ran deep and "[t]he problem that we encountered was in the culture – the **willful self blinding of company officials.**"

40.    Moreover, defendant Loranger confirmed the Company's wrongdoing by announcing that "serious violations occurred" and acknowledged that ITT "had gaps in our compliance programs." Nevertheless, despite admitting that ITT engaged in conduct that was illegal and detrimental to its shareholders, and pleading guilty to criminal charges with the U.S. Justice Department, the Company has failed to take any internal action against the Director Defendants for their breaches of fiduciary duties and gross mismanagement of ITT assets.

41.    In addition, ITT has agreed to indemnify its directors against liability for acts and omissions occurring in the performance of their duties as directors and maintains insurance policies to cover the costs of such indemnification. However, under the terms of the directors' indemnification agreement, the Company will not indemnify directors for any breaches of their fiduciary duty to act in good faith and in a manner they reasonably believe to be in or not opposed to the best interest of the Corporation. Directors are also not covered for engaging in any acts or omissions which involve intentional misconduct or a knowing violation of law.

42.    In order to bring this action for breaches of fiduciary duty and gross mismanagement of Company assets in connection to ITT's imprudent and illegal business practices, the Director Defendants would have to sue themselves, and/or their fellow directors for conduct that is excluded from coverage under ITT's indemnification agreement.

43.    Therefore, ITT's Board is effectively disabled from complying with any demand that would cause it to bring suit against the Director Defendants because to do so would result in the loss of their insurance coverage. They would not initiate such litigation, nor be able to prosecute any such action.

13

44.    The Director Defendants' actions or willful inactions, as a result of their failures as Board and relevant committee members, have already resulted in guilty pleas to serious criminal charges, as well as substantial financial penalties, and have also exposed the Company to massive civil liability and expense.  The Company has nonetheless failed to hold any Director Defendants responsible for the harmful effects of their actions on the Company and its shareholders.  Demand on the Director Directors at this time is therefore futile.

## DERIVATIVE ALLEGATIONS

45.    Plaintiff brings this action derivatively, on behalf of ITT to enforce its claims against the Director Defendants, which claims may properly be asserted by the Company and which it has failed to enforce.

46.    The wrongs complained of herein occurred during the period when plaintiff was a Company shareholder.  Plaintiff continues to hold his ITT shares.  Hence, plaintiff has standing to bring this derivative action on behalf of ITT to recover damages for all of the conduct described herein.

47.    Plaintiff will fairly and adequately protect the interests of ITT and its shareholders in enforcing the rights of ITT against the Director Defendants.  Plaintiff's attorneys are experienced in this type of litigation and will prosecute this action diligently on behalf of ITT to insure its rights and those of its stockholders.  Plaintiff has no interests adverse to the Company.

## SUBSTANTIVE ALLEGATIONS

48.    Sophisticated night vision goggles provide our military with a commanding advantage on the battlefield by greatly enhancing its capability to operate around the clock.  The unique ability of our military forces to operate effectively at all times of the night is one

14

advantage U.S. forces have over our adversaries. U.S. Attorney Brownlee asserted, "The superior quality of our night vision technology gives the United States Armed Forces an enormous advantage on the battlefield." Additionally, in a Department of Justice news release, Assistant Attorney General for the National Security Division Kenneth L. Wainstein declared, "The sensitive night vision systems produced by ITT Corporation are critical to U.S. war-fighting capability and are sought by our enemies and allies alike."

49.    In August 2001, the U.S. Justice Department launched a criminal investigation against ITT regarding its night-vision production practices as non-compliant with International Traffic in Arms Regulations ("ITAR"). This investigation was commenced after special agents from the Defense Criminal Investigative Service discovered that ITT employees had illegally sent a classified U.S. military document about night vision technology to foreign nationals in the United Kingdom.

50.    The investigation uncovered that ITT had disseminated classified night-vision data, not only to the United Kingdom, but also to Singapore, and even the People's Republic of China, without obtaining State Department approval. This technical data related to laser counter measures for military night vision goggle systems that, when placed in the hands of our adversaries, poses a significant threat to the safety of our battlefield troops. As Julie Myers, Head of U.S. Immigration and Customs Enforcement, warned, such "export violations that comprise military technology pose a potentially deadly threat to our military and our nation." U.S. Attorney Brownlee added that, "By illegally outsourcing the production of some of the most sensitive pieces of the night vision system, ITT has put in jeopardy our military's night time tactical advantages and America's national security."

15

51.    Even more appalling, ITT engaged in such deplorable conduct on many different occasions.  Indeed, according to a March 27, 2007 statement released by U.S. Attorney Brownlee, ITT engaged in a "regular pattern of export violations and misrepresentations to the government from 1980 to 2005."  ITT even facilitated its illegal overseas exports by setting up a front company that, according to prosecutors, "went to significant lengths to set up an end run" around export laws.

52.    Government agencies also discovered evidence that the Company's night vision branch collaborated with foreigners on engineering projects including, among other things, allowing Singapore engineers to work with ITT engineers at the Company's night vision manufacturing operation in the Untied States and granting Chinese optical engineers access to work on the design of the enhanced night vision goggle system in Singapore.

53.    Moreover, according to prosecutors, despite possessing knowledge that this systematic conduct was taking place in violation of ITAR, the Company knowingly and willfully omitted material facts from required arms export reports between April 2000 and October 2004 that made the reports patently misleading.  Specifically, ITT failed to state in reports that it was aware that it was violating its export licenses by exporting night vision goggles and night vision parts to foreign persons without informing the State Department.  By making these misleading statements, ITT took affirmative steps to conceal its ongoing violations of export laws from the State Department, its shareholders and the general public.

54.    Indeed, U.S. Attorney Brownlee reported that ITT managers were aware of U.S. export laws but viewed them as "obstacles to getting business done."  Government investigators disclosed that ITT gave defense-related technical data to contractors in China, Singapore and the

United Kingdom in order to "reduce its costs and enhance its financial bottom line." For instance, ITT would illegally transfer information to foreign entities "in an effort to find a new and cheaper manufacturer for the laser protection device." As Homeland Security Assistant Secretary Julie Myers announced, "Placing profits ahead of the security of our nation is simply not acceptable for any corporation."

55.     But, astonishingly, the Director Defendants did cause or permit to sacrifice our national security and jeopardize the safety of our battlefield troops to achieve short-term financial gain but which wound up costing the Company $100 million plus incalculable reputational loss.

56.     As a result of its deplorable behavior, ITT was charged with three felony counts of violating the Arms Export Control Act of 1976. Count I charged ITT with violations of Title 18, U.S.C.§ 2[1], Title 22, U.S.C. §§2778(b)(2)[2] and 2778(c)[3], and Title 22, C.F.R. §§127.1(a)[4] and

---

[1]  Title 18, U.S.C.§2 provides:
    (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
    (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

[2]  Title 22, U.S.C. §2778(b)(2) provides:
    (b) Registration and licensing requirements for manufacturers, exporters, or importers of designated defense articles and defense services.
    (2) Except as otherwise specifically provided in regulations issued under subsection (a)(1) of this section, no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter, except that no license shall be required for exports or imports made by or for an agency of the United States Government
    (A) for official use by a department or agency of the United States Government, or
    (B) for carrying out any foreign assistance or sales program authorized by law and subject to the control of the President by other means.
As provided in Title 22, U.S.C. §2778(a)(1):
    (a) Presidential control of exports and imports of defense articles and services, guidance of policy, etc.; designation of United States Munitions List; issuance of export licenses; negotiations information.
    (1) In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for

17

127.3[5].  Specifically, Count I of the Criminal Information ("Willful Violation of the International

Traffic in Arms Regulations, Export of Defense Articles Without a License") charged that:

> On or between March 2001 and August 2001, in the Western District of Virginia, the defendant, ITT Corporation, did knowingly and willfully export and cause to be exported from the United States to Singapore, the People's Republic of China, and the United Kingdom, defense articles, that is, technical data related to a laser counter measure (also known as a "light interference filter") for

---

the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.

[3] Title 22, U.S.C. §2778(c) provides:
(c) Any person who willfully violates any provision of this section or section 2779 of this title, or any rule or regulation issued under either section, or who willfully, in a registration or license application or required report, makes any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined for each violation not more than $1,000,000 or imprisoned not more than ten years, or both.

[4] Title 22, C.F.R. §127.1(a) provides:
(a) It is unlawful:
(1) To export or attempt to export from the United States, or to reexport or retransfer or attempt to reexport or retransfer from one foreign destination to another foreign destination by a U.S. person of any defense article or technical data or by anyone of any U.S. origin defense article or technical data or to furnish any defense service for which a license or written approval is required by this subchapter without first obtaining the required license or written approval from the Directorate of Defense Trade Controls;
(2) To import or attempt to import any defense article whenever a license is required by this subchapter without first obtaining the required license or written approval from the Directorate of Defense Trade Controls;
(3) To conspire to export, import, reexport or cause to be exported, imported or reexported, any defense article or to furnish any defense service for which a license or written approval is required by this subchapter without first obtaining the required license or written approval from the Directorate of Defense Trade Controls;
(4) To violate any of the terms or conditions of licenses or approvals granted pursuant to this subchapter;
(5) To engage in the United States in the business of either manufacturing or exporting defense article or furnishing defense services without complying with the registration requirements. For the purposes of this subchapter, engaging in the business of manufacturing or exporting defense articles or furnishing defense services requires only one occasion of manufacturing or exporting a defense article or furnishing a defense service; or
(6) To engage in the business of brokering activities for which registration, a license or written approval is required by this subchapter without first registering or obtaining the required license or written approval from the Directorate of Defense Trade Controls. For the purposes of this subchapter, engaging in the business of brokering activities requires only one occasion of engaging in an activity as reflected in §129.2(b).

[5] Title 22, C.F.R. §127.3 provides:
Any person who willfully:
(a)  Violates any provision of section 38 or section 39 of the Arms Export Control Act (22 U.S.C. 2778 and 2779), or any undertaking specifically required by part 124 of this subchapter; or
(b)  In a registration, license application or report required by §38 or §39 of the Arms Export Control Act (22 U.S.C. 2778 and 2779) or by any rule or regulation issued under either section, makes any untrue statement of a material fact or omits a material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be subject to a fine or imprisonment, or both, as prescribed by 22 U.S.C. 2778(c).

military night vision goggle systems, which were designated as defense articles on the United States Munitions List, without having first obtained from the Department of State a license or written authorization for such exports.

57.    Additionally, Count II charged ITT with violations of Title 22, U.S.C. §2778(c) and Title 18, U.S.C. §2.    Specifically, Count II of the Criminal Information ("Omission of Statements of Material Fact in Arms Exports Required Reports") charged that:

> On or between April 2000 and October 2004, within the Western District of Virginia, the defendant, ITT Corporation, did knowingly and willfully omit material facts from required reports that were necessary to make the statements in the reports not misleading, that is, that ITT Corporation was aware that it was violating its export licenses for the temporary export or consignment of night vision goggles or night vision parts to foreign persons for years before informing the Department of State about the violations, and that ITT Corporation failed to take significant corrective action to stop the ongoing violations until shortly before it informed the Department of State about the violations.

58.    ITT was also charged with a third count ("Willful Violation of the International Traffic in Arms Regulations, Export of Defense Articles Without a License") charging that:

> On or between January 1996 and May 2006, within the Western District of Virginia, the defendants, ITT Corporation, did knowingly and willfully export and cause to be exported from the United States to the People's Republic of China, Singapore, and Japan, defense articles, that is technical data, including drawings and specifications and defense services related to military night vision goggles systems, including the Enhanced Night Vision Goggle System, which were designated as defense articles on the United States Munitions List, without having first obtained from the Department of State a license for such exports or written authorization for such exports.

Although the government has agreed to defer action regarding this count for five years, that deferment is contingent on ITT's implementation of an extensive Remedial Action Plan.

59.    According to its most recent Form 8-K filed with the SEC on March 30, 2007, as a result of its guilty pleas, and in addition to is $100 million penalty, ITT has become subject to automatic statutory "debarment" from future export licenses.  For instance, the State Department has placed restrictions on ITT's shipment of technical data and night vision equipment to specific parties to remain in effect for a period of not less than one year.

60.    Moreover, although the State Department has not as of yet brought criminal charges against any individual officers, directors or employees of ITT, U.S. Attorney Brownlee stated on March 28, 2007 that the investigation was still in progress.

61.    The gravity of the criminal charges and the size of the fines incurred by ITT thus reflect the seriousness of ITT's illegal sales of sensitive military technology to potential adversaries of the United States and ITT's subsequent concealment of those sales.  The severity of ITT's criminal acts and the Director Defendants' participation in and/or willful blindness towards these acts is escalated by the fact that such acts were committed in a pattern and practice over a long period of time.

62.    On its corporate website, ITT delineates its Code of Corporate Conduct as being "Doing the Right Thing --- Always."  Not withstanding such lofty sentiment, as a result of the foregoing acts of misconduct, ITT became the first major defense contractor to be convicted of a criminal violation under the Arms Export Control Act of 1976, and was given one of the largest penalties ever in a criminal case.  These acts have also stripped ITT of the reputation that befits a public corporation and weakened public trust and confidence in ITT as a prudently managed institution fully capable of meeting its duties and obligations.

20

## CLAIM I

## BREACH OF FIDUCIARY DUTY
### (Against All Director Defendants

63.    Plaintiff repeats and realleges each and every allegation set forth above.

64.    Each Director Defendant owed to the Company and its shareholders the duty to exercise due care and diligence in the management and administration of its affairs and to make information available to ITT shareholders with all due candor.

65.    The Director Defendants' conduct set forth herein was not due to an honest error or misjudgment, but rather was due to their intentional breach or reckless disregard of their fiduciary duties to the Company.  By engaging in and/or failing to disclose ITT's pattern of illegal business practices, the Director Defendants intentionally breached or recklessly disregarded their fiduciary duties to protect the rights and interests of ITT and its shareholders.

66.    To discharge these duties, each Director Defendant was required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial affairs of ITT.  By virtue of this obligation and diligence, each Director Defendant was required, inter alia, to:

(a)    exercise reasonable control and supervision over ITT's officers, employees, agents, business, and operations;

(b)    remain informed as to how ITT was, in fact, operating and, upon receiving notice or information of an imprudent, unsound or illegal decision, conditions, or practice, to make a reasonable investigation in connection therewith and to take steps to correct that decision, condition, or practice, and to make public disclosure of such decisions, condition, or practices in a timely and forthright manner; and

21

(c)    conduct the affairs of the Company in an efficient business-like manner so as to make it possible to provide the highest quality services and maximize the profitability of the Company for the benefit of its shareholders.

67.    In an attached press release to ITT's most recent Form 8-K filed with the SEC on March 30, 2007, defendant Loranger admitted that "[t]hese violations have made it clear that we had gaps in our compliance program." A Company spokesman further disclosed, "[t]here's no question that violations occurred."

68.    Accordingly, the Director Defendants either intentionally or recklessly breached their fiduciary duties by, among other things:

(a)    permitting or causing the Company to engage in the transactions described herein, which were in direct violation of ITAR and the Arms Export Control Act and were done to the detriment of the Company and its shareholders;

(b)    knowingly or recklessly disseminating, or permitting to be disseminated, misleading information to shareholders, the investing public, and the public at large;

(c)    allowing the Company to engage in a pattern of improper and illegal business practices, thereby subjecting the Company to serious criminal charges, fines, penalties, lawsuits, and further investigations; and

(d)    failing to disclose the Company's illegal business practices to the Company's shareholders.

69.    In breach of their fiduciary duties owed to ITT and its stockholders, the Director Defendants participated in or willfully failed to prevent misconduct that caused the Company to

waste its valuable assets and otherwise to expend unnecessarily its corporate funds in a manner not in the best interests of the Company or its stockholders. As a result, the Director Defendants are guilty of at least inaction amounting to recklessness in failing to control ITT's employees, business and affairs in accordance with federal law, thereby rendering them personally liable to the Company for breaching their fiduciary duties.

70.     Consequently, ITT and its stockholders have sustained and will continue to sustain injury and damages by reason of the Director Defendants' intentional breach or reckless disregard of their fiduciary duties owed to the Company and its shareholders.

## CLAIM II

### GROSS MISMANAGEMENT
### (Against All Director Defendants)

71.     Plaintiff repeats and realleges each and every allegation set forth above.

72.     As detailed more fully herein, the Director Defendants each possessed a duty to ITT and its shareholders to prudently supervise, manage and control ITT's operations.

73.     The Director Defendants by their actions or inactions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business and assets of ITT.

74.     By subjecting ITT to the unreasonable risk of substantial losses due to their failure to monitor, prevent, and/or report all acts of ITT employees that directly violated ITAR and the Arms Export Control Act, the Director Defendants failed responsibly and with due care to oversee and implement proper business practices at ITT, thereby breaching their duties of loyalty and diligence in the management and administration of ITT's affairs and in the use and preservation of ITT's assets.

75.    During the course of the discharge of their duties, the Director Defendants knew or recklessly disregarded the unreasonable risks associated with the wrongful conduct described herein, and either participated in or failed to monitor and/or disclose ITT's illegal business practices in accordance with their duties to both ITT and its shareholders.  As a result, the Director Defendants grossly mismanaged or aided and abetted in the gross mismanagement of ITT and its assets.

76.    As a proximate result thereof, ITT and its stockholders have been damaged and will continue to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment in favor of the Company, as appropriate, against all defendants as follows:

(a)    Removing and replacing the Director Defendants as the directors of ITT, instituting a new election of directors and appointing a receiver for the management of ITT until a new election of directors is called and determined;

(b)    Declaring that the Director Defendants have violated and/or aided and abetted in the breach of their fiduciary duties to the Company and its shareholders;

(c)    Awarding the Company compensatory damages against the Director Defendants, individually and severally, in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

(d)    Awarding the Company punitive damages against the Director Defendants for their egregious conduct;

(e)    Awarding plaintiff the costs and disbursements of this action,

24

including reasonable allowances for plaintiff's attorneys' and experts' fees and expenses; and

(f)    Granting such other or further relief as may be just and proper

under the circumstances.

Dated: April 10, 2007

**HARWOOD FEFFER LLP**

By:

Robert I. Harwood (RH–3286)
Samuel K. Rosen (SR–3287)
488 Madison Avenue
New York, New York 10022
Tel. (212) 935-7400

Attorneys for Plaintiff

## ITT CORPORATION VERIFICATION

I, Sylvia B. Piven, Trustee, under trust agreement dated April 3, 1973 f/b/o Sylvia B. Piven, derivatively on behalf of ITT Corporation, hereby verify that I am familiar with the allegations in the forgoing Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

DATE: April 7, 2007

SYLVIA B. PIVEN, TRUSTEE