## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

No. 07-CV-2878 (CLB)

**IN RE ITT CORPORATION
DERIVATIVE LITIGATION**

**VERIFIED CONSOLIDATED
AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Anthony Reale and Sylvia B. Piven, for their Consolidated

Amended Complaint by and through their undersigned attorneys, allege the following

based on, *inter alia*, the Plea Agreement, Statement of Facts, and associated documents

filed in connection with the guilty plea entered by ITT Company ("ITT" or the

"Company") entered in connection with *United States of America v. ITT Company*, Cr. No.

07-22 (W.D. Va.), as described below.   All facts relating to Plaintiffs and their own acts

are pled on personal knowledge, while other facts are pled on information and belief.

### NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of and for the

benefit of nominal defendant ITT against certain members of its Board of Directors ("the

Director Defendants") who served during the period of time encompassing the acts

complained of herein and certain ITT Managers and an outside law firm (named herein as

John Does), seeking to remedy defendants' breaches of fiduciary duties and other

violations of law that have caused damage to ITT.   This case arises out of a criminal

proceeding in which ITT  pled guilty on March 27, 2007 to federal felonies involving the

willful export of defense articles without a license and the willful omission of statements of material fact in arms control exports. As stated in the Plea Agreement, *"ITT agrees that it is pleading guilty . . . because ITT is in fact guilty."* In connection with this Plea Agreement, ITT agreed to pay *$100 million* in shareholder money in criminal fines, penalties, and forfeitures. ITT also agreed to a deferred prosecution agreement with respect to the criminal charge of willful violation of the international traffic in arms regulations (ITAR) and export of defense articles without a license, and agreed to pay for the costs of an independent monitor and staff to monitor its compliance with the deferred prosecution agreement and federal law. In the words of the United States Attorney who oversaw the prosecution, "ITT managers created an atmosphere where U.S. export laws were viewed as obstacles to getting business done. "This atmosphere led to the transfer of sensitive military technology to the Republic of China, and/or others."

2.    Named herein as "John Doe" defendants are four managers of ITT's Night Vision Division (the "John Doe defendants Managers A, B, C, and D") whose conduct while employed as decision-makers with managerial authority within ITT was, in large part, responsible for the government's criminal investigation and the criminal charges to which ITT pled guilty (collectively, "the Manager Defendants"). The lawsuit also names as a defendant the outside law firm (the "John Doe defendant law firm") that conspired with the managers and with ITT to cover up and conceal defendants' conduct from the government's investigators. The John Doe Defendants' conduct as described herein was the proximate cause of the damages that ITT suffered as a result of defendants'

2

participation in, reckless failure to prevent, or aiding and abetting the illegal export of technical data, drawings, and specifications relating to military night vision systems, and the illegal omission of material facts from required arms export reports submitted to the government, causing those reports to be patently misleading and false. The Director Defendants failed to exercise good faith in carrying out their duty to prevent such acts, and to pursue appropriate legal and remedial action once these activities were fully uncovered. Over a period of many years, the John Doe Defendants instituted and carried out an elaborate and complex scheme of deceit, subterfuge, and concealment directed against agencies of the federal government to facilitate their scheme and plan of (a) subverting the export control laws of the United States and (b) exporting classified information dealing with military night vision systems to foreign countries in violation of multiple criminal laws and government regulations. The motive behind this scheme, which compromised the safety and welfare of American combat troops during a war and eroded the national security of the United States, was simply to make additional profit, at the expense of our soldiers, the government, and ultimately the Company itself.

3.    At all relevant times, ITT was the leading manufacturer of night-vision equipment for the United States. ITT is currently the twelfth largest supplier of sophisticated defense systems to the U.S. military. In a gross abuse of the trust and responsibility bestowed upon ITT to enhance our military's success and to preserve our nation's safety, ITT's executives threatened our national security in a direct and substantial way by providing foreign countries with classified technical data relating to military night

vision capabilities.

4.      By sharing top secret military data relating to night vision equipment with foreign entities, ITT's executives single-handedly threatened to strip our soldiers of the advantage they formerly enjoyed in combat operations against military adversaries who did not have access to this equipment.  As the United States Attorney for the Western District of Virginia explained, "The criminal actions of this Company have threatened to turn on the lights on the modern battlefield for our enemies and expose American soldiers to great harm."  There can be no doubt -- and, by its guilty plea, ITT has so acknowledged -- that ITT's executives jeopardized our national security and the safety of our military men and women on the battlefield.

5.      In the course of a wide-ranging criminal investigation, various government agencies, such as the Department of Justice, the Department of Defense, the Bureau of Immigration and Customs Enforcement, and Homeland Security discovered that ITT's executives had disseminated defense-related technical data to Singapore, the People's Republic of China, and the United Kingdom, without notifying or obtaining approval from the State Department.  This technical data related to laser counter-measures for military night vision systems, designated as defense articles on the United States Munitions List, as well as to helmet-borne night vision technology.  The State Department classified the technology for the laser counter-measures as "Secret - No Foreign," meaning it could not be shared even with friendly governments like Britain, and certainly not with potential

strategic threats, such as China.

6.      Although, as the U.S. Attorney for the Western District of Virginia stated, American soldiers were "the principal victims of ITT's crimes," and although the harm to the Company and its shareholders is monetary and not potentially fatal, the consequences of the conduct described herein have been, and will continue to be, severe for ITT and, by extension, its shareholders. For example, in addition to the $100 million in penalties and forfeitures described below, the Company is now the subject of independent monitoring, as well as the severely adverse publicity associated with their misconduct and guilty pleas.

7.      As a result of defendants' misconduct, a criminal information dated March 26, 2007, was filed against ITT in a criminal action captioned *United States of America v. ITT Company*, Cr. No. 07-22 (W.D. Va.), charging ITT with three felony counts of violating the Arms Export Control Act of 1976, 22 U.S.C. § 2778 and specified sections of ITAR, 22 C.F.R. §§ 127.1(a) & 127.3.  The size of the penalties imposed upon ITT pursuant to its guilty plea demonstrates how severely the government regarded ITT's transfer of such sensitive military technology to foreigners.  On March 27, 2007, ITT agreed to pay a total payment of *$100 million* in penalties and forfeitures in connection with its guilty pleas to the charges.  The penalties are as follows: ITT will pay an upfront $2 million criminal fine ($1 million for each felony charge), pay an upfront $20 million penalty to the State Department, and forfeit to the federal government $28 million in proceeds derived from its illegal actions, a portion of which will be shared with state, local,

and federal law enforcement agencies to reimburse them for the cost of their work during the investigations that led to the criminal charges. Within the next five years, ITT may either pay the remaining $50 million fine or invest dollar for dollar in the research of advanced night-vision technology, to which the United States government will obtain all rights -- and which technology the government will share with any competing defense contractors for future contracts -- to ensure that members of the U.S. Armed Forces will have access to "the most capable night vision equipment in the world." The $50 million will also be used to cover the cost of government monitors to ensure that ITT does not again illegally export sensitive technology. Any amount of the $50 million penalty that remains unspent after five years must be immediately paid to the United States. As the United States Attorney stated, ITT will pay this last $50 million "in restitution to the victims of their crimes -- the American soldier."

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.00 exclusive of interest and costs. This action is not a collusive one to confer jurisdiction on a court of the United States which it otherwise would not have.

9.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) insofar as a substantial part of the events, actions or omissions to act giving rise to the claims occurred within this judicial district. In addition, nominal defendant ITT's principal place

of business is located in this district.

## PARTIES

10.    Plaintiff Anthony Reale, a New Jersey citizen, is the owner of ITT common stock, which he has held at all times relevant hereto.

11.    Plaintiff Sylvia B. Piven, beneficiary of a trust for her benefit, is a citizen of Maryland and an owner of ITT common stock, and has owned ITT common stock at all times relevant hereto.

12.    Nominal Defendant ITT is a Company organized under the laws of Indiana with its corporate headquarters located at 4 West Red Oak Lane, White Plains, New York 10604.    ITT supplies advanced technology products and services in several growth markets.    It plays a vital role in national and international security through its defense communications and electronic products, space surveillance and intelligence systems, and advanced engineering and related services.    ITT has become the leading manufacturer of night-vision equipment for the United States Armed Forces.

13.    Defendant ITT is named as a nominal defendant herein solely in a derivative capacity.    This action is brought on ITT's behalf and no claims are asserted against it.

14.    Defendant Steven R. Loranger ("Loranger") has served as Chairman of the Board, President, and Chief Executive Officer of ITT since June 28, 2004. He is a citizen of New York.

15.     Defendant Curtis J. Crawford (Crawford) has served as a director of ITT since 1996. He is a citizen of California.

16.     Defendant Christina A. Gold (Gold) has served as a director of ITT since 1997. She is a citizen of Colorado.

17.     Defendant Ralph F. Hake (Hake) has served as a director of ITT since 2002. He is a citizen of Michigan.

18.     Defendant Dr. John J. Hamre (Hamre) has served as a director of ITT since 2000. He is a citizen of the District of Columbia.

19.     Defendant Raymond W. LeBoeuf (LeBoeuf) has served of ITT as a director since 2000. He is a citizen of Florida.

20.     Defendant Frank T. Macinnis (Macinnis) has served as a director of ITT since 2001. He is a citizen of Connecticut.

21.     Defendant Linda S. Sanford (Sanford) has served as a director of ITT since 1998. She is a citizen of New York.

22.     Defendant Markos I. Tambakeras (Tambakeras) has served as a director of ITT since 2001. He is a citizen of Pennsylvania.

23.     Defendants Loranger, Crawford, Gold, Hake, Hamre, LeBoeuf, Macinnis, Sanford, and Tambakeras are collectively referred to as the Director Defendants.

24.     The John Doe Defendants named herein are four managers of ITT's Night Vision Division who had direct, personal responsibility for causing ITT to commit the criminal offenses to which it has pled guilty (named herein as John Doe defendant

8

managers A, B, C, and D, respectively), and an outside law firm that knowingly concealed ITT's illegal conduct from the United States government. Plaintiffs are aware of the names of the John Doe defendants, but are not naming or serving them because, as a result of agreements entered into with ITT, the John Doe defendants have entered into Statute of Limitation Tolling Agreements.

### Obligations of the Director Defendants

25.    The Director Defendants, by reason of their corporate directorship and/or executive positions, are fiduciaries to and for the Company's shareholders, which fiduciary relationship requires them to exercise their best judgment, and to act in a prudent manner and in the best interests of the Company's shareholders.

26.    According to ITT's Schedule 14A Proxy Statement filed with the SEC on April 1, 2006, the role of ITT's Board is "to oversee the actions and results of management. In discharging its responsibilities, the Board of Directors will act in the best interests of the Company and its shareholders." The Board also "sets policy for the Company and advises and counsels the Chief Executive Officer and senior executives who manage the Company's business and affairs."

27.    Accordingly, each Director Defendant owed ITT and its shareholders the duty to exercise due care, diligence, and loyalty in the management and administration of the affairs of the Company and in the use and preservation of its property and assets, and owed ITT the duty of full and candid disclosure of all material facts related thereto.

28.    To discharge these duties, the Director Defendants were required to exercise

reasonable and prudent supervision over ITT's management, policies, practices, controls, and financial and corporate affairs. By virtue of this obligation of ordinary care and diligence, the Director Defendants were required, among other things, to:

      a.     manage, conduct, supervise, and direct the employees, business, and affairs of ITT in accordance with federal laws, rules and regulations, and not to violate federal law, rules, and regulations, including the criminal laws of the United States;

      b.     ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by ITT;

      c.     remain informed as to how ITT was, in fact, operating, and upon receiving notice or information of unsafe, imprudent or illegal practices, to make reasonable investigation in connection therewith, and to take steps to correct that condition or practice;

      d.     supervise the preparation, filing, and/or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by ITT, and to examine and evaluate any reports of examinations, audits, or other information concerning the financial state of ITT, and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above;

      e.     exercise reasonable control and supervision over ITT's officers and employees;

      f.     maintain and implement an adequate system of internal controls at ITT, including financial, accounting, and management information systems;

g.     examine and evaluate any reports of examinations or investigations by government agencies concerning the practices, products, or conduct of ITT officers, directors, or employees, to supply true, accurate, and complete information to all government agencies at all times, and to ensure that no information supplied to any government agency is incomplete, false, or misleading.

h.     assure that the assets of the Company and its subsidiaries are utilized in the most effective manner and that and capital expenditures and appropriations are reviewed; and

i.     preserve and enhance ITT's reputation as befits a public Company, and to maintain public trust and confidence in ITT as a prudently managed institution fully capable of meeting its duties and obligations

### **Obligations of the Corporate Responsibility Committee**

29.    In their capacities as directors, defendants Crawford, as Chair, along with defendants Gold, Hamre and Tambakeras, served on the Board's Corporate Responsibility Committee. The Corporate Responsibility Committee is responsible for, among other things:

a.     reviewing and making recommendations concerning the Company's roles and responsibilities as a good corporate citizen;

b.     reviewing and considering major claims and litigation involving the Company and its subsidiaries;

c.     regularly assessing the adequacy and effectiveness of the Company's

11

Code of Corporate Conduct and reviewing any violations of the Code; and

      d.    examining the Company's programs and policies for effecting compliance with laws and regulations, including international and environmental laws and regulations.

    30.    Defendants Crawford, Gold, Hume, and Tambakeras are collectively referred to as the "Corporate Responsibility Defendants."

<b><u>Obligations of the Audit Committee</u></b>

    31.    In their capacities as directors, defendants Hake, as Chair, along with defendants Gold, Hamre, and LeBoeuf served on the Board's Audit Committee. The Audit Committee is responsible for, among other things:

      a.    reviewing with management and the independent auditors the effect of regulatory and accounting initiatives on the Company's financial statements;

      b.    reviewing and discussing with management the types of information to be disclosed and the types of presentations to be made with respect to the Company's earnings, press releases, and rating agency presentations;

      c.    monitoring and discussing with management and the independent auditors the quality and adequacy of the Company's internal controls and their effectiveness;

      d.    updating the Board on a regular basis with respect to matters coming to its attention which may have a significant impact on the Company's financial condition or affairs, the Company's compliance with legal or regulatory requirements, and the

performance and independence of the independent auditors and the internal audit function;

        e.     reviewing all material related-party transactions before initiation of the transaction and making recommendations to the Board for approval or disapproval; and

        f.     reviewing and approving procedures for receipt, retention, and treatment of complaints received by the Company.

32.    Defendants Hake, Gold, Hamre, and LeBoeuf are collectively referred to as the "Audit Defendants."

## Obligations of the Compensation and Personnel Committee

33.    In their capacities as directors, defendants Tambakeras, as Chair, along with defendants Crawford, MacInnis, and Sanford served on the Board's Compensation and Personnel Committee. The Compensation and Personnel Committee is responsible for, among other things:

        a.     approving and overseeing administration of the Company's employee compensation program, including incentive plans and equity-based compensation plans;

        b.     evaluating senior management and chief executive officer performance; and

        c.     evaluating and making regular reports to the Board on matters concerning management performance.

34.    Defendants Tambakeras, Crawford, MacInnis, and Sanford are collectively referred to as the "Personnel Defendants."

## Obligations of the Nominating and Governance Committee

35.    In their capacities as directors, Defendant MacInnis, as Chair, along with defendants Hake, LeBoeuf, and Sanford served on the Board's Nominating and Governance Committee. The Nominating and Governance Committee is responsible for, among other things:

a.    developing, annually reviewing, updating, and recommending to the board corporate governanance principles for the Company;

b.    evaluating and making recommendations to the Board concerning the composition, governance, and structure of the Board; and

c.    determining desired Board skills and attributes, and conducting searches for prospective board members whose skills and attributes reflect those desired for the Board.

36.    Defendants MacInnis, Hake, LeBoeuf, and Sanford are collectively referred to as the "Governance Defendants."

## DEMAND ALLEGATIONS

37.    This is a consolidated action brought by plaintiffs who have pled both demand refusal and demand excusal.  Accordingly, Plaintiffs plead in the alternative that demand on the Company was refused and that demand was excused.

## Demand Refusal Allegations

38.    Demand on ITT to commence legal action was made by Plaintiff Antony Reale, by letter dated April 12, 2007, directed to Defendant Loranger. (Attached hereto as

Exh. A). In the time since Plaintiff's demand, ITT has done almost nothing. In the four months between the date of Plaintiff's demand letter and the date of the filing of the Reale Complaint, ITT took no action at all. After the Reale Complaint was filed, ITT hired Susan Brune, Esq., a purportedly "independent" investigator who is not at all independent because (1) Ms. Brune is being paid by either ITT or ITT's insurance carriers, and (2) Ms. Brune specializes in defending corporations and law firms against breach of fiduciary duty claims similar to those alleged in this Action. Nearly seven months have elapsed since the Demand was made, and the relevant facts to be "investigated" by ITT were already detailed in the criminal Statement of Facts, and conceded by ITT to be true and accurate. Yet ITT continues to stall and asserts that it is "investigating" the claims herein. Every day that goes by jeopardizes ITT's ability to recover on the claims asserted herein, and there is no reason to believe that ITT will take meaningful action on the Demand made in a timely fashion, if at all. Accordingly, Plaintiff has made sufficient effort under Fed. R. Civ. P. 23.1 to get ITT to bring this action, and need do no more.

**Demand Futility Allegations**

39.     Plaintiff Piven has not made demand on ITT to bring this action and is not necessary because such demand would be futile. ITT is controlled by its Board, which is comprised of nine directors, all of whom have served as directors at all relevant times.

40.     Each Director Defendant either directly participated in the alleged wrongdoing or breached their fiduciary duties by abdicating their responsibilities of supervision and oversight of ITT's employees and business operations and/or by failing to

disclose the wrongdoing to the Company's shareholders.

41.    The Director Defendants breached their fiduciary duties by abdicating their responsibilities of supervision and oversight of ITT's employees and business operations, and/or by failing to disclose the wrongdoing to the Company's shareholders.

42.    The Corporate Responsibility Defendants either caused or recklessly ignored the misconduct described therein by failing regularly to assess the adequacy and effectiveness of the Company's Code of Corporate Conduct and to review any violations of the Code, all as mandated in its Board Charter.  Proper assessment would have uncovered and led to correction of the egregious and felonious misconduct described herein.

43.    The Audit Defendants either caused or recklessly ignored the felonious misconduct described therein by failing regularly to monitor and discuss with management and the independent auditors the quality and adequacy of the Company's internal controls and their effectiveness. Proper monitoring would have uncovered and led to correction of the felonious misconduct described herein.

44.    The Personnel Defendants either caused or recklessly ignored the misconduct described herein by failing regularly to evaluate senior management and chief executive officer performance -- including the performance of John Doe defendant managers B, C, and D, and to evaluate and make regular reports to the Board on matters concerning management performance.  Proper evaluation would have uncovered and led to correction of the felonious misconduct described herein.

45.    The Governance Defendants either caused or recklessly ignored the

16

misconduct described herein by failing regularly to develop, review, update, and recommend to the Board corporate governance principles for the Company. Proper development and review would have uncovered and led to correction of the felonious misconduct described herein.

**Allegations As To Demand Refusal and Demand Futility**

46.    Upon learning of its violations of law and mismanagement of Company assets, ITT took no internal action against the Director Defendants or anyone else to recover the $100 million their fiduciary breaches cost the Company. Justice Department officials revealed that ITT was aware that its executives were engaged in a multi-year conspiracy to violate the criminal law and export control rules for classified military equipment, as well as its violating its export licenses for night-vision equipment, but failed to take significant corrective action. John Schoenweiss, a senior agent of the Defense Department's Defense Criminal Investigative Service, has stated that the ITT's "serious violations" ran deep and "[t]he problem that we encountered was in the culture --  the willful self blinding of company officials." The facts underlying this matter fully bear out his assessment.

47.    Moreover, defendant Loranger confirmed the Company's wrongdoing by announcing that "serious violations [i.e., multiple felonies] occurred," and acknowledged that ITT "had gaps in our compliance programs."  Nevertheless, despite admitting that ITT executives had engaged in conduct that was illegal and extremely detrimental to ITT and its shareholders (not to mention to American soldiers engaged in combat and to ITT's

Company reputation, which now lies in tatters), as well as pleading guilty to criminal charges with the Department of Justice, the Company has failed to take any internal action against the Director Defendants or anyone else for their breaches of fiduciary duties and gross mismanagement of ITT assets.

48.    In addition, ITT has agreed to indemnify its directors against liability for acts and omissions occurring in the performance of their duties as directors, and maintains insurance policies to cover the costs of such indemnification. However, under the terms of the directors' indemnification agreement, the Company will not indemnify directors for any breaches of their fiduciary duty to act in good faith and in a manner they reasonably believe to be in or not opposed to the best interest of the Company. Directors are also not covered for engaging in any acts or omissions which involve intentional misconduct or a knowing violation of law, such as the conduct to which ITT pled guilty in connection with this matter.

49.    In order to bring this action for breaches of fiduciary duty and gross mismanagement of corporate assets in connection to ITT's imprudent and illegal business practices, the Director Defendants would have to sue themselves and/or their fellow directors for conduct that is excluded from coverage under ITT's indemnification agreement.

50.    ITT's Board is effectively disabled from complying with any demand that would cause it to bring suit against the Director Defendants and others because to do so would result in the loss of their insurance coverage. They would not initiate such litigation,

nor be able to prosecute any such action.

51.    The Director Defendants' actions or willful inactions, as a result of their failures as Board and relevant committee members, have already resulted in guilty pleas to criminal felony charges, as well as the imposition of substantial financial penalties, and have also exposed the Company to massive civil liability and expense.    ITT has nonetheless failed to hold any Director Defendants or any other persons responsible for the harmful effects of their actions on itself and its shareholders.  Demand on the Director Directors has been sufficiently made and *de facto* refused.  In the alternative, demand was futile at the time it was made, and has proved futile as months have elapsed with no meaningful response.

## DERIVATIVE ALLEGATIONS

52.    Plaintiffs bring this action derivatively on behalf of ITT to enforce its claims against the Director Defendants and the Joe Doe defendants, which claims may properly be asserted by the Company but which it has failed to assert.

53.    The wrongs complained of herein occurred during the period when plaintiffs were ITT shareholders.  Plaintiffs continue to hold their ITT shares.  Hence, plaintiffs have standing to bring this derivative action on behalf of ITT to recover damages for all of the conduct described herein.

54.    Plaintiffs will fairly and adequately protect the interests of ITT and its

shareholders in enforcing the rights of ITT against the named defendants. Plaintiffs'
attorneys are experienced in this type of litigation and will prosecute this action diligently
on behalf of ITT to insure its rights and those of its stockholders. Plaintiffs have no interests
adverse to the Company.

## SUBSTANTIVE ALLEGATIONS

55.    The government's investigation of ITT began in August 2001, when special
agents of the Defense Department's Criminal Investigative Service (DCIS) were made
aware that employees of ITT Night Vision (ITT NV), a division of ITT located in Roanoke,
Virginia, had illegally sent a classified government document designated "Secret" and
"NOFORM" ("no foreign") to an unauthorized facility in the United Kingdom (U.K.)
Pursuant to a 2002 referral from DCIS and the Customs Service, a federal prosecutor was
assigned to the investigation. During the ensuing four years, the government uncovered a
consistent pattern of violation of federal export laws at ITT NV *going back to the 1980s*
and continuing, despite the fact of the on-going investigation, to 2006.

### ITT NV Export Compliance Background

56.    ITT NV has produced night vision equipment for the American military for
more than 30 years, during which time the government has awarded it many millions of
dollars pursuant to contracts to develop and produce, in conjunction with government
scientists and engineers, new night vision equipment requested by the military. Such night
vision equipment is deemed critical to the United States' war-fighting capabilities. The

equipment is extremely sensitive, and is highly sought after by U.S. allies and enemies alike.

57.    Recognizing the inordinate sensitivity of U.S. military night vision equipment and technology, the State Department restricts export of such defense articles -- including technical data, drawings and specifications, services, and equipment related to military night vision systems -- pursuant to the Arms Export Control Act and its implementing regulations, the International Traffic in Arms Regulations (ITAR). Pursuant to 22 U.S.C. § 2778, it is a criminal offense willfully to fail to obey ITAR provisions. Indeed, certain of the technical documents and information related to military night vision equipment are so sensitive -- and, in the wrong hands, so potentially damaging to the United States -- that the documents and information are protected as classified information. Willful or grossly negligent transfer of such material to a person not authorized to receive it is a criminal offense pursuant to 18 U.S.C. §§ 793(d) and 793(f).

58.    ITT NV was well aware of the law's requirements, including the necessity to obey all relevant ITAR regulations. But ITT failed to establish a system to ensure compliance with the relevant federal export laws. Throughout the 1980s and 1990s, ITT NV employees who attempted to ensure ITT's compliance with ITAR regulations were viewed by some ITT NV managers as obstacles to getting business done. So severe was the lack of support from certain ITT NV managers that one ITT NV employee who insisted on following the export laws felt it necessary to inform her direct manager, named herein as John Doe defendant Manager A (Manager A), that she would not ever break the law,

falsify documents, or break government regulations, and that she worked at ITT NV to do a job to the best of her ability and to make a life for herself and her family, not to go to jail for anybody, including ITT NV.

59.    This employee's concern that Manager A might instruct her to break the law was grounded in a firm basis in reality.  For example, in November 1998, Manager A asked an ITT NV employee to send sensitive export-controlled night vision equipment to a foreign customer for which ITT NV did not have an export license authorizing permanent transfer of such equipment.  The employee told Manager A that she was willing to apply to the State Department for an export license.    Manager A responded that the State Department would never approve such a license, and the employee agreed.    Nonetheless, despite the clear understanding that ITT NV did not have a license for the transfer and that the State Department would not approve such a transfer, Manager A ordered the employee to make the illegal transfer anyway.  In protest of this direct order, the employee wrote on the shipment paperwork that she had been directed to transfer the night vision equipment over her objections.

60.    The employee later informed Manager A that she would never break the law again and that he could fire her if he wanted.  The employee then informed appropriate personnel at ITT Defense, the ITT management group that oversees, *inter alia*, ITT NV, about the entire incident.  Instead of firing or disciplining Manager A, ITT Defense placed Manager A into a position where he was designated as the ITT NV official responsible for ensuring that the ITAR regulations he had so blatantly violated were enforced.  Moreover,

neither ITT NV nor ITT Defense informed anyone in the government about the illegal transfer of the highly sensitive export-controlled night vision equipment. The government learned about this squalid affair only through the course of the criminal investigation.

### False and Misleading Statements Relating to Export Consignments

61.     ITT NV regularly and routinely loaned or consigned export-controlled night vision equipment to foreign customers for evaluation and testing. In each such instance, ITT NV was required to obtain a temporary export license from the State Department's Office of Defense Trade Controls Licensing, and each temporary export license required that ITT NV ensure that the equipment be returned during the 4-year license period. Throughout the 1990s, however, ITT NV failed to secure return of much such equipment during its alloted 4-year period, and as a result lost track of numerous pieces of state-of-the-art night vision equipment, many of which remain missing.

62.     On April 13, 2000, an outside law firm acting for ITT NV -- named herein as John Doe Defendant Law Firm (Law Firm) -- sent a Preliminary Notification of Voluntary Disclosure (Preliminary Disclosure) to the Acting Director of the Compliance Analysis Division, Office of Defense Trade Controls, in the State Department (ODTC). The letter stated in pertinent part: "[ITT NV] recently discovered apparent violations of the ITAR that involve ITT's loans and consignments of night vision equipment to foreign persons." A copy of this letter was sent to corporate counsel for ITT Defense. On May 19, 2000, the Law Firm sent a second letter to ODTC on behalf of ITT NV, providing a "disclosure, as well as a description of mitigating factors and corrective actions." The May

19 letter stated in pertinent part, "Upon realizing that it had a compliance issue with respect to these temporary exports, ITT took corrective action described below." The Law Firm attached to the May 19 letter a certification signed by an ITT NV manager, who was designated as a person whom ITT NV had designated to sign on its behalf, stating that "all of the representations made in connection with the voluntary disclosure are true and correct to the best of the Company's knowledge and belief."

63.    The Law Firm intended the April 13 and May 19 disclosure letters to create the impression with the decision-makers at the State Department that ITT had only "recently discovered" its temporary export license non-compliance problems, and that, "[u]pon realizing that it had a compliance issue with respect to these temporary exports," ITT NV immediately addressed the issue and did everything within its power to rectify the violations. The Law Firm and ITT NV reinforced the impression of "corrective discovery followed by swift corrective action" by ITT NV's repeated references to the two disclosure letters in its ensuing correspondence and negotiations with the State Department.

64.    In part based on reliance on the impressions that the disclosure letters created, the State Department ultimately elected not to refer the ITT NV temporary export license violation to the Justice Department for prosecution. Instead, the State Department allowed ITT to combine these violations with two other serious sets of export compliance violations into a single civil consent agreement that was executed on October 25, 2004. ITT was required to pay an $8 million monetary penalty, but did not have to admit any wrongdoing. Most importantly, ITT avoided the major impact of a prospective debarment

from obtaining future export licenses from the State Department. In addition, the Company obtained the State Department's agreement that it "disclosed voluntarily all information concerning the facts and circumstances of the alleged violations . . . and has fully cooperated with the [State] Department."

65. The reality, however, was precisely the opposite. The government's subsequent criminal investigation established that counsel for ITT Defense and the Law Firm intentionally withheld from the State Department material facts, information, and circumstances about the export license violations in an effort to limit the potential penalties and consequences that the government might otherwise have imposed on ITT. Specifically, the April 13 letter's use of the phrase "recently discovered" was designed to create -- and did create -- the impression that ITT NV had complied with the pertinent ITAR regulations by reporting the consignment license violations near the time of their discovery. The government's subsequent criminal investigation, however, revealed not only that ITT NV had not discovered the consignment license violations near the time of the April 13 letter, but that a number of ITT NV employees and managers were in fact aware of some of the consignment license violations since at least the mid-1990s. In fact, by May 17, 1998 -- more than two years before submission of the April 19, 2000 letter -- an extensive and detailed list of "PAST DUE CONSIGNMENT EQUIPMENT" had already been compiled and circulated to at least *27* ITT NV managers and employees from most of ITT NV's major departments. A second such memorandum, dated April 28, 1998, listing an additional 35 specific night vision consignments that had not been returned in a

timely fashion was also widely circulated within ITT NV.  Some of the consignment licenses listed in the memorandum had expired as far back as November 1990.

66.     Equally important, the criminal investigation revealed that ITT managers and counsel for ITT Defense were discussing whether and when to disclose the consignment license violations to the government as far back as at least the summer of 1999. The evidence obtained by the government established that the Law Firm and counsel for ITT Defense intentionally delayed the disclosure of the myriad consignment license violations until they had completed their own investigation.  Moreover, the government investigation revealed that in March 200 counsel for ITT Defense was specifically informed that ITT NV employees had been aware of the consignment license violations at least as early as March 17, 1998.  Despite this knowledge, counsel for ITT Defense did not correct the false statement in the April 13, 2000 letter that ITT had only "recently discovered" the consignment licensing violations.

67.     During an April 17, 2000 meeting called to review a draft of what would become the May 19 letter to ODTC, the Law Firm (which was drafting the disclosures) and counsel for ITT Defense were specifically informed that ITT NV had been aware of the consignment license violations since at least March 17, 1998.  The words "recently discovered," however, remained in the draft until ITT Defense's top export compliance manager argued that use of the phrase "recently discovered" was false and misleading. Then, and only then, were those words removed from the draft letter.  Moreover, the Law Firm made no effort, then or at any other time, to inform the government that the phrase

26

"recently discovered" used in the April 13 letter was false and misleading. In fact, the Law Firm, joined by counsel for ITT Defense, specifically argued against telling the government about the March 17, 1998 discovery date. Even when ITT Defense's top export compliance manager argued that it was a material omission not to inform the government of the March 17, 1998 discovery date, the outside attorneys at the Law Firm continued to argue that ITT should not raise the issue because, "no matter how you slice it," the failure to disclose the consignment license violations for years after their discovery would make ITT look really "sloppy." Neither ITT nor its counsel ever disclosed the March 17, 1998 discovery date to the State Department, or the fact that the "recently discovered" language in the April 13 letter was false and misleading.

68.     The government's criminal investigation also revealed that ITT's statement in the May 19, 2000 letter that "[u]pon realizing that it had a compliance issue with respect to these temporary exports, ITT took corrective action" was false and misleading because few if any of the corrective actions specified in the May 19 letter had taken place, not only in the mid-1990s, but even by March 17, 1998, the date of the "PAST DUE CONSIGNMENT EQUIPMENT" memorandum. Despite the fact that many people at ITT NV were aware of the consignment license violations by at least March 1998, ITT took virtually no significant corrective action in this regard until the summer of 1999, when a small group of ITT NV employees was tasked with attempting to locate and recover the missing night vision equipment -- a task they could not perform because ITT gave them no meaningful resources or support. All of the other so-called "corrective actions" listed in

the May 19 letter did not take place -- or, if they took place at all, did not occur until very near the April-May 2000 time period.

69.    For example, ITT purported to hire an export license manager, as part of the May 19 letter's solution to "ensure that similar issues do not recur." But he was given virtually no resources to accomplish the mission of export compliance. Within two months he had quit, stating in his resignation letter, "I knew when accepting the job that Night Vision had many problems, but as things have now turned out the problems are greater than anyone could imagine."

## Export Violations to a Singapore Company

70.    Since the 1980s, ITT NV has purchased almost all of its night vision optical assemblies from a company located in Singapore (Singapore Company). Throughout the course of the relationship, ITT NV worked collaboratively with the Singapore Company on a wide variety of different optical designs. This typically involved ITT NV's routine provision of export-controlled technical specifications and drawings, which the Singapore Company would work on, in conjunction with ITT NV engineers, to design and create the required optical and related mechanical designs. After production and testing of the prototype optical assemblies, ITT NV purchased the finished optical assemblies from the Singapore Company.

### A.    Pre-September 2000 Export Violations

71.    Despite knowing that the transfer of export-controlled technical data, including specifications and drawings, was illegal without a State Department export

license, ITT's executives failed to obtain any export license authorizing transfer of technical data from ITT NV to the Singapore Company until October 24, 1994. Between October 24, 1994 and April 2, 1999, ITT NV executives submitted applications for and obtained three limited export licenses (DSP-5 License for Permanent Export of Unclassified Technical Data) permitting transfer of certain specifically identified export-controlled drawings. In submitting its applications for these licenses, ITT's executives violated the law by falsely claiming that the shipment of the drawings listed in the licenses was a "completely new shipment," when in fact ITT NV had illegally transferred many of the same drawings to the Singapore Company before the license applications were even submitted.

72.    Even after ITT NV obtained the three specific export licenses, it continued to violate the law by transferring to the Singapore Company export-controlled technical data not covered by the limited export licenses. In addition, ITT violated the restrictions and provisos that the State Department placed on the licenses. For example, the licenses limited the exports to "build to print" technical data, *i.e.*, "producing an end item. . .from technical drawings and specifications (which contain no process or know-how information) without the need for additional technical assistance" (quoting ITAR). The symbiotic relationship between ITT NV and the Singapore Company, however, far exceeded the "build-to-print" relationship authorized by the licenses. Thus, two of the export licenses required ITT NV to execute purchase orders with the Singapore Company that contained detailed and specific limitations on what the Singapore Company could and could not do

with the sensitive documents transferred thereunder before procuring any product from the Singapore Company. Despite the fact that ITT NV procured tens of millions of dollars of products from the Singapore Company while the licenses where in effect, ITT NV failed to include the required statements of limitations in any of their purchase orders from the Singapore Company, and, though required to do so, failed to file any of the purchase orders with the State Department.

73.    By early 2000, a number of ITT NV managers and employees were aware that the Company was violating ITAR by exporting controlled documents, services, and information to the Singapore Company without a license and by violating the limitations of the export licenses it had obtained. In the face of ITT NV's impending disclosure to the State Department of its violation of ITAR consignment license rules, the Company decided to seek State Department approval for a Technical Assistance Agreement (TAA) that would allow the Company to share specifically identified export-controlled technical data and services with the Singapore Company. In March 2000, an ITT NV employee was tasked with preparing a draft TAA for submission to the State Department. This employee was informed by his manager, John Doe defendant Manager B (Manager B), who was ITT NV's main contact with the Singapore Company, that ITT NV was only now applying for a TAA because of "the recent heightened controls," and that "there had been specific requirements on the previous licenses. . .that had not been followed."

74.    After learning this information, the employee alerted higher level ITT personnel at ITT Defense, including counsel for ITT Defense. Despite this alert about the

systemic and continuous export violations involving the Singapore Company, legal counsel for ITT Defense decided that ITT was "not in a position to make a disclosure about this issue" given the fact that ITT was about to disclose numerous ITAR consignment license violations.  ITT decided not to inform the State Department of the Singapore Company-related export violations.  In fact, it was not until 2004, when ITT NV was preparing to reveal a series of violations relating to the ITT NV/Singapore Company TAA, that ITT gave the government even a hint of these violations.  The full extent of the export violations was revealed only during the government's criminal investigation.

**B.**    **Post-September 2000 Export Violations**

75.    ITAR requires that a TAA provide information "in terms that are as precise as possible," and that all defense articles including technical data such as drawings and specifications designed for export be "described by military nomenclature, contract number, National Stock number, nameplate data, or other specific information."  ITAR also requires that a TAA applicant make a statement in the transmittal letter accompanying the TAA "identifying the U.S. Government contract under which the equipment or technical data was generated, improved, or developed and supplied to the U.S. Government, and whether the equipment or technical data was derived from any bid or other proposal to the U.S. Government."

76.    In preparing a draft of the TAA, ITT NV employees put together an Annex to the TAA (TAA Annex) containing a list of specific drawings and specification numbers for the documents they wished to export to the Singapore Company pursuant to the

anticipated TAA. Significant efforts were expended to ensure that the TAA Annex was as complete as possible because everyone involved in the process understood that only specifically listed documents (and their updates/revisions) would be able to be exported pursuant to the TAA if it was approved as submitted. A copy of each of the specified drawings and specifications listed on the TAA Annex was attached to the TAA for review when ITT NV submitted it to the State Department for approval on May 10, 2000. ITT made it clear that the documents that would be transferred were limited to three specific night vision systems, specifically, the PVS/7, the PVS/14, and the ANVIS night vision systems. Moreover, the TAA Annex made clear that ITT NV was requesting permission for a limited "build-to-print" type of relationship with the Singapore Company, stating in relevant part, "No manufacturing or process data will be provided to . . . [the Singapore Company] under the TAA."

77.    The State Department approved the TAA request in a letter dated September 11, 2000, imposing a series of very restrictive limiting provisos. Among these were provisos that expressly did *not* authorize (a) the shipment of hardware; (b) the release or offering of manufacturing technology, systems optimization/integration know-how, or design know-now; and (c) any production without an approved manufacturing license agreement. The State Department added these restrictive provisos in an attempt to limit what ITT NV could do under the TAA because (a) the night vision technology was extremely sensitive and (b) Singapore was a well-known conduit for the transfer of military technology to the People's Republic of China, a prohibited destination.    The State

Department expected that ITT NV would share the documents, but only the documents, listed in the TAA Annex, explore the possibility of a limited relationship with the Singapore Company, and then come back to the State Department for explicit approval if ITT NV wished to engage in any of the activities outlined in items (a) through (c) above. After receiving the State Department's approval/limitation letter, an ITT NV Manager signed the TAA on behalf of ITT on September 18, 2000. Once he received a copy of the signed TAA and the approval/limitation letter, the Managing Director of the Singapore Company signed the TAA on September 22, 2000, thereby making the TAA effective as of that date.

78.    ITT NV proceeded to ignore the limitations built into the TAA and the State Department restrictions placed on the TAA. ITT NV continued to export export-controlled drawings and specifications to the Singapore Company that were not covered by the TAA or any export license, exactly as if these restrictions and provisos did not exist. ITT NV also violated the TAA provisos by shipping hardware to the Singapore Company and by producing millions of dollars of product without authority. In a letter dated December 19, 2003, ITT admitted to the State Department that it had been in production for years with the Singapore Company, in direct and continuous violation of the "no production" proviso. The December 19 letter stated that it would not supply night vision goggles to the military unless the "no production" proviso was lifted. Faced with the military's need for night vision goggles during an ongoing war, the State Department lifted this proviso.

**Illegal Export of Classified Information; Export Violations Relating to the LIF**

A.      **Background**

79.      Night vision technology is critical to the military's war-fighting capabilities, and having the most capable night vision systems gives U.S. combat military personnel a critical battlefield advantage over the enemies of the United States.   To preserve this advantage, the military pays close attention to weapons that might damage, degrade, or destroy night vision equipment on the battlefield.  One of the battlefield threats to night vision equipment is laser weapons, certain of which are effective against such equipment.  To prevent damage or destruction of night vision equipment that might leave a pilot or soldier night-blind at a crucial moment on the battlefield and result in his death, the U.S. military has developed laser countermeasures, one of which is an optical addition to night vision equipment called a light interference filter (LIF).  The LIF is composed of an underlying glass lens (substrate lens) coated with a series of specialized coatings that is mounted in a metal housing.

80.      Because of LIF's critical nature and the sensitivity of the technology involved, the government classified certain portions of the written specification for the LIF as Secret.  The classified LIF specification is so sensitive that it is not only classified as "Secret" but, pursuant to the March 7, 2000 "Security Classification Guide for Laser Protection Material," was also given the special designation "NOFORN" (No Foreign). This designation means that the classified LIF specification cannot be shared with *any* foreign country, including the United States' closest military allies.  In addition to the

classified LIF specification, all LIF drawings are export-controlled and may not be exported without a State Department license.

81.    Even if the classified LIF specification did not carry a "No Foreign" designation that prevented its export to any country without exception, obtaining the necessary verification of clearance and proper government authorizations for an export of classified material is a cumbersome and enervating process, a process which is necessary to prevent the damage to national security that is likely to occur from disclosure to an unauthorized or uncleared foreign person or entity.  The National Industrial Security Program Operating Manual (NISPOM) sets forth specific and detailed requirements that govern the potential export of such materials, and these, plus ITAR, must be followed, with no exceptions allowed, before any classified document may be exported to a foreign person or entity.  At a minimum, the following basic steps must be taken:  (a) contact the Defense Security Service Industrial Security Representative (DSS ISR) to inform that office of the desire to export classified material; (b) verify with DSS ISR the proper procedures to follow; (c) review the current Security Classification Guide (DD 254) for the classified material to verify the exact level of classification and determine whether there are any special classifications; (d) contact the Government Contracting Agency (GCA) to obtain its agreement and approval to export the classified material to the proposed foreign recipient; (e) contact the Cognizant Security Agency (CSA) "at the earliest possible stage in deliberations that will lead to the international transfer of classified material," and obtain CSA's agreement and written approval to export the designated classified material to the

proposed foreign recipient; (f) contact the Defense Industrial Security Clearance Office (DISCO) to obtain written verification that the intended foreign recipient has the proper clearance, classified storage capability, and classified handling procedures in place; (g) submit an application to export classified data to the State Department's Office of Defense Trade Controls (ODTC) for approval, and obtain ODTC's written approval and limitations; (h) prepare written transmission instructions for export of the classified materials, and submit them to the CSA for approval; (i) coordinate with the CSA the identification of the Designated Government Representative (DGR) for the United States and the identification of the DGR of the government of the foreign recipient's country who will carry out the mandatory government-to-government transfer of the classified materials; and (j) prepare the necessary paperwork and packaging for visual review and verification by the U.S. DGR before export.

82.     If all steps set forth in the preceding paragraph have been successfully completed and all necessary coordination, verifications, and authorizations have been obtained, a foreign shipment of classified material may take place only through government-to-government channels. Exactly as is the case with registered mail carried by the Postal Service, a continuous chain of written receipts reflecting all transfers must be meticulously maintained throughout the entire government-to-government export process.

**B.     Illegal Export of Controlled LIF Drawings**

83.     In 1999 the LIF's for ITT NV's equipment were manufactured by an American company located in California (California Company) under a sub-contract with

ITT NV. In an effort to reduce its costs and thereby increase ITT's profits, Manager B applied pressure to the California Company to lower the price of the LIF (target price). In response, the California Company explored the possibility of using a company located in the People's Republic of China to manufacture the LIF's substrate lens because manufacturing and labor costs in China are substantially lower than elsewhere. On July 23, 1999, the California Company applied for an export license to send the drawing for the LIF substrate lens to a company located in Shanghai. Not surprisingly, the State Department rejected this application on August 16, 1999 for reasons of "National Security" because "China is a prohibited destination pursuant to ITAR."

84.     On February 17, 2000, the California Company sent Manager B an e-mail stating that one of the main reasons it was having problems meeting the target price was because the State Department had denied it permission to manufacture the LIF substrate "off-shore." One week later, on February 24, the license application and the State Department's letter denying the California Company's request to manufacture the LIF substrate lens in China were faxed to Manager B. Manager B subsequently recommended that the California Company explore using the Singapore Company to manufacture the LIF substrate lens. In response, the California Company sent an e-mail to the Singapore Company to obtain a price quote. Not realizing that the request had originated with ITT NV, the Singapore Company declined to provide a price quote on the ostensible ground that their "capacity" was "fully over loaded." After learning that the Singapore Company had declined to provide a quote, Manager B sent an e-mail to a high-level manager at the

Singapore Company on February 28, 2000. The February 28 e-mail stated in pertinent part: "I was both surprised and disappointed that you were to [sic] busy to take on more business!? I would have offered [the Singapore Company] the opportunity to quote the whole LIF assembly but, because the coating is US Government Classified it can not go off-shore." Reversing its "fully over loaded capacity" position, the Singapore Company immediately responded that because this was in reality a project for ITT NV, it could "take on more job." The Singapore Company subsequently provided the California Company with a favorable quote to manufacture the LIF substrate lens.

85.    Despite receiving a favorable quote from the Singapore Company, the California Company notified Manager B on March 27, 2000 that the "financial performance" of the LIF manufacturing program was "very, very poor," and that the California Company would need to increase the price that it was charging ITT NV for the LIF. The California Company also stated that it would understand if ITT NV decided to get another supplier for the LIF. On August 17, 2000, Manager B informed the California Company that ITT NV was exploring the possibility of using other suppliers and that ITT NV had gotten a favorable quote from another company. On October 9, the California Company informed Manager B that it was probably going to transfer all its "coating work" to its U.K. facility. After discussing and agreeing that the classified specification for the LIF could not be transferred to its U.K. facility, Manager B indicated that ITT NV would probably "want to do a last-buy to cover [their] future needs." On October 16, 2000, the California Company sent Manager B an e-mail confirming that it had decided to transfer

38