the coating business to their U.K. facility, and that it needed to know "ASAP" the "quantities and time-frame" for a "last-and-final buy from" the California Company. The e-mail also stated that, "Your [LIF] coating, being classified, can't be transferred as we recently discussed." In response, on October 18 Manager B told the California Company that ITT NV wanted to "add-on 4,000 additional pieces to their Dec. Delivery as their last-and-final buy." When, on November 6, 2000, the California Company informed ITT NV that the price for the add-on to the "last-and-final buy" was "$120K more than they would have paid with our old price," Manager B asked for "30 days to see if they can get someone else to take up this program since they are ultimately going to have to get someone to do it anyway." Manager B also indicated that they had gotten quotes from two other companies to manufacture the LIF.

86.     Despite the fact that ITT NV had received quotes for the production of the LIF from two other companies, by the end of March 2001 Manager B had still not arranged for a replacement for the California Company. Manager B's delay in identifying a new manufacturer of the LIF's was quickly building to a crisis. As Manager B explained in an April 1, 2001 e-mail to the Singapore Company, "[t]his issue is becoming critical for me. I will need new parts by June-July timeframe. My third new source just quoted me (after a month delay) with a 10 month lead time." In fact, the crisis became so acute that by the end of May 2001, ITT NV had to ask the Army for permission temporarily to store night vision equipment intended for delivery to the Army in a warehouse until ITT NV was able to supply the required LIF's.

87.     Despite being fully aware that the classified specification for the LIF could not be exported, in his April 1, 2001 e-mail Manager B asked whether the Singapore Company could manufacture the LIF for ITT NV. In his effort to find a new LIF manufacturer, Manage B ignored the ITAR requirements -- which requirements he was completely conversant with -- and illegally faxed to the Singapore Company a "drawing package" for the LIF without obtaining a State Department license or notifying anyone in the government. Moreover, when he illegally exported these controlled LIF drawings to the Singapore Company, Manager B made no effort to ensure that the Singapore Company was aware of the sensitive nature of the drawings or the precautions the Singapore Company was obliged to take in handling them.

88.     On April 3, 2001, Manager B again intentionally violated the law by electronically exporting to the Singapore Company by e-mail additional export-controlled LIF drawings without obtaining a State Department export license. As before, Manager B made no effort to ensure that the Singapore Company was aware of the sensitive nature of the drawings or the precautions the Singapore Company was obliged to take in handling them.

**C.      Illegal Production of the LIF Substrate in the People's Republic of China**

89.     When the Singapore Company received the LIF drawings package it prepared an export-controlled derivative LIF drawing based on the illegally exported LIF drawings. Given that Manager B had made it pellucid that the LIF's cost had to be "very competitive," and since he had previously recommended that the Singapore Company use

40

its "facilities" located in "China," the Singapore Company exported the controlled derivative drawing to an optics company located in the People's Republic of China, a prohibited ITAR destination.    The Singapore Company also issued an order for the production of thousands of LIF substrates.    With the export-controlled derivative LIF substrate drawing and the purchase order in hand, the Chinese optics company quickly began production of the LIF substrates in China.    Ultimately, the Chinese company manufactured thousands of the LIF substrate lenses.

90.    While arranging for the production of the LIF substrate, Manager B also turned his attention to the issue of coating the LIF substrates.    Because the Singapore Company was incapable of performing the coating work, Manager B, at its suggestion, turned to a sister company of the Singapore Company located in the U.K. to do the LIF coating work.    Because the Singapore Company had already sent a copy of the export-controlled LIF drawing the U.K. company, Manager B turned his attention to providing a copy of the classified LIF specification to the U.K. Company.

### D.    Illegal Export of the Classified LIF Specification

91.    On April 2, 2001, Manager B sent an e-mail to another ITT NV manager explaining the problems he was having finding a new LIF supplier.    In his e-mail, Manager B explained that the "LIF specification is very demanding and worse, *it is a classified specification which prevents us from going to off-shore coating suppliers.*"    (emphasis added).    In response to this e-mail, the other manager contacted a government employee who worked at the Army Night Vision Lab to see if there was any way that ITT NV might

be able to use an "off-shore coating supplier." On April 6, 2001, the other manager informed Manager B and others at ITT NV that the government employee he contacted stated that using an "off-shore" coating supplier would be "a long road or tough to do." Despite his knowledge that the classified LIF specification could not go to an "off-shore coating supplier," that it could not go to the U.K., and that any attempt to get the government's permission to go "off-shore" would be "a long read or tough to do," on April 6, 2001, Manager B sent an e-mail to the Singapore Company asking for the "name and e-mail/telephone # of the security officer" at their U.K. sister company so he could "expedite the transfer of the [classified LIF] specification" to the U.K. Company.

92.     To obtain a copy of the classified LIF specification, Manager B contacted another ITT NV manager, John Doe defendant Manager C (Manager C), who had access to the classified information. After explaining to Manager C the pressing need to send the classified information to the U.K. Company, Manager C made an effort to locate a copy of the classified LIF information. When he was unable to find a copy of the classified LIF specification in the ITT NV classified safe or elsewhere, Manager C contacted the Army to obtain a new copy. During his contact with the Army, Manager C made no mention of the fact that the Company intended to export the classified information to the U.K. On April 5, 2001, the Army sent a copy of the classified information to ITT NV based on the trust and confidence it reposed in Manager C and in ITT NV.

93.     In addition to obtaining a copy of the classified LIF specification, Manager C also contacted ITT NV's government DSS ISR to obtain a contact number for DISCO,

which contact numbers the DSS ISR provided to Manager C on April 9, 2001. Despite the fact that Manager C and the DSS ISR worked with each other routinely, and the DSS ISR would have been the primary government person to consult about transferring classified information to foreigners, Manager C never mentioned that the Company intended to export the classified LIF specification to the U.K. On April 10, without the DSS ISR's knowledge, Manager C contacted the section of DISCO responsible for confirming whether a foreign company or person has a security clearance and asked whether the U.K. Company located at a specified U.K. address had a security clearance. In addition, at Manager B's request, on April 10, 2001, Manager C contacted the U.K. Company's security supervisor to "verify the clearance level of your facility."

94.    On April 17, 2001, the U.K. Company sent an e-mail to Manager C informing him that they had been unable to find a copy of the classified LIF specification, and instructing him to send the e-mail to their sister company at a different U.K. address, since "[t]hey are cleared to receive classified materials." Manager C forwarded this e-mail to Manager B, and also informed him that after he received the U.K. Company's e-mail he had contacted DISCO to determine the status of the request to verify the U.K. Company's security clearance. Manager C further informed Manager B that the government had "just received appropriate documentation per our request and are currently confirming." Manager C concluded by stating that it "[m]ay be another day or so before I have official confirmation" by "fax." On April 18, DISCO sent a fax to Manager C informing him that a sister company with another U.K. address held a "SECRET/NATO SECRET" clearance.

The April 18 DISCO did not indicate that the U.K. Company itself had any type of clearance.

95.     ITT NV had not obtained the government's permission to send the classified LIF specification to the U.K. Company or to any foreign entity or person. ITT NV had not received any government verification that the U.K. Company held an appropriate clearance. The U.K. Company -- and, separately, DISCO -- had indirectly informed ITT NV that the U.K. Company was not a cleared facility. ITT NV had not obtained a State Department license to export the classified LIF specification to the U.K. Company. And, the U.K. Company had specifically instructed ITT NV to send the classified LIF specification to the U.K. Company's sister company at a different address. On April 2, Manager B had sent an e-mail in which he wrote, "*it is a classified specification which prevents us from going to off-shore coating suppliers.*" Despite all this, just 16 days later -- to wit, April 18, 2001 -- Manager C, at Manager B's direction, illegally sent through the U.S. Mail, in blatant and egregious violation of the NIPSOM and ITAR, the classified LIF specification to the U.K. Company -- a facility without any clearance or authority to receive classified information.

### E.     Illegal Production of the LIF's

96.     On April 21, 2001, the U.K. Company's managing director sent an e-mail to Manager B informing him that the U.K. Company had not yet received the classified LIF specification, stating that he was "concerned that it may be lost in either the U.S. or U.K. postal system." The next day, April 26, the U.K. Company received the classified LIF

specification, which was delivered through the Royal Mail. The U.K. Company's managing director informed Manager B that he had sent the specification to a facility that lacked a security clearance. When the managing director asked Manager B what he wanted to do next, Manager B instructed him to open the package containing the classified LIF specification and prepare the requested price quotation for the manufacture of the LIF's.

97.    On May 22, 2001, after a number of uncleared U.K. Company employees had reviewed the classified LIF specification, the U.K. Company's general manager sent Manager B a price quotation for the manufacture of LIF's for delivery beginning in "late June/early July dependent on [U.K.] export license approval." On May 31, Manager B sent an e-mail to the U.K. Company stating, "[a]t this time we are planning on buying 24,000 pieces at 2000 per month with deliveries the first of each month. We will need the first production units for our August deliveries. We will need them here in time to complete the final assembly. I am hoping to be able to get your first article samples this month." On June 11, the U.K. Company's general manager sent an e-mail to the ITT NV Purchasing Manager stating that the U.K. Company expected to have 20 LIF's ready to ship to ITT NV "this month."

98.    Despite the fact that the LIF substrates and the coated LIF's were well along their way to production, Manager B did not initiate any internal requests for the required export license applications with ITT NV's export control personnel until May 24, 2001. On that date, Manager B filled out an internal ITT NV form requesting, *inter alia*, a license to transmit to the U.K. Company some of the LIF drawings he had previously sent

45

to the Singapore Company. Manager B, however, did not indicate that the Singapore Company had itself sent at least one of these drawings to the U.K. Company and that the U.K. Company had used this drawing in preparing its price quotation. Manager B also lied on the internal ITT NV application when he stated that the U.K. Company had been "cleared to accept" the classified LIF specification "through the DSS." Finally, on June 8, 2001, an ITT NV export compliance employee directly asked Manager B whether the Singapore Company would "have access to the drawings at all." She posed this question because she understood that if the Singapore Company had access to the LIF drawings, then ITT NV "should list them on the license too." Despite the fact that Manager B had already illegally exported the same LIF substrate drawing to the Singapore Company without a license, he lied and told her that the Singapore Company would not have any access to the LIF drawings, and therefore would not need to be listed on the license application.

99.     On June 12, ITT NV submitted a license application to the State Department to export a LIF drawing (Drawing Number 273220) to the U.K. Company. ITT NV falsely indicated on the license application that the shipment of the LIF drawing was a "completely new shipment." Nonetheless, the State Department rejected the application on August 7, stating in relevant part: "The drawing is of no value without specifications. The specifications are classified as 'secret/no foreign.' Light interference filters [LIF] are the critical technology for electro-optical countermeasures systems for USG military/national security night vision systems. You have not justified why you want

46

to purchase these components from a foreign source.  If ITT Night Vision wants to pursue this offshore procurement, ITT Night Vision should obtain the concurrence of the Army, especially the Night Vision laboratory, before resubmitting."  Despite the facts that (a) ITT NV had no export license in place to obtain LIF's from a foreign source and (b) it was submitting a license application to the State Department, ITT NV issued a purchase order for 20 LIF's on June 12, 2001.

100.    The next day -- June 13 -- an ITT NV employee mentioned, during a discussion with an Army Night Vision Lab employee, that ITT was obtaining LIF's from a foreign source.  When the Lab employee inquired how ITT NV was able to do so, given the fact that the LIF specification was designated "No Foreign" (NOFORN), the ITT NV employee was unable to respond.  DSS was notified of the compromise of classified information, leading the DSS ISR to tell Manager C to get the classified documents returned in a proper manner through government-to-government channels, *i.e.*, not using the Royal Mail or the U.S. Postal System.  Accordingly, on July 3, Manager C sent an e-mail to the U.K. Company's General Manager requesting return of the classified LIF specification, to which the General Manager responded on July 4, stating that the specification would be returned that day.  Instead of being returned properly through government-to-government channels, however, it was sent back the way it had come -- through the U.K. and U.S. postal systems.  Manager C signed a postal receipt for the return of the classified LIF specification on July 17.

101.    On August 22 and again on August 27, 2001, the State Department issued a

47

written demand that within 30 days ITT provide a wide variety of information about ITT NV's violations relating to the classified LIF specification compromise, including the return of "All technical data (classified and unclassified) and/or defense articles sent to the U.K." Despite the State Department's demand for the return of the classified LIF specification, ITT failed to return it within the 30-day time limit.

102. On March 1, 2002, ITT NV informed the State Department that it had turned over "all classified information requested." In light of the timing and substance of this response, the government obtained a search warrant to search for a variety of evidence, including the classified LIF specification. The search warrant was executed on October 29, 2002. During the search of ITT NV's classified safe, which was conducted pursuant to the warrant, federal agents recovered the missing classified LIF specification that the U.K. Company had returned in July 2001.

103. In addition to failing to return the classified LIF specification, ITT NV continued to push forward with the illegal foreign production of LIF's even though (a) it knew that it had illegally exported the LIF specification to the U.K. Company; (b) the DSS ISR had demanded immediate return of the LIF specification; (c) the DSS ISR was conducting an on-going investigation of the compromise of the classified information; and (d) ITT NV had no export license for the foreign production of LIF's. For example, on July 6, 2001, ITT NV issued a second purchase order to the U.K. Company for the manufacture of 20,000 LIF's for delivery beginning August 1, 2001. Even when Manager B learned that the U.K. Company had retained a copy of the LIF specification after it had

claimed to have returned it, Manager B continued to press ahead with the manufacturing process, and even provided direct assistance to the U.K. Company.

104.    By way of example, on July 30, the U.K. Company's Product Assurance Manager sent an e-mail to an ITT NV employing stating, "Can you help clear up one issue on the LIF filters. There is a discrepancy between the spherical power specification in the Mil spec and your drawing. As per the detail of the Mil spec this document should take precedence, however can you confirm that this is correct. Thank you for your assistance." After obtaining the answer from Manager B, the ITT NV employee replied, "[t]he Mil. Spec. takes precedent [sic]." ITT NV never told the government that the U.K. Company had retained a copy of the classified LIF specification, and the government has to this day been unable to recover the copy that the U.K. Company made.

105.    It was not until August 9, 2001 that ITT NV asked the U.K. Company, at the government's specific direction, to halt LIF production. By that date the U.K. Company had delivered 20 completed LIF's to ITT NV, had manufactured 518 LIF's that passed testing standards, and had generated a significant amount of new classified test data related to testing LIF's. It was not until February 6, 2002 that ITT NV finally put the LIF purchase order on "hold indefinitely" status. By that time, the U.K. Company had produced at least 1000 coated LIF filers, and the Singapore Company had manufactured as many as 20 LIF substrates in China. Many of these LIF's and LIF substrates have never been recovered, and all of them could  wind up in the hands of America's battlefield enemies.

49

## Export Violations Relating to the Enhanced Night Vision Goggle System

### A.    ENVG Background

106.    In July 2000, the Army awarded a development contract to ITT NV and several other U.S. defense contractors to study the area of helmet-born night vision technology.    The study contract made clear that the Army was looking for a "[r]evolutionary approach (versus evolutionary)" towards the development of a night vision goggle that would replace the night vision goggles in production at that time.

107.    The contract was divided into two phases.    In phase one, ITT NV was obligated to produce a report that set forth and evaluated "conceptual designs" for an Enhanced Night Vision Goggle (ENVG).    In phase two, ITT NV was to develop, build, and test "prototype ENVG units."    The Army awarded ITT $1,843,000 over the life of the initial development contract.

108.    Phase One of the initial development contract concluded in December 2000.    The Army evaluated the reports submitted and decided to move forward on a "revolutionary" night vision goggle system.    This new ENVG system would combine the strengths of night vision technology with the strengths of thermal imaging technology.    The Army hoped to give its soldiers a distinct battlefield visual advantage by optically blending the two systems' visual images into one system and one image.    If successfully developed, not only would American soldiers be able to see in the dark, but they would also be able to see through smoke, clouds, and other obscurants, an advantage that could mean the difference between life and death on the battlefield.

**B.**   **Pre-2002 Illegal ENVG Exports to Singapore**

109.    In 2001, the Army moved forward with phase two of the development contract and requested the production of several different ENVG prototypes from several defense contractors, including ITT NV.  ITT NV turned to the Singapore Company to produce an ENVG prototype.  The Singapore Company thereafter assigned a Singaporean optical designer to work on the ENVG contract.  Without obtaining any of the necessary export licenses, ITT NV and the Singapore Company began to work collaboratively on the design and development of the ENVG prototype.   In connection with this joint development work, ITT violated ITAR by shipping export-controlled drawings to the Singapore Company without having first obtained the required export licenses.  ITT NV even brought the Singapore Company's optical engineer to the United States to work side-by-side with his ITT NV counterpart inside ITT's Roanoke, Va. facilities without notifying or getting any type of approval from the State Department.

110.    After conducting tests on the ENVG prototypes that the defense contractors involved in the ENVG competition delivered to the Army, the Army, towards the end of 2001, made of series of technology selections and awarded additional money through a second development contract for the development, production, and testing of additional ENVG prototypes.   The Army gave ITT NV $1,204,000 pursuant to this second development contract.  When the second contract came to an end, the Army gave ITT NV an additional $4,175,000 in 2003 pursuant to a third ENVG contract.  In total, ITT NV received $7,232,000 from the Army during the developmental phase of the ENVG

program.

111.    The Singaporean optical engineer who had worked with ITT NV during the

development of the first ENVG prototype left the Singapore Company during the summer

of 2001.  ITT NV therefore turned to a group of optical designers employed by the

Singapore Company to work collaboratively with ITT NV engineers to develop the next

ENVG prototype.  Again, however, ITT NV failed to obtain the necessary export licenses

from the State Department.  Among the Singapore Company optical engineers who were

collaboratively working with ITT NV on ENVG design and development were two who

were Chinese citizens, even though China was a prohibited destination for export-

controlled information.  The Chinese optical engineers routinely enjoyed access to export-

controlled drawings and specifications until 2003, when they left Singapore and returned to

China.   Moreover, ITT NV routinely shipped export-controlled ENVG drawings and

specifications to the Singapore Company without a State Department license throughout

the developmental phase of the ENVG program.  ITT NV's disregard of ITAR during the

developmental phrase was harmful to the interests of the United States:  as an ITT NV

optical engineer stated in an e-mail discussing the need to protect the ENVG system's

optical design, "[b]y knowing the optical train of the ENVG. . .they can determine how the

whole system works."

112.    Some managers at ITT NV were personally aware that the Company was

working collaboratively with, and sharing export-controlled drawings with, the Singapore

Company without an export license.  Nonetheless, no effort to obtain such a license was

considered until September 2002.  At the request of an ITT NV manager, John Doe

defendant Manager D (Manager D), ITT NV engineers prepared a draft of an amendment

to the ITT NV/Singapore Company TAA for submission to the State Department.  This

draft agreement listed 20 specific export-controlled drawings by number that "ITT and [the

Singapore Company] need to trade information on" that were not listed on the TAA Annex.

Thirteen (13) of the listed drawings related to night vision goggle systems in production,

and the remaining 7 drawings related to ENVG "optical assemblies used on systems being

developed."   The draft amendment also made clear that ITT NV and the Singapore

Company had worked collaboratively on the design of export-controlled night vision optics

"*since the 1980s*."    Submission of the amendment would have informed the State

Department that not only was ITT NV illegally working with the Singapore Company on

the design and development of the highly sensitive ENVG system, but also that *ITT NV had

been illegally working with the Singapore Company for more than 20 years*.  Given the

immediate and obvious implications of revealing this information to the State Department,

ITT NV never submitted the draft amendment.

113.    In the summer of 2003, ITT NV became so concerned about its relationship

with the Singapore Company that it decided to stop working with it on future ENVG

designs.  Instead, ITT NV began a search for an American partner which it could legally

work on future ENVG designs.  After a selection process, ITT NV selected an American

company (American Company) to take the Singapore Company's place in the design of

future ENVG optics.  The American Company, with the assistance of other American

53

companies, eventually redesigned the entire "optical train" for the ENVG system.

114.    By the end of 2003, Manager D was openly informing other ITT NV employees that the Company did not have a license to export ENVG documents to the Singapore Company, and that the Company needed to obtain an amendment to its existing technical assistance agreement if it wished to continue to "undertake detailed design collaborative efforts for ENVG optics." ITT NV needed to continue to work with the Singapore Company with regard to production of the existing prototype ENVG design for delivery to the Army. In July 2004, therefore, Manager D once again asked an ITT NV engineer to draft an amendment to the existing ITT NV/Singapore Company TAA for submission to the State Department. This amendment, like the previous one, was never submitted because it would never have received State Department approval. Despite the clear understanding that ITT did not have a license to export ENVG drawings and specifications, Manager D continued to authorize ITT NV personnel routinely to export controlled drawings and specifications in violation of ITAR. With the full personal knowledge of ITT NV management, ITT NV personnel even went to the extreme of exporting to the Singapore Company, on February 27, 2004, the most up-to-date export-controlled ENVG performance specifications, including information related to the pertinent thermal optics, a highly sensitive part of the ENVG system that the Singapore Company had no responsibility for and which it never worked on. ITT NV decided to export these latest ENVG performance specifications to the Singapore Company so that it would be ready to assist ITT NV when it came time for full production of the ENVG optical

components and assemblies in 2006.

    **C.**    **Post-2004 Illegal ENVG Exports to Singapore**

    115.    With the knowledge that ITT NV was routinely violating ITAR requirements, in 2003 Manager D and other ITT NV managers began looking for a way to circumvent sending export-controlled ENVG technical data *directly* from ITT NV to the Singapore Company, as well as for a way to shift the legal responsibility for the export of ENVG technical data to someone else. On February 23, 2004, Manager B, with the knowledge of Manager D, wrote an e-mail to the Singapore Company stating, "I am sorry to say that I am extremely disappointed in the efforts so far to establish a domestic U.S. operation and specifically to find an optical engineer. We are continuing to falter here in our efforts to re-design the ENVG optics while complying with U.S. export regulations. This is forcing us to consider finding a U.S. domestic source for ENVG optics and future optical assembly's [sic]."

    116.    Manager B went on to say that if the Singapore Company "did find a domestic engineer, that person would have to be employed by a [Singapore Company parent] . . . division that was incorporated in the U.S. (*i.e.*, [. . .] Rochester). If the engineer were employed by . . . the Singapore Company] then they would be considered a foreign national no matter what their citizenship." In response, the Singapore Company hired an optical engineer who was a U.S. citizen (John Doe defendant American engineer, or American engineer) and attached him to a sister company located near Rochester, N.Y. (Rochester Company). The Singapore Company was willing to do this for ITT NV

because ITT NV was its largest customer. The loss of ITT NV's business to a domestic U.S. competitor, as threatened in Manager D's e-mail, would have had an enormous negative impact on the Singapore Company and its sister companies.

117.    On June 10, 2004, Manager B and Manager D met with the management of the Rochester Company and others to discuss shifting responsibility, to the Rochester Company, for the export of ITT NV ENVG technology to the Singapore Company. During the meeting, Manager B and Manager D explained that ITT NV was developing the "next generation" of night vision equipment, called ENVG. Manager D stated that while ITT NV had a TAA with the Singapore Company, that TAA did not cover ENVG. Manager D also stated that ITT NV believed that the State Department would disapprove an amendment to the TAA that would cover ENVG. ITT NV, therefore, proposed to share ENVG-related technical data with the American optical engineer hired by the Singapore Company, who was attached to the Rochester Company. Under this scenario, it would be the Rochester Company rather than ITT that would be responsible for exporting any export-controlled technical data to the Singapore Company. Manager B made it clear that if the Rochester Company did not agree with this proposal, ITT NV would take its business elsewhere. Despite the facts that the Rochester Company (a) was not involved in the development or production of night vision equipment; (b) had virtually no experience with the export of controlled technical data; and (c) did not employ anyone who had even a basic working knowledge of ITAR's requirements, it ultimately agreed to ITT's proposal because ITT NV was such a critical customer.

118.    Before the June 10 meeting, the Rochester Company had submitted a request for a TAA between itself and its Singapore sister company (Rochester/Singapore TAA). In that May 14 request, the Rochester Company applied for an export license to provide "services to design and develop optical components, optical assemblies, and opto-mechanical assemblies for use in defense products like night vision equipment." The request further requested permission for the Rochester Company to share its designs with the Singapore Company to enable the Singapore Company to manufacture the Rochester Company's designs on a "build-to-print" basis in Singapore. The State Department approved the Rochester/Singapore TAA on June 29, 2004, with a series of limitations. The TAA became effective on January 4, 2005, when the Rochester Company's president signed it.

119.    After the Rochester/Singapore TAA became effective, the American engineer attached to the Rochester Company sent a copy of the TAA, the TAA transmittal letter, the State Department's approval letter, and other documents related to the TAA to Manager D for his review. Despite the facts that (a) Manager D knew that the technical data to be exported under a TAA was required to be identified, which in this case it was not; (b) the Rochester /Singapore TAA did not list any ENVG drawing or specification, or even mention ENVG or ITT at all; and (c) the transmittal letter never mentioned any of the ENVG contracts as contracts under which the technical data to be exported was developed, on February 2, 2005, Manager D sent an e-mail to Manager B as well as to the U.S. engineers and others stating that he had reviewed the Rochester/Singapore TAA and that

"the TAA appears to satisfy our requirements for establishing a U.S. sourced *lens design operation* to interface with [the Singapore Company] in Singapore." (emphasis added).

120.    In reliance on Manager D's February 2, 2005 e-mail, ITT NV engineers began freely to share export-controlled ENVG technical data, including drawings and specifications, with the American engineer.    The American engineer, however, soon learned that the ENVG optical designs on which the Singapore Company had previously worked were obsolete, and that a new American company had redesigned the ENVG optics.    Despite the fact that the Rochester/Singapore TAA was limited to the export of designs created by the Rochester Company, the first thing that ITT NV asked the American engineer to export to the Singapore Company was an ITT specification and drawing for a "Special Night Vision Goggle" (SNVG) beam combiner for a manufacturing quote for as many as 500 beam combiners in 2005 and for "10,000/year for 2006 and beyond."

121.    The ITT NV engineers made it clear that they did not want the American engineer to work on either the design or the drawing of the SNVG beam combiner.    In fact, the American engineer was not qualified to work on the design of a beam combiner.    ITT NV merely wanted the American engineer to act as a conduit for the export of ITT's SNVG beam combiner specifications and drawing.    In order to hide the fact that the SNVG beam combiner specification and drawing really comprised the latest and most up-to-date specification and drawing for the ENVG beam combiner, an ITT NV engineer replaced all references in the ENVG beam combiner specification with the fictitious name "Special Night Vision Goggle," or "SNVG," before giving it to the American engineer for export to

the Singapore Company.

122.   Before he exported ITT's "SNVG" to the Singapore Company, the American engineer felt it appropriate to consult with Manager D because he himself had absolutely no experience with exporting controlled documents, and had had only two days of ITAR training from an introductory ITAR course. On March 1, 2005, after Manager D had given him specific permission to export the "SNVG" beam combiner specification and drawing, the American engineer sent the "SNVG" export-controlled  documents to the Singapore Company by fax.  In his transmittal letter to the Singapore Company, the American engineer stated that he believed that "these updated requirements are for the ENVG and that the term 'SNVG' *was used as a decoy*." (emphasis added) .

123.   ITT NV's knowing use of a "decoy" specification was further illuminated in a subsequent conversation between Manager D and the American engineer.  On March 7, 2005, the American engineer called Manager D to get his permission to export an electronic copy of the ENVG beam combiner drawing to the Singapore Company.  During the course of the conversation, Manager D asked the American engineer to remove all "ITT markings" from the ITT documents exported to the Singapore Company.  Manager D explained that he wanted all references to ITT removed because "he prefers that TAA's be very specific, and ours [the Rochester/Singapore TAA] is not."  After further discussion, Manager D backed away from his request to remove all ITT markings.  Even with the full knowledge that the Rochester/Singapore TAA was not specific and did not permit the transmittal of ITT NV's export-controlled ENVG drawings and specifications, Manager D

59

still gave the American engineer approval to send the electronic version of the export-controlled ENVG beam combiner drawing to the Singapore Company.

124.    Throughout the rest of 2005, whenever ITT NV personnel asked the American engineer to transmit ENVG drawings and specifications to the Singapore Company, he requested and received specific permission for the exports from Manager D or other ITT NV employees. With Manager D's blessing, the American engineer illegally exported without a license ITT's most up-to-date ENVG specifications and drawings to the Singapore Company. By September 2005, ITT NV had illegally exported the entire ENVG "optical train" through the Rochester Company. ITT NV caused these illegal exports to take place in an effort to have the Singapore Company ready to "reenter" ITT NV's new production schedule "by the March 2006 date for production." As one ITT NV engineer recognized in an e-mail he sent to another ITT NV engineer, the whole relationship between the Rochester Company and ITT NV was nothing but a "front" for an effort to circumvent U.S. export laws.

125.    ITT NV's intent to establish a "front" for its illegal (and successful) effort to circumvent U.S. export laws was made even clearer by the nature of the relationship between the American engineer and the Rochester Company. Despite the fact that ITT NV was specifically aware of the fact that -- and had informed the Singapore Company -- if the American engineer was not an employee of the Rochester Company, any exports sent by him or under his direction would be illegal, in fact the American engineer was in reality an employee of the Singapore Company who was merely attached to the Rochester

60

Company.  The American engineer was hired by the Singapore Company, he was supervised by Singapore Company personnel, his work was controlled by the Singapore Company, and all expenses incurred by the Rochester Company to support the American engineer were reimbursed to the Rochester Company by the Singapore Company.  The American engineer was not even listed on the Rochester Company personnel chart, and he was openly referred to as a Singapore Company employee.  As an employee of a foreign company, the American engineer had no right to export anything to the Singapore Company under the Rochester/Singapore TAA.

### D.    Illegal ENVG Exports to Japan and China

126.    ITT NV engineers encountered difficulty obtaining a critical switch for the ENVG system during its developmental phrase.  After experimenting with several existing switches, ITT NV concluded that it would have to design its own unique switch.  In 2003, an ITT NV engineer successfully designed a unique switch (ENVG switch) that met the ENVG system's specific requirements.

127.    ITT NV turned to the U.S. office of a Japanese company to manufacture the ENVG switch.  Despite its full awareness that drawings and information about the ENVG switch constituted export-controlled items that would require an export license to be shipped to Japan, ITT NV failed to make any attempt to obtain the necessary export license before exporting such ENVG switch information and drawings.  Between September 2003 and December 2005, ITT NV worked collaboratively with the Japanese company in an unlicensed and illegal effort to produce a final ENVG switch.  During this unlicensed

61

collaborative design and production process, ITT NV illegally exported a series of ENVG switch drawings to the Japanese company, including the final ENVG switch design. Pursuant to ITAR, ITT NV had included, on some of these drawings, specific statements that identified the drawings as export-controlled.

128.    During the course of design and production of the ENVG switch, the Japanese company specifically informed ITT NV that to reduce production costs it intended to use a sister company located in China (Chinese Switch Company) during the manufacturing, assembly, and testing process. Despite ITT NV's acute awareness, derived from its prior illegal activities as described above, that China was a prohibited destination for export-controlled military items, ITT NV made no effort to prevent the Japanese Company from exporting the ENVG switch designs to China. In fact, all of the export-controlled drawings and technical information that ITT NV illegally provided to the Japanese Company were subsequently transferred to the Chinese Switch Company, which ultimately produced hundreds of switches that were shipped to the Japanese Company and then to ITT NV. While ENVG switch manufacturing was eventually shifted to Japan, the Chinese Switch Company remained involved in the assembly and final testing of the ENVG switches until April 2006. The relationship between ITT NV, the Japanese Company, and the Chinese Switch Company did not end until April 2006, when the illegal and unlicensed relationship between the three companies was fully uncovered.

129.    Defendants' conduct as described herein jeopardized the safety of our battlefield troops to achieve short-term financial gain. Their conduct, to which ITT has

now pleaded guilty, caused the Company a measurable pecuniary loss of $100 million, plus incalculable reputational loss.

130.    As a result of its felonious behavior, ITT was charged with three felony counts of violating the Arms Export Control Act of 1976. Count I charged ITT with violations of 18 U.S.C. § 2, 22 U.S.C. §§ 2778(b)(2) and 2778(c), and 22 C.F.R. §§ 127.1(a) 127.3. Specifically, Count I of the Criminal Information ("Willful Violation of the International Traffic in Arms Regulations, Export of Defense Articles Without a License") charged that:

> On or between March 2001 and August 2001, in the Western District of Virginia, the defendant, ITT Company, did knowingly and willfully export and cause to be exported from the United States to Singapore, the People's Republic of China, and the United Kingdom, defense articles, that is, technical data related to a laser counter measure (also known as a "light interference filter") for military night vision goggle systems, which were designated as defense articles on the United States Munitions List, without having first obtained from the Department of State a license or written authorization for such exports.

131.    Count II charged ITT with violations of 22 U.S.C. § 2778(c) and 18 U.S.C. § 2. Specifically, Count II of the Criminal Information ("Omission of Statements of Material Fact in Arms Exports Required Reports") charged that:

> On or between April 2000 and October 2004, within the Western District of Virginia, the defendant, ITT Company, did knowingly and willfully omit material facts from required reports that were necessary to make the statements in the reports not misleading, that is, that ITT Company was aware that it was violating its export licenses for the temporary export or consignment of night vision goggles or night vision parts to foreign persons for years before informing the Department of State about the violations, and that ITT Company failed to take significant corrective action to stop the ongoing

63

violations until shortly before it informed the Department of State about the violations.

132.    ITT was also charged with a third count ("Willful Violation of the International Traffic in Arms Regulations, Export of Defense Articles Without a License"), charging that:

> On or between January 1996 and May 2006, within the Western District of Virginia, the defendants, ITT Company, did knowingly and willfully export and cause to be exported from the United States to the People's Republic of China, Singapore, and Japan, defense articles, that is technical data, including drawings and specifications and defense services related to military night vision goggles systems, including the Enhanced Night Vision Goggle System, which were designated *as* defense articles on the United States Munitions List, without having first obtained from the Department of State a license for such exports or written authorization for such exports.

Although the government has agreed to defer action regarding this count for five years, that deferment is contingent on ITT's implementation of an extensive Remedial Action Plan.

133.    According to its Report on Form 8-K filed with the SEC on March 30, 2007,  in addition to its $100 million penalty, as a result of its guilty plea ITT has become subject to automatic statutory "debarment" from future export licenses. For instance, the State Department has placed restrictions on ITT's shipment of technical data and night vision equipment to specific parties, to remain in effect for a period of not less than one year.

134.    Moreover, although the State Department has not yet brought criminal charges against any individual officers, directors, or employees of ITT, the United States Attorney's Office stated on March 28, 2007, that the investigation was still in progress.

Such a statement is unusual, and indicates that more criminal charges can be expected.

135.    The gravity of the criminal charges and the size of the penalties and forfeitures incurred by ITT reflect the seriousness of ITT's illegal sales of sensitive military technology to potential adversaries of the United States, as well as ITT's subsequent concealment of those sales. The severity of ITT's criminal acts and defendants' participation in and/or willful blindness towards these acts is escalated by the fact that such acts were committed in a pattern and practice over a long period of time.

136.    On its corporate website, ITT delineates its Code of Corporate Conduct as being "Doing the Right Thing -- Always." Notwithstanding such lofty sentiment, as a result of the foregoing acts of misconduct, ITT became the first major defense contractor to be convicted of a criminal violation under the Arms Export Control Act of 1976, and was given one of the largest penalties ever in a criminal case. These acts have also stripped ITT of the reputation that befits a public Company, and weakened public trust and confidence in ITT as a prudently managed institution fully capable of meeting its duties and obligations. The damage thus done to ITT as a proximate result of defendants' conduct thus greatly exceeds the $100 million in penalties and forfitures assessed against the Company.

## COUNT I

### BREACH OF FIDUCIARY DUTY
### (Against All Director Defendants)

137.    Plaintiffs repeat and reallege each and every allegation set forth above as though set forth herein at length.

138.    Each Director Defendant owed the Company and its shareholders the duty to exercise due care and diligence in the management and administration of its affairs and to make information available to ITT shareholders with all due candor.  Each Director Defendant owed ITT the paramount duty not to have the Company break the law, and especially not to engage in a long-standing conspiracy to violate the export laws of the United States with regard to controlled military equipment.

139.    The Director Defendants' conduct set forth herein was not due to an honest error or misjudgment, but rather was due to their intentional breach or reckless disregard of their fiduciary duties to the Company. By engaging in and/or failing to disclose ITT's pattern of illegal business practices, the Director Defendants recklessly disregarded their fiduciary duties to protect the rights and interests of ITT and its shareholders.

140.    To discharge these duties, each Director Defendant was required to exercise reasonable and prudent supervision over ITT's management, policies, practices, controls and financial affairs. By virtue of this obligation and diligence, each Director Defendant was required, *inter alia*, to:

a.    exercise reasonable control and supervision over ITT's officers, employees, agents, business, and operations;

66

b.     remain informed as to how ITT was, in fact, operating and, upon receiving notice or information of an imprudent, unsound, or illegal decision, conditions, or practice, to make a reasonable investigation in connection therewith and to take steps to correct that decision, condition, or practice, and to make public disclosure of such decisions, condition, or practices in a timely and forthright mariner; and

c.     conduct the affairs of the Company in an efficient business-like manner to make it possible to provide the highest quality services while operating within the bounds of the law.

d.     In an attached press release to ITT's Report on Form 8-K filed with the SEC on March 30, 2007, defendant Loranger admitted that "[t]hese violations have made it clear that we had gaps in our compliance program." An ITT spokesman further stated, "[t]here's no question that violations occurred," which, given ITT's recitation in the Plea Agreement that *"ITT agrees that it is pleading guilty . . . because ITT is in fact guilty,"* would appear to be something of an understatement.

141.   Accordingly, the Director Defendants either intentionally or recklessly breached their fiduciary duties to the Company by, *inter alia*, permitting or causing the Company to engage in the transactions described herein, which (a) constituted felonies, (b) were in direct and knowing violation of ITAR and the Arms Export Control Act, and (c) were done to the detriment of the Company and its shareholders. Specifically, ITT

a.     knowingly or recklessly disseminated, or permitted to be disseminated, misleading information to its shareholders, the investing public, and the

public at large;

      b.    allowed the Company to engage in a pattern of improper and felonious business practices, thereby subjecting it to serious criminal charges, fines, penalties, lawsuits, and further investigations; and

      c.    failing to disclose ITT's illegal business practices to the government or to the Company's shareholders.

142.    In breach of their fiduciary duties owed to ITT and its stockholders, the Director Defendants willfully failed to prevent misconduct that caused the Company to waste its valuable assets and otherwise to expend unnecessarily its corporate funds in a manner not in its best interests or its stockholders. As a result, the Director Defendants are guilty of at least inaction amounting to recklessness in failing to control ITT's employees, business, and affairs in accordance with federal law, thereby rendering them personally liable to the Company for breaching their fiduciary duties.

143.    Consequently, ITT and its stockholders have sustained and will continue to sustain injury and damages by reason of the Director Defendants' intentional breach or reckless disregard of their fiduciary duties owed to the Company and its shareholders.

## COUNT II

### GROSS MISMANAGEMENT
### (Against All Director Defendants)

144.    Plaintiffs repeat and reallege each and every allegation set forth above as though set forth herein at length.

145.    As detailed more fully herein, the Director Defendants each possessed a duty to ITT and its shareholders to prudently supervise, manage, and control ITT's operations without having ITT commit felonies.

146.    The Director Defendants, by their actions or inactions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to prudently managing ITT's business and assets.

147.    By subjecting ITT to the unreasonable risk of substantial losses due to their failure to monitor, prevent, and/or report the many acts of ITT managers and controlling persons that directly and knowingly violated ITAR and the Arms Export Control Act, the Director Defendants failed responsibly and with due care to oversee and implement proper business practices at ITT, thereby breaching their duties of loyalty and diligence in the management and administration of ITT's affairs and in the use and preservation of ITT's assets.

148.    During the course of the discharge of their duties, the Director Defendants knew or recklessly disregarded the unreasonable risks associated with the wrongful conduct described herein, and either participated in or failed to monitor and/or disclose ITT's illegal business practices in accordance with their duties to both ITT and its shareholders. As a result, the Director Defendants grossly mismanaged or aided and abetted in the gross mismanagement of ITT and its assets.

149.    As a proximate result thereof, ITT and its stockholders have been damaged and will continue to suffer damages.

## COUNT III
### (Against The John Doe Manager Defendants For Breach of Fiduciary Duty)

150.    Plaintiffs repeat and reallege each and every allegation set forth above as though set forth herein at length.

151.    As detailed more fully herein, the John Doe Manager Defendants each possessed a duty to ITT and its shareholders to prudently supervise, manage, and control ITT's operations over which they had control without having ITT commit felonies.

152.    The John Doe Manager Defendants, by their actions or inactions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to prudently managing ITT's business and assets.

153.    By subjecting ITT to the unreasonable risk of substantial losses due to  the actions of the John Doe Manager Defendants that directly and knowingly violated ITAR and the Arms Export Control Act, the John Doe Manager Defendants failed responsibly and with due care to oversee and implement proper business practices at ITT, thereby breaching their duties of loyalty and diligence in the management and administration of ITT's affairs over which they had responsibility and in the use and preservation of ITT's assets.

154.    During the course of the discharge of their duties, the John Doe Manager Defendants knew or recklessly disregarded the unreasonable risks associated with the wrongful conduct described herein, and either participated in or failed to monitor and/or disclose ITT's illegal business practices in accordance with their duties to both ITT and its

shareholders. As a result, the John Doe Manager Defendants grossly mismanaged or aided and abetted in the gross mismanagement of ITT and its assets.

155.    As a proximate result thereof, ITT and its stockholders have been damaged and will continue to suffer damages.

**COUNT IV**
**(Against The John Doe Law Firm For Professional Negligence and Aiding and Abetting Breaches of Fiduciary Duty)**

156.    Plaintiffs repeat and reallege each and every allegation set forth above as though set forth herein at length.

157.    The John Doe Law Firm owed ITT a duty to carry out its duties competently, and within the confines of the law.  It likewise had a duty not to join in, or aid and abet, any breaches of fiduciary duty of which it became aware.

158.    As detailed above, the John Doe Law Firm failed to provide competent legal advice, and to take competent legal actions.

159.    As detailed above, the John Doe Law Firm learned of actions constituting a breach of fiduciary duty to ITT, and joined in such actions, helped conceal such actions, and helped further such actions, all of which aided and abetted such breached of fiduciary duty.

160.    As a proximate result thereof, ITT and its stockholders have been damaged and will continue to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment in favor of the Company, as appropriate, against all defendants as follows:

      a.      Removing and replacing the Director Defendants as the directors of ITT, instituting a new election of directors, and appointing a receiver for the management of ITT until a new election of directors is called and determined;

      b.      Declaring that the Defendants have violated and/or aided and abetted in the breach of their fiduciary duties to ITT and its shareholders, or committed professional negligence;

      c.      Awarding ITT compensatory damages against the Defendants, individually and severally, in an amount to be determined at trial, together with pre-judgment and post-judgment interest;

      d.      Awarding ITT punitive damages against the Defendants for their egregious and willful conduct;

      e.      Awarding plaintiffs the costs of this action, including reasonable allowances for plaintiffs' attorney's and expert's fees and expenses; and

f.    Granting such other or further relief as may be just and proper under the circumstances.

DATED: November  5, 2007

Respectfully Submitted,

**HARWOOD FEFFER LLP**

By:  _____
Robert I. Harwood (RH – 3286)
Samuel K. Rosen (SR – 3287)
488 Madison Avenue
New York, NY 10022
Telephone: (212) 935-7400
Facsimile:  (212) 753-3630

CHAIRMAN OF PLAINTIFFS'
EXECUTIVE COMMITTEE

**PASKOWITZ & ASSOCIATES**
Laurence D. Paskowitz, Esq. (LP-7324)
60 East 42nd Street
New York, New York 10165
Telephone: (212) 685-0969
Facsimile: (212) 685-2306

**WEISS & LURIE**
Joseph H. Weiss (JW-4354)
James E. Tullman (JT-9597)
David C. Katz (DK-6235)
Ilya Nuzov (IN-1955)
551 Fifth Avenue, Suite 1600
New York, NY 10176
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

PLAINTIFFS' EXECUTIVE COMMITTEE

73

**JACOBS LAW GROUP, PC**
Samuel R. Simon
1800 John F. Kennedy Boulevard, Suite 404
Philadelphia, PA 19103
Tel:  (215) 569-9701
Fax:  (215) 569-9788

**ABBEY SPANIER RODD**
  **& ABRAMS, LLP**
Judith Spanier (JS-5065)
Orin Kurtz (OK-7334)
212 East 39th Street
New York, New York 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191

**ROY JACOBS & ASSOCIATES**
Roy Jacobs
60 East 42nd Street
46th Floor
New York, New York 10165
Telephone: (212) 867-1156
Facsimile:  (212) 504-8343

**STULL, STULL & BRODY**
Jules Brody (JB-1951)
6 East 45th Street
New York, New York 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022

**COUNSEL FOR PLAINTIFFS**

74

## ITT CORPORATION VERIFICATION

I, Sylvia B. Piven, Trustee, under trust agreement dated April 3, 1973 f/b/o Sylvia B. Piven, derivatively on behalf of ITT Corporation, hereby verify that I am familiar with the allegations in the Verified Consolidated Amended Complaint, and that I have authorized the filing of said Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

DATE: November 2, 2007

Sylvia B. Piven

## CERTIFICATE OF SERVICE

I, Cary Savitz, hereby certify that I am over the age of 18 years, am employed by the law firm of Harwood Feffer LLP and that on November 5, 2007, the foregoing VERIFIED CONSOLIDATED AMENDED COMPLAINT was served in accordance with the Federal Rules of Civil Procedure, and/or the Court's Local Rules, by First Class Mail, postage prepaid, and/or the Rules on Electronic Service, upon the following counsel for Defendants:

SIMPSON THACHER & BARTLETT LLP
Paul C. Curnin, Esq.
Mary Beth Forshaw, Esq.
David Elbaum, Esq.
425 Lexington Avenue
New York, NY 10017

Cary Savitz