## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re ITT Corporation Derivative Litigation | Case No. 07 Civ. 2878 (CLB) |

## ITT CORPORATION'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO DISMISS

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017-3954
*Attorneys for Nominal Defendant*
*ITT Corporation*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ......................................................................................3

ARGUMENT..............................................................................................9

I.    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED BECAUSE A DEMAND
      WAS MADE ON THE BOARD AND THE BOARD APPOINTED A SPECIAL
      LITIGATION COMMITTEE................................................................11

      A.    Plaintiffs Have Conceded That Demand Is Not Excused ......................11

      B.    The Board Appointed A Special Litigation Committee .........................12

II.   PLAINTIFFS' CLAIMS AGAINST THE DIRECTORS SHOULD BE
      DISMISSED FOR FAILURE TO MAKE A DEMAND UPON THE BOARD .............14

      A.    Count I Should Be Dismissed Because Plaintiffs Fail To Allege That More
            Than Half Of The Directors Face A Substantial Likelihood Of Liability
            For Breach Of Fiduciary Duty .....................................................15

            1.    Plaintiffs Have Not Alleged That The Directors Knowingly Failed
                  To Establish A Reporting Or Information System ......................18

            2.    Plaintiffs Have Not Alleged That Directors Had Reason To
                  Suspect And Consciously Disregarded Wrongdoing....................19

      B.    The Additional Boilerplate Allegations Do Not Show That A Majority of
            the Board Is Interested Or Incapable Of Acting Independently .............23

      C.    Count II Should Be Dismissed Because Plaintiffs Fail To Allege That A
            Majority Of The Board Faces A Substantial Likelihood Of Liability For
            Gross Mismanagement...............................................................24

III.  PLAINTIFFS' CLAIMS AGAINST THE JOHN DOE DEFENDANTS SHOULD
      BE DISMISSED FOR FAILURE TO MAKE A DEMAND ...............................25

CONCLUSION..........................................................................................25

## TABLE OF AUTHORITIES

### Cases

Page

*Amalgamated Bank v. Yost*, 2005 WL 226117 (E.D. Pa.
Jan. 31, 2005) .............................................................................24

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984).............................................10

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d
Cir. 2007) ......................................................................................18

*Boeing Co. v. Shrontz*, 1992 WL 81228 (Del. Ch. Apr. 20,
1992) ..............................................................................................12

*Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ...........................................10

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir.
2002) ................................................................................................7

*Clark v. Lacy*, 376 F.3d 682 (7th Cir. 2004)............................................24

*David B. Shaev Profit Sharing Account v. Armstrong*, 2006
WL 391931 (Del. Ch. Feb. 13, 2006), *aff'd on opinion
below*, 911 A.2d 802 (Del. 2006)............................................ passim

*Desimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007)............................ passim

*Ferre v. McGrath*, 2007 WL 1180650 (S.D.N.Y. Feb. 16,
2007) ............................................................................................ passim

*Fink v. Komansky*, 2004 WL 2813166 (S.D.N.Y. Dec. 8,
2004..............................................................................................17

*G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227 (Ind. 2001).........................10

*Goodwin v. Live Entm't, Inc.*, 1999 WL 64265 (Del. Ch.
Jan. 22, 1999)..............................................................................18

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003)........................11, 15, 18

*Halpert Enters., Inc. v. Harrison*, 362 F. Supp. 2d 426
(S.D.N.Y. 2005) .....................................................................20, 24

*Highland Select Equity Fund, L.P. v. Motient Corp.*, 2007
WL 907650 (Del. Ch. Mar. 14, 2007)......................................11

Page

*In re Boston Scientific Corp. Shareholders Litig.*, 2007 WL 1696995 (S.D.N.Y. June 13, 2007) ...................................................11

*In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).................................................................14, 15, 22, 23

*In re Coca-Cola Enters., Inc. Deriv. Litig.*, 478 F. Supp. 2d 1369 (N.D. Ga. 2007)...................................................................22

*In re Computer Scis. Deriv. Litig.*, 2007 WL 1321715 (C.D. Cal. Mar. 27, 2007) ............................................................21

*In re Forest Labs., Inc. Deriv. Litig.*, 450 F. Supp. 2d 379 (S.D.N.Y. 2006) ....................................................9, 10, 15, 21

*In re Guidant Corp. Shareholders Deriv. Litig.*, 2006 WL 290524 (S.D. Ind. Feb. 6, 2006)...........................................16

*In re Guidant Shareholders Deriv. Litig.*, 841 N.E.2d 571 (Ind. 2006).........................................................10, 13, 14, 23

*In Re ITT Educational Services, Inc. Deriv. Litig.*, No. 29DQ3-0402-PL-176 (Ind. Sup. Sept. 16, 2005) ....................25

*In re Openwave Sys., Inc. Shareholder Deriv. Litig.*, 503 F. Supp. 2d 1341 (N.D. Cal. 2007)..............................................11

*In re Xethanol Corp. Deriv. Litig.*, 2007 WL 2331975 (S.D.N.Y. Aug. 16, 2007) .............................................................21

*In re Zoran Corp. Deriv. Litig.*, 511 F. Supp. 2d 986 (N.D. Cal. 2007) ............................................................................24

*Irwin v. Gemunder*, 2006 WL 3366180 (E.D. Ky. Nov. 20, 2006) ..................................................................................18

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991)..................................9, 11

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991) .................16

*Miller ex rel. Commonwealth Edison Co. v. Thomas*, 656 N.E.2d 89 (Ill. App. Ct. 1995).............................................11

*Pace v. Jordan*, 999 S.W.2d 615 (Tex. App. 1999)...................................12

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993) .............................10, 14, 24, 25

                                                                                            **Page**

*Spiegel v. Buntrock*, 571 A.2d 767 (Del. 1990) ..................................................................11, 12

*Stone v. Ritter*, 911 A.2d 362 (Del. 2006) ......................................................................... passim

*Stotland v. GAF Corp.*, 469 A.2d 421 (Del. 1983) ....................................................................12

*West Coast Mgmt. & Capital LLC v. Carrier Access Corp.*,
    914 A.2d 633 (Del. Ch. 2006).............................................................................................11

### Statutes

22 C.F.R. §§ 123.1, *et seq.*..........................................................................................................5

8 DEL. CODE § 220 .....................................................................................................................10

FED. R. CIV. P. 23.1 .................................................................................................................9, 10

IND. CODE ANN. § 23-1-32-2 .................................................................................................10, 13

IND. CODE ANN. § 23-1-32-4 cmt. ....................................................................................10, 12, 13

IND. CODE ANN. § 23-1-32-4 cmt. (c) ........................................................................................13

IND. CODE ANN. § 23-1-32-4(c) ..................................................................................................13

IND. CODE ANN. § 23-1-35-1 cmt. (e) ........................................................................................16

IND. CODE ANN. § 23-1-35-1(e)(2) .............................................................................................16

IND. CODE ANN. § 23-1-52-2 .......................................................................................................10

IND. TRIAL R. 23.1......................................................................................................................10

Nominal defendant ITT Corporation respectfully submits this Memorandum of Law, together with the Affidavit of David Elbaum, sworn to on November 30, 2007, in support of its motion to dismiss the consolidated amended complaint pursuant to Rule 23.1 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This is a derivative action. In a derivative action a shareholder seeks to bring an action on behalf of a corporation, asserting rights that belong to the corporation. But no one may bring a derivative action without complying with the "demand requirement"—that is, either making a demand on the board of directors that it bring the claims at issue, or demonstrating that the demand requirement is excused. Plaintiffs here argue in the alternative *both* that a demand was made *and* that demand is excused. Plaintiffs' arguments are wrong and the complaint should be dismissed.

In March 2007, ITT entered into a settlement with the United States Attorney for the Western District of Virginia regarding certain conduct by employees of its Night Vision systems business unit. ITT pled guilty to two felony violations of State Department regulations that restrict the export of technical data (and prosecution of a third violation was deferred). ITT also agreed to pay fines and penalties of $50 million and to invest an additional $50 million towards the development of the next generation of night vision systems.

Plaintiffs allege that ITT's directors injured ITT, not by any affirmative action, but by failing to adequately supervise the Night Vision business unit. Compl. ¶ 41. This is known as a *Caremark* claim. Plaintiffs who attempt to plead a *Caremark* claim—rightfully called "the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment"—always face an uphill battle.

Plaintiffs here have an even more difficult task. First, one of the Plaintiffs made a demand on the board. Having made that demand, Plaintiffs have conceded, as a matter of law, that the Board can independently evaluate a demand. As a result Plaintiffs can no longer argue that demand is excused. It is too late for Plaintiffs to change their mind and argue that demand is excused after they make a demand. Second, in response to the demand, ITT established a Special Litigation Committee to investigate these claims with the assistance of independent counsel. Under controlling law, once a company takes that step, Plaintiffs may not pursue separate derivative litigation. These two facts—Plaintiffs' demand and the appointment of a Committee—standing alone require dismissal of the complaint.

Even assuming Plaintiffs had not already made a demand, they still could not show that demand was excused. To establish that demand is excused, Plaintiffs must allege particularized facts that create a reasonable doubt as to each individual director's ability to properly exercise his or her independent business judgment when considering a demand. Plaintiffs must demonstrate with particularized facts that at least half of the directors face a substantial likelihood of personal liability because they *consciously* disregarded their fiduciary duties. This is a scienter-based standard and Plaintiffs have not come close to satisfying it.

In a *Caremark* case, Plaintiffs must demonstrate with particular factual allegations how the directors failed in their oversight, what controls they failed to implement, and what obvious warning signs they received and consciously ignored. Courts routinely dismiss complaints that lack these essential details. And on this key point, the complaint here is silent, not alleging any of these facts. While the complaint recites the misdeeds of certain night vision employees in Virginia (involving, for example, the improper transmission of technical drawings), it alleges no facts about the directors.

2

Eight of ITT's nine directors are independent, outside directors, with no day-to-day responsibilities at the Company. Courts do not require outside directors to know the details of every aspect of the operations of a company. That would be an impossible standard, of course, particularly at a large, diversified corporation like ITT, which, during the relevant time period, had 42,000 employees operating in a range of different businesses around the globe. The Night Vision unit was only one of many separate business units and it generated only 4.2% of ITT's total revenues. The complaint simply does not allege any facts that would have raised the low-level operational details of the Night Vision unit to the attention of the Board. For all these reasons, the complaint should be dismissed.

## STATEMENT OF FACTS

### *ITT Corporation*

ITT Corporation is a global, multi-industry enterprise engaged in the design and manufacture of a wide range of engineered products and services. As of year-end 2000, ITT generated $4.8 billion in sales and had 42,000 employees operating in 49 countries.[1] Elbaum Aff., Ex. A at 2 (ITT Corp. 10-K, filed Mar. 26, 2001). The company operated in four primary segments: Connectors and Switches, Specialty Products, Pumps and Complementary Products, and Defense Products and Services.[2] *Id.* at 3.

---

[1]    The year 2000 is the period at issue in the two counts of the criminal information to which ITT pled guilty. As of year-end 2006, ITT generated revenues of $7.8 billion and employed 33,000 people in 52 countries. Elbaum Aff., Ex. B at 2 (ITT Corp. 10-K, filed Feb. 28, 2007).

[2]    In 2002, ITT renamed its business segments, respectively, as Electronic Components; Motion & Flow Control; Fluid Technology; and Defense Electronics and Services. Elbaum Aff., Ex. C at 2 (ITT Corp. 10-K, filed Mar. 10, 2006). In 2006, ITT consolidated its Electronic Components segment into its Motion & Flow Control segment and subsequently sold its Switches business in 2007. Elbaum Aff., Ex. B at 2; Elbaum Aff., Ex. D at 26 (ITT Corp. 10-Q, filed July 30, 2007).

*Connectors and Switches*: The Connectors and Switches segment developed and manufactured a wide variety of products and services in the areas of communications, industrial, transportation, consumer, military/aerospace, computer and commercial aircraft. *Id.* at 3. This segment had approximately 14,800 employees operating at 31 facilities in 12 countries. *Id.* at 4.

*Specialty Products*: The Specialty Products segment included a group of units operating in numerous specialty market segments. *Id.* at 7. These businesses provided a broad range of products, including whirlpool and spa bath components, aerospace valves, industrial pressure regulators, shock absorbers, and friction pads for braking applications. *Id.* at 8. This segment had approximately 7,100 employees operating at 44 facilities in 11 countries. *Id.*

*Pumps and Complementary Products*: The Pumps and Complementary Products segment was a leading global provider of fluid system products and services. *Id.* at 5. The segment was engaged in the design, development, production, sale and support of pumps, mixers, heat exchangers, valves and related systems for various applications, including municipal, industrial and agricultural water systems. *Id.* at 5. This segment had approximately 10,400 employees operating at 273 facilities in 35 countries. *Id.* at 7.

*Defense Products and Services* ("ITT Defense"): ITT Defense developed, manufactured and supported high technology electronic systems and components for worldwide defense and commercial markets. *Id.* at 4. ITT Defense was organized in five business divisions: Systems, Advanced Engineering & Sciences, Aerospace & Communications, Night Vision, and Avionics. *Id.* Its products included military communications systems, airborne electronic warfare systems, air traffic control systems, and night vision goggles. *Id.* at 4-5. ITT Defense had approximately 9,200 employees operating in 95 facilities in 15 countries. *Id.* at 5.

4

The Night Vision unit is located in Roanoke, Virginia and supplies night vision equipment to the U.S., allied military forces, and U.S. law enforcement officers. *Id.* at 4. The night vision equipment uses a complex tube that enhances very low light levels to provide visibility at night. As of year-end 2000, the Night Vision unit generated only 4.2% of ITT's total revenues. *Id.* at 5.

The ITT Board consists of Steven R. Loranger, Curtis J. Crawford, Christina A. Gold, Ralph F. Hake, Dr. John J. Hamre, Raymond W. LeBoeuf, Frank T. MacInnis, Linda S. Sanford, and Markos I. Tambakeras. Mr. Loranger is also ITT's president and Chief Executive Officer. The eight other board members are independent, outside directors.

**The Relevant Export Regulations**

Under the Arms Export Control Act and its implementing regulations, the International Traffic in Arms Regulations ("ITAR"), the State Department restricts the export of certain defense articles. Technical data, drawings and specifications, services and equipment related to the Night Vision unit's products are subject to ITAR export regulations. Under ITAR, companies may obtain licenses from the State Department for the export of controlled materials. *See* 22 C.F.R. §§ 123.1, *et seq.*

**The Investigations of the Night Vision Unit**

Investigations concerning the Night Vision unit's compliance with ITAR opened in August 2001. Elbaum Aff., Ex. H at App. A, 1 (ITT Corp. 8-K, Ex.-99.4, filed Mar. 30, 2007). The Department of Defense Defense Criminal Investigative Service ("DCIS") suspected that the Night Vision unit employees had improperly sent classified material to an unauthorized facility in the United Kingdom. *Id.* In addition, the State Department sought the return of the classified material transferred to the UK, as well as additional information relating to its export of

5

classified information. *Id.* at 25-26. Following an exchange of correspondence, the State

Department executed a search warrant in October 2002 and recovered the relevant materials. *Id.*

at 26. DCIS referred its concerns to the U.S. Attorney for the Western District of Virginia in

2002. *Id.* at 1. The U.S. Attorney's investigation was resolved by settlement announced on

March 27, 2007. Elbaum Aff., Ex. E at 2 (ITT Corp. 8K, filed Mar. 30, 2007).

### *The Plea Agreement*

The settlement included a plea agreement and a deferred prosecution agreement. *Id.* ITT

pled guilty to two violations of ITAR and agreed to pay $50 million in fines, forfeitures and

penalties. *Id.* The settlement also provided for a deferred prosecution as to a third ITAR

violation in exchange for ITT's implementation of a remedial action plan and investment of $50

million over five years into night vision products. *Id.* ITT was also debarred from certain future

Night Vision export licenses, which restricted approximately 5% of its night vision sales. *Id.*

Count I of the Criminal Information was based on the foreign transfer of certain drawings

and specifications relating to a light interference filter without a proper license between March

and August 2001. Elbaum Aff., Ex. G at 1 (ITT Corp. 8-K, Ex.-99.2, filed Mar. 30, 2007). The

filter is designed as a counter measure if enemy forces attempt to use lasers to disable night

vision goggles. Elbaum Aff., Ex. H at 16. It consists of a lens and a lens coating that is mounted

on a night vision system. *Id.* Employees of the Night Vision unit improperly transferred

information relating to the size and shape of a lens used in night vision goggles to Singapore and

China so that manufacturers there could grind the lenses for use in the filter. *Id.* at 18-21. Night

Vision unit employees also transferred information relating to the lens coating to the United

Kingdom without obtaining a license in order to obtain an additional supply of the coating. *Id.* at

21-23.

Count II related to misleading statements made in a voluntary disclosure to the State

Department in April and May 2000. Elbaum Aff., Ex. G at 2. The Night Vision unit voluntarily

reported that it had violated the terms of certain licenses for the temporary export of night vision

products to foreign persons. Elbaum Aff., Ex. H at 3-5. However, the reports obscured the fact

that certain individuals had been aware of the violations for approximately two years without

taking any significant corrective action before making the voluntary disclosure.[3] *Id.* at 7.

Count III concerned unapproved transfers of technical drawings and information relating

to night vision systems without a proper license during the period 1996 to 2006. Elbaum Aff.,

Ex. G at 3. The technical data was exported to China, Singapore and Japan. *Id.* Prosecution of

this count was deferred pending completion of a remedial action plan. Elbaum Aff., Ex. H at 2-

4.

In announcing the plea agreement, ITT's CEO Loranger stated:

> We have been cooperating with the government in this investigation and
> we have voluntarily disclosed all discrepancies that our internal reviews
> revealed. . . . While this settlement relates to the actions of a few
> individuals in one of our 15 business units, we regret very much that these
> serious violations occurred. I want to reinforce, however, that the heart of
> our night vision goggles – the tube – is secure. No technical information
> regarding the tube was ever compromised.

Elbaum Aff., Ex. F (ITT Corp. Form 8-K, Mar. 30, 2007, Ex. 99.1) (cited in Compl. ¶ 47).

Despite the complaint's rhetoric, it never alleges (because it cannot) that the central component

of the night vision goggles, the core tube, was ever compromised or that any U.S. personnel were

---

[3]      In October 2004, ITT entered into a Consent Agreement with the State Department to
resolve the matters raised in the voluntary disclosure. Compl. ¶ 64. Under the Consent
Agreement, ITT agreed to pay a total of $8 million in civil penalties and investment in additional
compliance programs. Elbaum Aff., Ex. I at 3 (available on the State Department's website).
The Consent Agreement specified several substantial remedial measures that the Company was
required to implement to improve its ITAR compliance. *Id.* at 8-12. The Consent Agreement
may be considered on this motion because it is a public document and was cited in the
complaint. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

ever injured by the inappropriate actions of the responsible Night Vision employees.

***Plaintiff Reale's Demand Letter and the Initial Complaints***

A pre-suit "demand on ITT to commence legal action was made by Plaintiff Anthony Reale, by letter dated April 12, 2007, directed to Defendant Loranger." Compl. ¶ 38. The Demand Letter requested that:

> the Company commence legal proceedings against the individuals responsible for this misconduct for their breaches of fiduciary duties, for causing the Company to engage in illegal conduct or for failing properly to oversee the Company's operations so as to prevent such misconduct, and for engaging in violations of law, thereby exposing the Company to millions of dollars in damages.

Demand Letter at 3 (Elbaum Aff., Ex. J). Counsel for ITT contacted Mr. Reale's counsel several times thereafter, informing Plaintiff's counsel that ITT had received the Demand Letter, was in the process of retaining independent counsel to assist in an investigation, and that independent counsel would be the point of contact going forward. *See* Elbaum Aff., Ex. K (June 11, 2007 Ltr. to Pls. Counsel).

Plaintiff Reale raised no objection to this process at any time and made no further attempt to communicate with ITT. Instead, on August 17, he commenced a derivative action. Reale's complaint alleged breach of fiduciary duty and gross mismanagement claims against ITT's directors, and breach of fiduciary duty and professional negligence claims against four John Doe Manager Defendants and a John Doe Law Firm.

Meanwhile, on April 12, Plaintiff Sylvia Piven filed a derivative action alleging claims against ITT's directors for breach of fiduciary duty and gross mismanagement. Also, on July 11, Plaintiff Norman Levy filed a nearly identical derivative action. Neither Piven nor Levy made a pre-suit demand on the Board. On September 10, all three actions were consolidated, and on November 5, Plaintiffs Reale and Piven filed a consolidated amended complaint, which largely

tracks the allegations in the Reale complaint, arguing both that demand was made and that demand was excused.

***The Special Committee***

In response to Reale's Demand Letter, ITT's Board appointed a Special Litigation Committee to investigate the Company's potential claims against the John Doe Defendants, and any other employees, and determine what, if any, legal action to take. Elbaum Aff., Ex. L at 26 (ITT Corp. 10-Q, filed Oct. 26, 2007). The Committee consists of the independent outside directors Crawford, LeBoeuf, and MacInnis. The Committee retained Susan Brune of Brune & Richard LLP, an experienced former Assistant United States Attorney in this District, to assist it in conducting its investigation and evaluating potential legal claims.[4] With the assistance of Ms. Brune, who has been appointed by Judges of this Court as a receiver in four SEC enforcement actions, the Committee is in the process of reviewing thousands of documents and other materials regarding the underlying government investigation.

## ARGUMENT

Federal Rule 23.1 requires that a derivative complaint state with particularity what efforts the plaintiffs made to urge the directors to bring suit in the company's name or the reasons for the plaintiffs' failure to do so. FED. R. CIV. P. 23.1. The standard for excusing demand, also known as "demand futility," is governed by the law of the state of incorporation, here Indiana. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09 (1991); *In re Forest Labs., Inc. Deriv. Litig.*, 450 F. Supp. 2d 379, 387 (S.D.N.Y. 2006).

Indiana has a "long-standing demand requirement." *In re Guidant Shareholders Deriv.*

---

[4]    The New York City Department of Investigation has also appointed Ms. Brune as a monitor. *See* Elbaum Aff., Ex. M (Ms. Brune's website resume).

*Litig.*, 841 N.E.2d 571, 573 (Ind. 2006). "[T]he demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).[5] Thus, "the decision whether and to what extent to investigate and prosecute corporate claims ... should in most instances be subject to the judgment and control of the board." *Guidant*, 841 N.E.2d at 575 (quoting IND. CODE ANN. § 23-1-32-4 cmt.).

To ensure that individual shareholders do not improperly usurp the authority of the board, both Indiana law and Federal Rule 23.1 impose a heightened pleading standard in derivative actions: a shareholder derivative complaint must "allege with particularity the demand made, if any, and either that the demand was refused or ignored or why the shareholder did not make the demand." IND. CODE ANN. § 23-1-32-2; *see also* IND. TRIAL R. 23.1; *Ferre v. McGrath*, 2007 WL 1180650, at *3 (S.D.N.Y. Feb. 16, 2007) (same under Fed. R. 23.1). "Allegations of demand futility under Rule 23.1 'must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by ... Rule 8.'" *Stone v. Ritter*, 911 A.2d 362, 367 n.9 (Del. 2006) (quoting *Brehm*, 746 A.2d at 254); *see also Ferre*, 2007 WL 1180650, at *3. Conclusory allegations of futility are not sufficient. *Ferre*, 2007 WL 1180650, at *3; *G & N Aircraft*, 743 N.E.2d at 237. In addition, the complaint must allege facts showing demand futility "*on a director-by-director basis*," *Ferre*, 2007 WL 1180650, at *4 (emphasis added)—a requirement Plaintiffs do not even attempt to undertake.[6]

---

[5]     Indiana courts rely on Delaware decisions in resolving corporate fiduciary duty cases. *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 238 (Ind. 2001) (citing *Aronson*, 473 A.2d at 812).

[6]     None of the plaintiffs filed an action pursuant to Indiana law to obtain corporate records to evaluate the potential merits of their claims and assist in preparing a derivative complaint. *See* IND. CODE ANN. § 23-1-52-2; *cf.* 8 DEL. CODE § 220. Courts routinely criticize shareholder plaintiffs for failing to use the available investigatory tools before filing a complaint. *See, e.g., Forest Labs.*, 450 F. Supp. 2d at 393-94; *Rales v. Blasband*, 634 A.2d 927, 934-35 n.10 (Del.

I.    **PLAINTIFFS' CLAIMS SHOULD BE DISMISSED BECAUSE A DEMAND WAS MADE ON THE BOARD AND THE BOARD APPOINTED A SPECIAL LITIGATION COMMITTEE**

A.    **Plaintiffs Have Conceded That Demand Is Not Excused**

The Court should reject Plaintiffs' allegations of demand futility because they have been waived as a matter of law. In the Demand Letter, Plaintiff Reale demanded that the Board "take the necessary action to identify the wrongdoers and take legal action against them to redress the wrongs they have committed." Elbaum Aff., Ex. J. Citing this Letter, Plaintiffs allege in their complaint that a pre-suit "[d]emand on ITT to commence legal action was made." Compl. ¶ 38. As the United States Supreme Court found in *Kamen*, "[u]nder the law of Delaware and the States that follow its lead, a shareholder who makes demand may not later assert that demand was in fact excused as futile." *Kamen*, 500 U.S. at 103; *see also Spiegel v. Buntrock*, 571 A.2d 767, 775 (Del. 1990) ("A shareholder who makes a demand can no longer argue that demand is excused."); *In re Boston Scientific Corp. Shareholders Litig.*, 2007 WL 1696995, at *4 (S.D.N.Y. June 13, 2007); *Miller ex rel. Commonwealth Edison Co. v. Thomas*, 656 N.E.2d 89, 97 (Ill. App. Ct. 1995). "By making a demand, a stockholder tacitly acknowledges the absence of facts to support a finding of futility." *Spiegel*, 571 A.2d at 775; *see also id.* at 777. "The effect of a demand is to place control of the derivative litigation in the hands of the board of directors," and as a result, it is "unnecessary for the Court . . . to consider the merits of [the plaintiff's] argument that demand [is] excused." *Id.* at 775. Significantly, the Delaware

---

1993); *Guttman v. Huang*, 823 A.2d 492, 504 (Del. Ch. 2003). Once shareholders file a derivative complaint, however, they may not seek corporate records to aid in drafting an amended derivative complaint. *See Highland Select Equity Fund, L.P. v. Motient Corp.*, 2007 WL 907650, at *1 (Del. Ch. Mar. 14, 2007); *West Coast Mgmt. & Capital LLC v. Carrier Access Corp.*, 914 A.2d 633, 645-46 (Del. Ch. 2006); *see also In re Openwave Sys., Inc. Shareholder Deriv. Litig.*, 503 F. Supp. 2d 1341, 1352-53 (N.D. Cal. 2007) (denying discovery in aid of drafting amended complaint following dismissal under Rule 23.1).

Chancery Court has applied this rule where, as here, one of two co-plaintiffs made a pre-suit demand, holding that neither plaintiff could argue that demand was futile. *Boeing Co. v. Shrontz*, 1992 WL 81228, at *5 (Del. Ch. Apr. 20, 1992); *see also Pace v. Jordan*, 999 S.W.2d 615, 621-22 (Tex. App. 1999). Although Indiana courts have not addressed it specifically, this rule is fully consistent with Indiana's policy favoring Board and/or Special Committee control over corporate litigation. *See Guidant*, 841 N.E.2d at 575 (citing IND CODE ANN. § 23-1-32-4 cmt.)

Plaintiffs' conclusory allegation that ITT's Board failed to take sufficient action in response to the Demand Letter is legally insufficient to revive their demand futility theories. Compl. ¶¶ 38, 51. Having made a demand (and reasserted that they made a demand in their complaint), Plaintiffs may not play a tactical gambit and argue in the alternative that demand was excused. "[O]nce a demand has been made, absent a wrongful refusal, the stockholders' ability to initiate a derivative suit is terminated." *Spiegel*, 571 A.2d at 775 (quoting *Stotland v. GAF Corp.*, 469 A.2d 421, 422 (Del. 1983)).

Further, ITT did not refuse or ignore the Demand Letter. Rather, the Board appointed a Special Litigation Committee, which retained qualified independent counsel. ITT informed Plaintiff Reale that the Board was retaining independent counsel to assist in an investigation, but he filed a lawsuit without objecting or even inquiring as to the status of the investigation. Thus, Plaintiffs' cursory allegation that the demand was "*de facto* refused," Compl. ¶ 51, is both entirely unsupported and directly contradicted by ITT's public filings. *See* Elbaum Aff., Ex. L.

**B.    The Board Appointed A Special Litigation Committee**

In response to the Demand Letter, ITT formed a Special Litigation Committee. The Committee retained independent counsel and is currently investigating the proposed claims

12

against the "wrongdoers" referred to in the Letter, including the John Doe Defendants.

Under Indiana law, the Committee's decision will be "'presumed to be conclusive against any shareholder making a demand or bringing a derivative proceeding ...,' unless a shareholder can prove the committee was not disinterested or there was no good faith investigation." *Guidant*, 841 N.E.2d at 575 (quoting IND. CODE ANN. § 23-1-32-4(c)). "This statute codifies the 'business judgment rule' as applied to a special committee's determination," such that a court may not independently evaluate a committee's decision. *Id.* (citing IND. CODE ANN. § 23-1-32-4 cmt. (c)). Once a Committee is appointed, allegations of demand futility are irrelevant as a matter of law and cannot save a derivative complaint from dismissal. As the Indiana Supreme Court held:

> Once a corporation establishes a disinterested committee (which it can do even after a suit is filed without a demand according to section 23-1-32-2) demand futility is no longer an issue. There is no need at that point for a court to determine if demand would be futile on traditional grounds, for example, such as when a majority of the board of directors have an interest in the transaction. This is because the decision of the disinterested directors or other disinterested persons is presumed to be conclusive, except where a claimant could establish that the committee was not disinterested or that its determination had not been made after a good faith investigation.

*Id.*[7]

Accordingly, under controlling Indiana law, because the Special Litigation Committee is conducting an investigation in response to the Demand Letter, Plaintiffs may not pursue a separate derivative action. The Demand Letter and the resulting Committee investigation are

---

[7] *See also* IND. CODE ANN. § 23-1-32-2 ("Whether or not a demand for action was made, if the corporation commences an investigation of the charges made in the demand or complaint . . ., the court may stay any proceeding until the investigation is completed.").

fatal to Plaintiffs' claims.[8]

## II.  PLAINTIFFS' CLAIMS AGAINST THE DIRECTORS SHOULD BE DISMISSED FOR FAILURE TO MAKE A DEMAND UPON THE BOARD

Even if the Court were to consider Plaintiffs' alternative theory that demand was excused (which it should not), the derivative claims should still be dismissed because Plaintiffs have not alleged particularized facts showing that demand was futile.  Counts I and II of the complaint allege that the directors breached their fiduciary duties by "abdicating their responsibilities of supervision and oversight" of the Night Vision unit.  Compl. ¶ 41; *see also id.* ¶¶ 2, 140.  Plaintiffs' theory of liability is known as a *Caremark* claim, based on a Delaware Chancery Court decision that considered directors' potential liability for failure to monitor corporate activities that eventually led to significant legal liability.  *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

Where, as here, the challenged conduct is the alleged failure of the directors to act, rather than a specific affirmative decision, Plaintiffs must allege particularized facts that create a reasonable doubt as to the Board's ability to properly exercise its independent and disinterested business judgment in responding to a demand.  *Rales v. Blasband*, 634 A.2d 927, 933-34 (Del. 1993).  As the Indiana Supreme Court has held, demand is not excused "simply because the verified complaint names the members of the board, or because it alleges that members of the board are involved in wrongdoing."  *Guidant*, 841 N.E.2d at 576.  Rather, Plaintiffs must show that at least half the directors "'face a substantial likelihood of liability' that renders them

---

[8]      Plaintiffs' attacks on Ms. Brune, Compl. ¶ 38, are frivolous and ignore her distinguished record of public service as an Assistant United States Attorney and Court-appointed receiver.  Ms. Brune is exceptionally well qualified to assist the Committee in its investigation.  Plaintiffs also cannot legitimately complain that ITT will compensate her for her professional services.  *See id.*  No independent counsel would assist the Committee without compensation.

'personally interested in the outcome of the decision on whether to pursue the claims asserted in the complaint.'" *Stone*, 911 A.2d at 367 (quoting *Rales*, 634 A.2d 927).

### A.    Count I Should Be Dismissed Because Plaintiffs Fail To Allege That More Than Half Of The Directors Face A Substantial Likelihood Of Liability For Breach Of Fiduciary Duty

The Delaware Supreme Court recently reaffirmed that a *Caremark* claim *"is 'possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'"* *Stone*, 911 A.2d at 372 (quoting *Caremark*, 698 A.2d at 967) (emphasis added). Courts recognize that "[m]ost of the decisions that a corporation, acting through its human agents, makes are...not the subject of director attention." *Id.* "Legally, the board itself will be required only to authorize the most significant corporate acts or transactions." *Caremark*, 698 A.2d at 968. Thus, "the duty to act in good faith to be informed cannot be thought to require directors to possess detailed information about all aspects of the operation of the enterprise." *Stone*, 911 A.2d at 368 (quoting *Caremark*, 698 A.2d at 967).

To excuse demand on a *Caremark* claim, Plaintiffs must satisfy a "scienter-based standard" and allege with particularity facts showing a "conscious decision" by the directors to breach their fiduciary duties. *Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007); *see also David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *1 (Del. Ch. Feb. 13, 2006) ("*Shaev*") (allegations must show "the directors consciously disregarded their duties over an extended period of time"), *aff'd on opinion below*, 911 A.2d 802 (Del. 2006); *Forest Labs*, 450 F. Supp. 2d at 395 ("Liability under *Caremark* is premised 'on a showing that the directors were *conscious* of the fact that they were not doing their jobs.'") (quoting *Guttman*, 823 A.2d at 506). As the Delaware Supreme Court held in *Stone*, "the necessary conditions predicate for director oversight liability" are:

15

(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, [the directors] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. *In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations.*

911 A.2d at 370 (emphasis added).

Similarly, under the Indiana Business Corporations Law, directors may not be held liable for breach of fiduciary duty unless "the breach or failure to perform constitutes willful misconduct or recklessness." IND. CODE ANN. § 23-1-35-1(e)(2). Plaintiffs must show "at minimum, a conscious disregard of or indifference to the consequences of a risky act." IND. CODE ANN. § 23-1-35-1 cmt. (e); *see also In re Guidant Corp. Shareholders Deriv. Litig.*, 2006 WL 290524, at *7 (S.D. Ind. Feb. 6, 2006). ITT's shareholders also adopted these limitations on director liability in the Company's Articles of Incorporation. Elbaum Aff., Ex. N at Art. 6th (ITT Corp. 10-Q, filed Aug. 7, 2006, Ex.-3.A).[9] By imposing a scienter-based standard for *Caremark* claims, courts ensure that these protections are not improperly eroded. *Ferre*, 2007 WL 1180650, at *8; *Desimone*, 924 A.2d at 935.

Plaintiffs do not even attempt to plead facts that might satisfy this standard. Plaintiffs' claims are cribbed from the plea agreement. But neither the seriousness of the underlying misconduct by certain Night Vision employees nor the size of the fine is sufficient to excuse demand. "[C]ourts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so." *Desimone*, 924 A.2d at 940.

---

[9]    The Court may take judicial notice of public documents, including ITT's articles of incorporation. *See, e.g., Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

For example, in *Stone*, the plaintiffs brought a derivative action against AmSouth

Bancorporation's directors based on their alleged failure to oversee the conduct of employees

working for AmSouth Bank, a subsidiary with 600 banking branches and 11,600 employees.

911 A.2d at 365. The employees' violations of the Bank Secrecy Act resulted in fines totaling

$50 million. *Id.* at 371. The Delaware Supreme Court held that demand was not excused

because the plaintiffs had not alleged sufficient facts to show that AmSouth's directors faced a

substantial likelihood of personal liability. *Id.* at 366-67. The Court emphasized that the

"directors' good faith exercise of oversight responsibility may not invariably prevent employees

from violating criminal laws, or from causing the corporation to incur significant financial

liability, or both." *Id.* at 373; *see also Fink v. Komansky*, 2004 WL 2813166, at *4 (S.D.N.Y.

Dec. 8, 2004) (finding demand was not excused where claims were based solely "on a

presumption that employee wrongdoing would not occur if directors performed their duty

properly").

Similarly, in *Shaev*, the derivative plaintiffs alleged that Citigroup lost $5 billion in

settlements, fines and failed loans as a result of the directors' failure to prevent the corporation's

fraudulent relationships with Enron and WorldCom. *Shaev*, 2006 WL 391931, at *3, *aff'd on

opinion below*, 911 A.2d 802 (Del. 2006). The Delaware courts dismissed the complaint for

failure to make a demand, holding that "[a]bsent any facts to show that a board's ignorance can

only be explained by a breach of fiduciary duty, such as allegations as to the centrality of the

fraudulent relationships to the corporation's business, *the size of any financial loss is not a

sufficient basis on which to rest liability.*" *Id.* at *6 (emphasis added).[10]

---

[10]    Although the complaint includes a few boilerplate allegations that the directors breached
the duty of disclosure, Compl. ¶¶ 41, 141, Plaintiffs have failed to plead any facts showing that
the directors knew of any violations, let alone that the directors face a substantial likelihood of

1. **Plaintiffs Have Not Alleged That The Directors Knowingly Failed To Establish A Reporting Or Information System**

Like the complaint recently dismissed by the Southern District in *Ferre v. McGrath*, the complaint here "does not contain any allegations concerning any lack of reasonable information and reporting systems." 2007 WL 1180650, at *8. The complaint does not even attempt to satisfy this element of the *Stone/Caremark* analysis with particularized allegations.

Plaintiffs do not allege any facts showing how "defendants failed in their oversight duties [or] what controls or systems they failed to implement." *Irwin v. Gemunder*, 2006 WL 3366180, at *4 (E.D. Ky. Nov. 20, 2006). Plaintiffs also do not allege any facts showing that the board completely lacked appropriate oversight committees or that the committees "failed to meet." *Shaev*, 2006 WL 391931, at *5; *see also Guttman*, 823 A.2d at 507. To the contrary, Plaintiffs concede that the board established four oversight committees: an audit committee, a corporate responsibility committee, a compensation and personnel committee and a nominating and governance committee. Compl. ¶¶ 29-36. They do not—and cannot—allege that these committees failed to meet on a regular basis and receive appropriate reports from management.

Although Plaintiffs assert that "*ITT* failed to establish a system to ensure compliance with the relevant federal export laws," Compl. ¶ 58, this sweeping generalization does not implicate the directors in any way, let alone show that the directors made a "conscious decision" not to create a more robust ITAR compliance program. Significantly, the more specific allegations in the complaint directly contradict this lone conclusory allegation and refute Plaintiffs' *Caremark* claims. For example, Plaintiffs concede that the Night Vision unit had employees who were responsible for compliance with export regulations. Compl. ¶¶ 68-69; *see also id.* ¶ 67 (referring

---

liability on a disclosure claim. *See Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *15 n.8 (Del. Ch. Jan. 22, 1999) (directors not required to disclose information that is unknown to them). In addition, the complaint does not allege any facts that would satisfy the heightened pleading standard of Rule 9(b). *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

to "ITT Defense's top export compliance manager"). Plaintiffs also allege that Night Vision unit compliance personnel reviewed an application to the State Department for an ITAR license to transfer certain technical drawings, but an individual manager "lied" to the compliance employee about his past actions and future plans. *Id.* ¶ 98. Similarly, Plaintiffs concede that the Night Vision unit retained outside counsel to assist in the filing of a voluntary disclosure of ITAR violations to the State Department. *Id.* ¶ 62. The complaint further alleges that the Night Vision unit applied for and obtained export licenses between 1994 and 1999, *id.* ¶ 71, and also obtained in 2000 State Department approval of a Technical Assistance Agreement with a Singapore company that authorized the transfer certain technical drawings to Singapore so that the company there could manufacture lenses for use in night vision goggles. *Id.* ¶¶ 76-77. These allegations in the complaint—that the Night Vision unit had compliance personnel, applied for and obtained export licenses, and hired outside counsel to handle a voluntary ITAR disclosure— belie any possible claim that there was no compliance program at all.

The fact that the Night Vision unit's ITAR compliance programs may appear inadequate in hindsight is irrelevant. Courts routinely reject *Caremark* claims against directors—like Plaintiffs' complaint here—that are based on nothing more than hindsight and speculation. *Desimone*, 924 A.2d at 940. The complaint must plead a "conscious decision" by the board or an "utter failure" to establish any compliance and reporting system at all. *Stone*, 911 A.2d at 372; *Desimone*, 924 A.2d at 935. Plaintiffs do not attempt to satisfy this standard.[11]

### 2.  Plaintiffs Have Not Alleged That Directors Had Reason To Suspect And Consciously Disregarded Wrongdoing

Likewise, Plaintiffs fail to allege with particularity that the directors knowingly

---

[11]    Contrary to Plaintiffs' suggestion, Mr. Loranger's acknowledgment of wrongdoing by employees is not an admission that the directors are liable for the misconduct. Compl. ¶ 47.

disregarded any "red flags" of wrongdoing. Where a corporation has in place an oversight system, courts will not excuse the demand requirement unless the complaint alleges facts showing that the directors *consciously disregarded* specific indications of misconduct. *Shaev*, 2006 WL 391931, at *5. Plaintiffs must allege with particularity "what obvious danger signs were ignored or what additional measures the directors should have taken." *Halpert Enters., Inc. v. Harrison*, 362 F. Supp. 2d 426, 433 (S.D.N.Y. 2005) (citation omitted).

The complaint does not allege any facts that could possibly suggest the directors received and ignored "obvious danger signs." Instead, the complaint merely purports to describe the conduct of employees in a particular business unit without alleging *any* connection between those employees and the directors. *See, e.g.*, Compl. ¶¶ 60, 65, 73, and 114. In addition, the complaint specifically alleges that individual employees (the John Doe Defendants) "instituted and carried out an elaborate and complex scheme of deceit, subterfuge, and concealment," *Id.* ¶ 2, and "lied" to those employees charged with ensuring ITAR compliance. *Id.* ¶ 98. The absence of any alleged link to the directors, combined with the alleged concealment by employees, is fatal to Plaintiffs' claims. *See Ferre*, 2007 WL 1180650, at *6 (allegation that misconduct was discovered only by regulatory agencies during investigation "specifically excludes any possibility" of knowledge by outside directors).

Rather than identify any red flags actually received by the directors, Plaintiffs speculate that if the directors done something more, they "would have" uncovered the ITAR violations by employees. Plaintiffs offer nothing more than the following conclusory allegations:

- "The Corporate Responsibility Defendants either caused or recklessly ignored the misconduct described therein by failing regularly to assess the adequacy and effectiveness of the Company's Code of Corporate Conduct and to review any violations of the Code, all as mandated in its Board Charter. Proper assessment would have uncovered and led to correction of the egregious and felonious misconduct described herein." Compl. ¶ 42.

20

- "The Audit Defendants either caused or recklessly ignored the felonious misconduct described therein by failing regularly to monitor and discuss with management and the independent auditors the quality and adequacy of the Company's internal controls and their effectiveness. Proper monitoring would have uncovered and led to correction of the felonious misconduct described herein." Compl. ¶ 43.

- "The Personnel Defendants either caused or recklessly ignored the misconduct described herein by failing regularly to evaluate senior management and chief executive officer performance – including the performance of John Doe defendant managers B, C, and D, and to evaluate and make regular reports to the Board on matters concerning management performance. Proper evaluation would have uncovered and led to correction of the felonious misconduct described herein." Compl. ¶ 44.

- "The Governance Defendants either caused or recklessly ignored the misconduct described herein by failing to develop, review, update and recommend to the Board corporate governance principles for the Company. Proper development and review would have uncovered and led to correction of the felonious misconduct described herein." Compl. ¶ 45.

This is pure speculation, not particularized fact. Courts routinely find that these kind of boilerplate allegations "that the directors 'knew or should have known' about the misconduct are, as a matter of law, insufficient to excuse demand." *In re Xethanol Corp. Deriv. Litig.*, 2007 WL 2331975, at *4 (S.D.N.Y. Aug. 16, 2007).

Moreover, Plaintiffs may not impute knowledge of wrongdoing to the Defendants based solely on their roles as directors and committee members. The Southern District recently rejected this claim in *Forest Laboratories*, holding "there is no authority to support the attribution of knowledge to Outside Directors who are not alleged to be directly involved in the day-to-day operations of the company." 450 F. Supp. 2d at 391. Similarly, in *Ferre* the Southern District held that "[a]llegations of knowledge explained solely by the directors' service as directors, without more, are insufficient as a matter of law." 2007 WL 1180650, at *6.[12]

---

[12]    *See also Desimone*, 924 A.2d at 942 (refusing to impute knowledge of options backdating); *In re Computer Scis. Deriv. Litig.*, 2007 WL 1321715, at *9 (C.D. Cal. Mar. 27, 2007) (same); *In re Coca-Cola Enters., Inc. Deriv. Litig.*, 478 F. Supp. 2d 1369, 1378-79 (N.D.

Plaintiffs' attempt to impute knowledge to ITT's directors is especially weak given the scope of ITT's operations and relative size of the Night Vision unit. During the relevant time period, ITT was a diversified company with global operations and 42,000 employees. ITT developed, manufactured and sold thousands of products and services in a broad array of markets, ranging from water treatment pumps to railcar shock absorbers to battlefield communications systems. The Night Vision unit was one of many business units in this $4.8 billion conglomerate, generating only 4.2% of the Company's total revenues. Night Vision equipment clearly was not the Company's "core" product line.

ITT's eight outside directors, a clear majority of the Board, are not required "to possess detailed information about all aspects of the operation of the enterprise." *Stone*, 911 A.2d at 368 (quoting *Caremark*, 698 A.2d at 971). Nor could outside directors possibly monitor the design process and supply chain for every component of every product manufactured by the Company. Thus, the directors do not face a substantial likelihood of personal liability because certain Night Vision unit employees improperly managed the supply process for two small components used in one product in one of the Company's diverse product categories. *See* Compl. ¶¶ 83-88. The glass lenses and related coatings used in the filter also are not even the core component (the night vision tube is) of this non-"core" product line. Nor do directors face a substantial likelihood of liability because certain employees improperly drafted a disclosure letter that had been prepared with the assistance of outside counsel. *See id.* ¶¶ 61-69. Further, even though the misconduct described in the deferred count of the criminal information occurred over a longer time period, the complaint does not allege any facts showing that the directors received any red flags of how a small number of employees in Virginia (among the Company's 42,000 employees

---

Ga. 2007) (refusing to impute knowledge of accounting improprieties).

worldwide) were handling the technical data at issue. *See id.* ¶¶ 106-128. The Board is "required only to authorize the most significant corporate acts or transactions," and nothing in the complaint raises the details of the misconduct to the level and attention of the Board. *Caremark*, 698 A.2d at 968.[13]

The investigation by the State Department itself also is not a sufficient red flag to excuse demand. Significantly, the search warrant was executed in October 2002, long after the central events underlying the two counts of the criminal information to which the Company pled guilty. The improper transfers of filter specifications at issue in Count I occurred between March and August of 2001, and the misleading disclosure letters at issue in Count II were sent in April and May of 2000. Compl. ¶¶ 65-68 & 130. The complaint also fails to allege any facts regarding any supposed action, or inappropriate inaction, taken by the directors to monitor and respond to the investigation. Nothing in the complaint reflects a "conscious decision" by the directors to breach their fiduciary duties. *Desimone*, 924 A.2d at 935.

### B. The Additional Boilerplate Allegations Do Not Show That A Majority of the Board Is Interested Or Incapable Of Acting Independently

Plaintiffs also assert two boilerplate theories that have been universally rejected as insufficient to excuse demand. First, Plaintiffs allege that demand would be futile because the directors would have to sue themselves. Compl. ¶ 49. The Indiana Supreme Court (like other courts) has held that this allegation fails as a matter of law. *Guidant*, 841 N.E.2d at 576; *see also Ferre*, 2007 WL 1180650, at *7 ("The rote allegation that directors would have to sue

---

[13]     Plaintiffs' additional allegations fail to provide any link between the underlying conduct and the directors. The alleged statement by a Defense Department agent concerning the "willful self blinding of company officials" does not refer to the Board or any individual directors. Compl. ¶ 46. And, while the complaint asserts generally that "ITT was aware that its executives were engaged in a multi-year conspiracy to violate the criminal law and export control rules" this vague conclusion appears to refer to the corporation and says nothing specific about the knowledge of the individual directors. *Id.*

themselves has been consistently rejected as a basis for excusing demand."). Second, Plaintiffs

claim that the directors are interested because any lawsuit would jeopardize their insurance

coverage due to the "insured versus insured" exclusion in most D&O liability policies. Compl. ¶

50. As the *Ferre* court recently found, "this argument has been rejected repeatedly." 2007 WL

1180650, at *8; *see Halpert Enters.*, 362 F. Supp. 2d at 433.[14]

### C.    Count II Should Be Dismissed Because Plaintiffs Fail To Allege That A Majority Of The Board Faces A Substantial Likelihood Of Liability For Gross Mismanagement

Plaintiffs have not alleged with particularity that the directors face a substantial

likelihood of liability on their claim for gross mismanagement. *See* Compl. ¶¶ 144-149. Gross

mismanagement is not an independent claim. Rather, it is merely a repackaging of Plaintiffs'

*Caremark* claim. *See, e.g., Clark v. Lacy*, 376 F.3d 682, 686 (7th Cir. 2004) (gross

mismanagement claims are premised on breach of fiduciary duties rather than independent duty);

*In re Zoran Corp. Deriv. Litig.*, 511 F. Supp. 2d 986, 1019 (N.D. Cal. Jun. 5, 2007) (gross

mismanagement "claims are often considered a repackaging of claims for breach of fiduciary

duties instead of being a separate tort"); *Amalgamated Bank v. Yost*, 2005 WL 226117, at *13-14

(E.D. Pa. Jan. 31, 2005) (analyzing gross mismanagement as a *Caremark* claim). Indeed, the

allegations in Counts I and II are based on the same underlying fiduciary duties. *Compare*

Compl. ¶ 140 (Count I: alleged duty "to exercise reasonable and prudent supervision") *with*

Compl. ¶ 145 (Count II: alleged duty "to prudently supervise, manage, and control"). For the

reasons discussed above, demand is not excused with respect to Count II.

---

[14]    Plaintiffs do not allege that demand should be excused because the directors are "so
under the influence" of an interested party "that their discretion [is] sterilized." *Rales*, 634 A.2d
at 936; *see also Shaev*, 2006 WL 391931, at *5 n.11.

### III.    PLAINTIFFS' CLAIMS AGAINST THE JOHN DOE DEFENDANTS SHOULD BE DISMISSED FOR FAILURE TO MAKE A DEMAND

Count III alleges breach of fiduciary duty claims against four John Doe Managers.  Count IV asserts claims of professional negligence and aiding and abetting a breach of fiduciary duty against a John Doe Law Firm.  Plaintiffs do not—and cannot—establish demand futility with respect to these counts.  Plaintiffs do not allege any facts suggesting that the proposed corporate claims against non-director employees and an outside law firm could create a substantial likelihood of liability for the directors.  In addition, there are no allegations of any relationships between the John Doe Defendants and any directors that would create a disqualifying interest.  *See Rales*, 634 A.2d at 934; *see also In Re ITT Educational Services, Inc. Deriv. Litig.*, No. 29DQ3-0402-PL-176, slip op. at 4 n.1 (Ind. Sup. Sept. 16, 2005) (dismissing derivative claims against company's outside auditors because the complaint alleged no facts showing the directors could not fairly evaluate a demand) (Elbaum Aff., Ex. O).

## CONCLUSION

For the reasons set forth above, ITT respectfully requests that the Court enter an order dismissing the consolidated amended complaint with prejudice.

Dated: November 30, 2007
      New York, New York

Respectfully submitted,

SIMPSON THACHER & BARTLETT LLP

Paul C. Curnin
David Elbaum
Marisa L. Sarig
425 Lexington Avenue
New York, New York 10017-3954
Tel: (212) 455-2000
Fax: (212) 455-2502
*Attorneys for Nominal Defendant ITT Corporation*