UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
|  | : |
| In re ITT CORPORATION DERIVATIVE | : |
| LITIGATION | : Case No. 07 Civ. 2878 (CLB) |
|  | : |

---

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO ITT CORPORATION'S MOTION TO DISMISS**

HARWOOD FEFFER LLP
488 Madison Avenue
New York, New York 10022
Tel. (212) 935-7400

Chairman, Plaintiffs' Executive Committee

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.      PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        A.      Defendants' Scheme and Criminal Violations . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        B.      The Harm To ITT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        C.      The Initial Complaints and the Reale Demand Letter . . . . . . . . . . . . . . . . . . . 9

        D.      The SLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.      Plaintiff Reale's Demand On The Board Does
                Not Prevent Any Other Shareholder From
                Asserting That Demand Is Futile . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.      The Appointment Of A Conflicted And Not Disinterested
                Special Committee Does Not Justify The Dismissal
                Of This Action, Or Provide Good Cause For Issuing A Stay . . . . . . . . . . . . . . 14

                1.      The Special Committee Members are Not Disinterested . . . . . . . . . . . . 16

                2.      There is Reasonable Doubt as to Whether
                        Special Counsel can Act in this Matter
                        with the Requisite Degree of Impartiality . . . . . . . . . . . . . . . . . . . . . . 17

        C.      Plaintiffs Adequately Plead Demand Futility . . . . . . . . . . . . . . . . . . . . . . . . . 19

                1.      The CAC Satisfies The Rales Standard . . . . . . . . . . . . . . . . . . . . . . . . 19

                2.      The Board's Inaction in the Face of Red Flags
                        Raises a Substantial Likelihood of Liability . . . . . . . . . . . . . . . . . . . . 22

                3.      The Continuing Criminal Investigation
                        Demonstrates the ITT Directors' Lack
                        of Disinterest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

i

4.    There Is a Substantial Likelihood of
          Liability for the Audit Committee and
          Corporate Responsibility Committee Defendants . . . . . . . . . . . . . . . . . . 27

5.    Demand On The John Doe Defendants Is Excused . . . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

**CASES** **PAGE**

Aronson v. Lewis,
    473 A.2d 805  (Del. 1984)  ................................................................... 19, 20

Ascher v. Target Corp.,
    2007 WL 3287441 (S.D.N.Y. Oct. 15, 2007) ................................................ 13

Atkins v. Topp Comm, Inc.,
    874 So. 2d 626 (Fla. App. 4th Dist. 2004)  ................................................. 17

Avacus Partners, L.P. v. Brian,
    1990 Del. Ch. LEXIS 178 (Del. Ch. Oct. 24, 1990)  .................................. 11, 12

Bergstein v. Texas Int'l, Co.,
    453 A.2d 467 (Del. Ch. 1982)  .......................................................... 19

Biondi v. Scrushy,
    820 A.2d 1148 (Del. Ch. 2003)  ........................................................ 16

Boeing v. Shrontz,
    1992 Del. Ch. LEXIS 84 (Del. Ch. Apr. 20, 1992)  ..................................... 11

Brehm v. Eisner,
    746 A.2d 244 (Del. 2000)  ............................................................... 20

Clark v. Lacy,
    376 F.3d 682 (7th Cir. 2004)  ........................................................... 26

Cole v. Schenley Indus. Inc.,
    563 F.2d 35 (2d Cir. 1977)  ............................................................. 13

David B. Shaev Profit Sharing Account v. Armstrong,
    2006 WL 391931 (Del. Ch. Feb. 13, 2006) ............................................... 23

Emerald Partners v. Berlin,
    726 A.2d 1215 (Del. 1999)  ............................................................. 20

Ferre v. McGrath,
    2007 WL 1180650 (S.D.N.Y. Feb. 16, 2007)  ............................................. 26

G&N Aircraft, Inc. v. Boehm,
        743 N.E.2d 227 (Ind. 2001) ................................................ 5

Graham v. Allis-Chalmers Mfg. Co.,
        188 A.2d 125 (Del. 1963) ................................................ 23

Grimes v Donald,
        673 A.2d 1207 (Del. 1996) ................................................ 20

Guttman v. Huang,
        823 A.2d 506 (Del. Ch. 2003) ................................................ 21, 23, 28

Harris v. Carter,
        582 A.2d 222 (Del. Ch. 1999) ................................................ 19, 20

Holland & Knight v. Deatley,
        2007 WL 2253272  (E. D. Wash. July 31, 2007) ................................................ 13

In re Abbott Labs. Deriv. S'holders Litig.,
        325 F.3d 795 (7th Cir. 2003) ................................................ 20, 24, 25, 27

In re Bank of N.Y. Deriv. Litig.,
        2000 WL 1708173 (S.D.N.Y. Nov. 14, 2000) ................................................ 16

In re Baxter S'holder Litig.,
        654 A.2d 1268, 1270 (Del. Ch. 1995) ................................................ 20

In re Caremark Int'l Inc. Deriv. Litig.,
        698 A.2d 959 (Del. Ch. 1996) ................................................ 4, 5, 23

In re FirstEnergy S'holder Deriv. Litig.,
        320 F. Supp. 2d 621 (N.D. Ohio 2004) ................................................ 12, 26

In re Guidant S'holders Deriv. Litig.,
        841 N.E.2d 571 (Ind. 2006) ................................................ 11, 19

In re Oracle Corp. Deriv. Litig.,
        824 A.2d 917 (Del. Ch. 2003) ................................................ 18, 19

In re Oxford Health Plans,
        192 F.R.D. 111 (S.D.N.Y. 2000) ................................................ 6, 25

In re SFBC Int'l, Inc. Sec. & Deriv. Litig.,
        495 F. Supp. 2d 477 (D.N.J. 2007) ................................................ 23, 25

In re Veeco Instruments, Inc. Sec. & Deriv. Litig.,
     434 F. Supp. 2d 265 (S.D.N.Y. 2006) ................................................................ 22, 27

Johnson v. Manhattan Ry. Co.,
     289 U.S. 479 (1933) ............................................................................................ 13

Joy v. North,
     692 F.2d 880 (2d Cir. 1982) ............................................................................... 17

Kaplan v. Peat, Marwick, Mitchell & Co.,
     540 A.2d 726 (Del. 1988) .................................................................................... 28

Katz v. Realty Equities Corp.,
     521 F.2d 1354 (2d Cir. 1975) ............................................................................. 13

Klein v. FPL Group, Inc.,
     2004 WL 302292 (S.D. Fla. Feb. 5, 2004) ......................................................... 18

McCall v. Scott,
     239 F.3d 808 (6th Cir. 2001),
     amended on denial of rehearing by,
     McCall v. Scott, 250 F.3d 997 (6th Cir. 2001) ............................................. 24, 25

Miller v. Loucks,
     1992 U.S. Dist. LEXIS 16966 (N.D. Ill. Nov. 5, 1992) ..................................... 12

Rales v. Blasband,
     634 A.2d. 927 (Del. 1993) ........................................................................ 3, 19, 20, 28

Spiegel v. Buntrock,
     571 A.2d 767 (Del. 1990) .................................................................................... 28

Stone v. Ritter,
     911 A.2d 362 (Del. 2006) ................................................................................ 4, 25

## FEDERAL STATUTES

22 C.F.R. § 127.1(a) ....................................................................................................... 9

22 C.F.R. § 127.3 ............................................................................................................. 9

22 U.S.C. § 2778 ............................................................................................................. 9

Fed. R. Civ. P. 8(e)(2) ................................................................................. 13

Fed. R. Civ. P. 23.1 ..................................................................................... 1

## INDIANA STATUTES

Ind. Code Ann. § 23-1-32-4 ............................................................... 15, 17

Ind. Code Ann. § 23-1-32-4(d))(1) .................................................... 16, 17

Ind. Code Ann. § 23-1-32-2 .......................................................... 5, 15, 19

This Memorandum of Law is respectfully submitted in opposition to the motion of nominal defendant ITT Corporation ("ITT" or the "Company") to dismiss the Verified Consolidated Amended Complaint ("CAC") pursuant to Fed. R. Civ. P. Rule 23.1.

## I. PRELIMINARY STATEMENT

This shareholder derivative action is brought for the benefit of nominal defendant ITT against certain members of its Board of Directors ("Director Defendants" or the "Board")[1] and certain ITT managers (the "Manager Defendants") and an outside law firm (all named in the CAC as John Does). The filing of the CAC arises from directorial fiduciary duty breaches due to failure to supervise adequately the Manager Defendants, whose conduct, over a period of years, included commission of federal felonies, the consequences of which damaged ITT by subjecting it to fines and penalties totaling $100 million. In short, on the Director Defendants' watch, the Manager Defendants caused ITT to violate federal law by sharing top secret data relating to military night vision equipment with foreign entities, including China, thereby threatening to strip American soldiers of the advantage they formerly enjoyed in night combat. (Indeed, once that technology was illegally exported to potentially unfriendly foreign nations, there is no telling to whom it was subsequently provided.) The CAC, therefore, asserts significant wrongdoing against the John Doe defendants.

As a result of ITT's criminal violations, it pled guilty to federal felonies involving the willful export of defense articles without a license and the willful omission of statements of material fact in arms control exports and agreed to pay fines, penalties, and forfeitures totaling $100

---

[1]     The Director Defendants are Steven R. Loranger, Curtis J. Crawford, Christina A. Gold, Ralph F. Hake, Dr. John J. Hamre, Raymond W. Leboeuf, Frank T. Macinnis, Linda S. Sanford, and Markos I. Tambakeras.

million.  According to the United States Attorney for the Western District of Virginia, Thomas

Brownlee, ("U.S. Attorney"), who accepted ITT's guilty plea: "[t]he criminal actions of this

Company have threatened to turn on the lights on the modern battlefield for our enemies and expose

American soldiers to great harm."  ¶ 4.[2]   As it stated in the related plea agreement (the "Plea

Agreement"), "ITT agrees that it is pleading guilty . . . because ITT is in fact guilty."  ¶ 1.

       In the face of the Director Defendants' failure to act to prevent this egregious

disclosure of America's military secrets, defendants now claim that plaintiffs "face an uphill battle"

in this action.    (ITT's Memorandum of Law at 1.)[3]   That assertion is wholly misplaced here.

Apparently recognizing that the ITT Board could not fairly address this action, it has appointed a

Special Litigation Committee ("SCL") to investigate the seriousness of the claims asserted.  Thus,

the ITT Board has no claim that pre-suit demand was required, since it has acknowledged that it

could not address such demand.  This is confirmed by the obvious facts.  By its sustained and

systematic failure to exercise oversight of ITT's outrageous and criminal misconduct, the Director

Defendants manifested a complete absence of good faith, shown by their (a) knowing or reckless

failure to know of the federal felonies in which the Company was engaged, and (b) failure to take

steps to prevent or end that misconduct.  Moreover, they oversaw efforts to "stonewall" the federal

investigation, which likely made the ultimate penalties far more severe than they would have been

had the directors ordered cooperation.  As a result, the Director Defendants' sustained failure to act

and approval of obstructionist tactics cost the Company at least $100 million.

---

[2]      References to the CAC shall be "¶."

[3]      References to ITT's Memorandum of Law shall be "ITT Br. at __."

2

ITT argues that since a Special Committee has been established, this action should be dismissed. This assertion is wholly baseless. As discussed below, the SLC process in this case is deeply flawed, and the Court should reject the ploy, since the SLC cannot be deemed independent or disinterested. Accordingly, this action should be permitted to proceed.

As a fallback, ITT argues that pre-suit demand was not excused. Yet, the CAC asserts both demand futility and demand made allegations, since three separate actions were consolidated here, including one action where pre-suit demand was made.[4] Since ITT has established the SLC, it cannot now argue that the ITT Board was capable of addressing that Demand. Nor does it claim that the ITT Board has taken any action with respect to the Demand. Accordingly, demand is excused because the CAC raises a reasonable doubt that a majority of the Director Defendants are disinterested or independent. Rales v. Blasband, 634 A.2d. 927, 930 (Del. 1993). As a result, they face a substantial likelihood of personal liability for the misconduct charged in the CAC.

Plaintiffs plead the Director Defendants' conscious failure of oversight with ample particularity and detail, yet, defendants claim that the CAC lacks adequate allegations of failures of monitoring and oversight procedures. This assertion arises from the erroneous claim that the CAC alleges no facts "that would have raised the low-level operational details of the night vision unit to the attention of the Board." (ITT Br. at 3.) To the contrary, the Director Defendants' ignorance of criminal conduct in a crucial segment of the Company's business evidences absence of meaningful oversight procedures, thereby subjecting Board members to a substantial likelihood of liability.

---

[4]     A copy of the Pre-Suit Demand is annexed to the Declaration of Robert I. Harwood ("Harwood Dec."), dated December 28, 2007.

These Director Defendants systematically failed to notice that ITT, the leading manufacturer of night vision equipment for the United States, had outsourced secret data to, among other countries, China, thereby making, according to the U.S. Attorney, American soldiers "the principal victims of ITT's crimes." Even if the Night Vision unit generated only 4.2% of ITT's total revenues, this criminal conduct by ITT Managers cannot be deemed "low-level operational details." It was a segment of ITT Defense that generated over 80% of ITT's sales and revenues. ITT Exhibit A at 4. (ITT Br. at 3.) ITT cannot claim its top secret equipment and technology division was too small a part of ITT's business to warrant Board supervision.

Accordingly, the CAC amply alleges that the Director Defendants breached "their duty of loyalty by failing to discharge that fiduciary obligation in good faith." Stone v. Ritter, 911 A.2d 362, 370 (Del. 2006). Failure to discuss at Board meetings ITT's criminal conduct, over a multi-year period, manifests "an utter failure to . . . assure a reasonable information and reporting system exists". In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d 959, 971 (Del. Ch. 1996). Demand, therefore, is excused because "(a) the directors utterly failed to implement any reporting or information system or control; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." Stone, 911 A.2d at 370. This inadequate oversight prevented proper exercise of the Board's independent and disinterested business judgment. The Board members ignored the red flags apparent for all to see, had they timely adhered to ITT's stated oversight procedures. That conscious disregard of their responsibilities has damaged ITT in excess of $100 million dollars. As a result, defendants face a substantial likelihood of liability due to their failure to prevent the wrongs alleged in the CAC by virtue of their duty of loyalty breaches.

4

The fact that one plaintiff made a demand on the Board does not mean that all plaintiffs in this CAC have made a demand and therefore conceded demand excusal. However, ITT's inadequate and untimely response to plaintiff Anthony Reale's ("Reale") demand evidences demand futility loudly and clearly. See infra at 9-13.

While Indiana courts generally look to Delaware law in resolving corporate fiduciary duty cases,[5] Indiana's law differs from Delaware law in that it permits, but does not mandate, a judicial stay of an action after establishment of a "disinterested committee." Ind. Code. Ann. §23-1-32-2. However, even though defendants established the SLC, Indiana law would not permit a stay here because none of the directors on the SLC is "disinterested." None is named for frivolous or insubstantial reasons. Plaintiffs named each for having committed serious fiduciary breaches.

ITT also asserts that plaintiffs have failed to meet their Caremark burden by failing to allege how directors failed in their oversight and implementation of controls, and the warning signs missed and ignored. (ITT Br. at 2.) Defendants are wrong. The CAC describes with ample particularity the misdeeds of the Manager Defendants and describes, based on governmental investigative sources, how the Board failed to learn of this misconduct:

> Justice Department officials revealed that ITT was aware that its executives were engaged in a multi-year conspiracy to violate the criminal law and export control rules for classified military equipment, as well as its violating its export licenses for night-vision equipment, but failed to take significant corrective action. John Schoenweiss, a senior agent of the Defense Department's Defense Criminal Investigative Service, has stated that the ITT's "serious violations" ran deep and "[t]he problem that we encountered was in the culture -- the willful self blinding of company officials."

¶ 46 (Emphasis added).

---

[5]     See G&N Aircraft, Inc. v. Boehm, 743 N.E.2d 227, 238 (Ind. 2001).

Indeed, the CAC alleges that defendant Loranger, ITT's Chairman, Chief Executive Officer, and President, even "acknowledged that ITT 'had gaps in our compliance programs.'" ¶ 47. As this Court found in In re Oxford Health Plans, 192 F.R.D. 111, 117 (S.D.N.Y. 2000), where, as here, plaintiffs allege directorial failure to supervise and monitor "demand futility is ordinarily found, especially where the failure involves a scheme of significant magnitude and duration which went undiscovered by the directors." Because of the magnitude of and duration of ITT's scheme, demand futility should also be found here. ITT's motion is, therefore, unsupported and unpersuasive, and the Court should deny the motion it its entirety and allow this action to proceed.

## II. THE FACTS

### A.    Defendants' Scheme and Criminal Violations

At all relevant times, ITT, the twelfth largest supplier of sophisticated defense systems to the U.S. military, was the leading manufacturer of military night vision equipment. ¶ 3. This case arises out of defendants' breaches of fiduciary duties, that caused criminal violations, thereby damaging ITT. Those violations led to a criminal proceeding in which ITT pled guilty on March 27, 2007 to federal felonies (U.S.A. v. ITT Corp., Cr. No. 07-22 (W.D. Va.)) involving the willful export of data relating to that night vision equipment articles without a license and the willful omission of statements of material fact in arms control exports.

In the Plea Agreement, ITT agreed to pay $100 million in stockholder money in criminal fines, penalties, and forfeitures. ITT also agreed to a deferred prosecution agreement with respect to the criminal charge of willful violation of the international traffic in arms regulations ("ITAR") and export of defense articles without a license, and agreed to pay for the costs of an

6

independent monitor and staff to monitor its compliance with the deferred prosecution agreement and federal law.  In the words of the U.S. Attorney, "ITT managers created an atmosphere where U.S. export laws were viewed as obstacles to getting business done.  This atmosphere led to the transfer of sensitive military technology to the Republic of China, and others." ¶ 1.

Named in the CAC as John Doe defendants are the four Manager Defendants whose conduct while employed as decision-makers with managerial authority within ITT was, in large part, responsible for the criminal charges to which ITT pled guilty.  The lawsuit also names as a John Doe defendant the outside law firm that conspired with the Manager Defendants and with ITT to cover up and conceal defendants' conduct from the government's investigators.[6]  The John Doe Defendants' conduct as described herein was the proximate cause of the damages that ITT suffered as a result of defendants' participation in, reckless failure to prevent, or aiding and abetting the illegal export of technical data, drawings, and specifications relating to military night vision systems, and the illegal omission of material facts from required arms export reports submitted to the government, causing those reports to be patently misleading and false.  ¶¶ 58-128.  The CAC alleges with particularity that the Director Defendants failed to exercise good faith in carrying out their duty to prevent such acts, and to pursue appropriate legal and remedial action once these activities were fully uncovered. ¶¶ 40-45.

Over a period of many years, while the Director Defendants turned a blind eye to their conduct, the Manager Defendants instituted and carried out the elaborate and complex scheme of deceit, subterfuge, and concealment directed against agencies of the federal government to

---

[6]     Based on an agreement with ITT, the five John Doe defendants have neither been named in the CAC nor served, but ITT has entered into agreements with them tolling the statute of limitations.

facilitate their plan of (a) subverting United States export control laws and (b) exporting classified information dealing with military night vision systems to foreign countries in violation of multiple criminal laws and government regulations.  (CAC ¶¶ 55-129.)  The motive behind this scheme, naked profit, compromised the safety and welfare of American combat troops while they were in the midst of a war and compromised American security.  The profit motive extended to providing foreign countries, including China, with classified data relating to night vision capabilities.

The State Department considered the night vision technology so sensitive that it classified it as "Secret - No Foreign," meaning it could not even be shared even with friendly governments like Britain (our ally in the Iraq war), and certainly not with potential strategic threats, such as China.  As the U.S. Attorney explained, "The criminal actions of this Company have threatened to turn on the lights on the modern battlefield for our enemies and expose American soldiers to great harm."  ¶¶ 4, 130-136.  There can be no doubt --  and, by its guilty plea, ITT has so acknowledged -- that  ITT's executives jeopardized our national security and the safety of our troops on the battlefield.

**B.     The Harm To ITT**

Although, as the U.S. Attorney stated, American soldiers were "the principal victims of ITT's crimes," and although the harm to the Company and its stockholders is monetary and not potentially fatal, the consequences of the conduct described herein have been, and will continue to be, severe for ITT and its stockholders. For example, in addition to the $100 million in penalties and forfeitures described below, the Company is now the subject of independent monitoring.  ¶ 6.

As a result of defendants' misconduct, a criminal information dated March 26, 2007

was filed against ITT in the above-referenced criminal action, charging ITT with three felony counts of violating the Arms Export Control Act of 1976, 22 U.S.C. § 2778 and specified sections of ITAR, 22 C.F.R. §§ 127.1(a) & 127.3. The magnitude of the penalties imposed upon ITT pursuant to its guilty plea demonstrates how severely the government regarded ITT's transfer of such sensitive military technology to foreigners. ¶¶ 7, 130-132.

Defendants assert that ITT's conduct described in the CAC was benign because the central component of the night vision goggles was never compromised or that "any U.S. personnel were ever injured by the inappropriate actions of the responsible Night Vision employees." ITT Br. at 7, 8. While the families of our killed and maimed troops who served in Iraq and Afghanistan may not be willing to accept that statement as factual, plaintiffs did not bring this action to assert their rights or those of the fallen. (The Director Defendants will have to look to their own consciences if they seek absolution.) But the U.S. Attorney did state that American soldiers were the principal victims of ITT's crimes because ITT's conduct "threatened to turn on the lights of the modern battlefield for our enemies." And because ITT's criminal conduct placed our troops at grave risk, they paid fines, penalties and restitution totaling $100 million, with the last $50 million "in restitution to the victims of their crimes - the American Soldiers." ¶ 7. It is because of the Director Defendants' actions, or systematic failure to act, that this action was brought - to recompense ITT and its stockholders for the directorial fiduciary breaches caused by a failure to monitor and detect these crimes.

## C. The Initial Complaints and the Reale Demand Letter

On April 10, 2007, ITT stockholder Sylvia B. Piven ("Piven") filed a derivative suit asserting demand futility. A second suit asserting demand futility was filed on April 11, 2007, and

on April 12, Reale served a pre-suit demand on ITT. Each of those individuals and their respective counsel acted independently of each other in seeking recompense for ITT based on defendants' misconduct. As a result, neither of the methods chosen by plaintiffs for pursuing the Company's remedies precludes the other from proceeding herein. Consolidation does not change their underlying rights.

### D.    The SLC

The SLC, formed months after Reale's demand and the commencement of Piven's action, is comprised of three Board members who are not disinterested under Indiana law. Any decision it reaches should, therefore, be given no weight by this Court.

## III. ARGUMENT

### A.    Plaintiff Reale's Demand On The Board Does Not Prevent Any Other Shareholder From Asserting That Demand Is Futile

On April 10, 2007, plaintiff Piven filed a derivative suit asserting that demand on the ITT Board of Directors was excused as futile. A second suit alleging demand futility was filed by ITT shareholder Norman Levy on July 11, 2007.[7] At the time Piven filed her case, she and her counsel were *completely unaware* that a demand would be made on the Board on April 12, 2007 by Reale who, after waiting four months for ITT to take action on his demand, and fearing that a longer wait would cause the statute of limitations to run on certain of his claims, filed a "demand made"

---

[7]    ITT mistakenly asserts in its brief that Piven's initial action was filed on April 12, 2007. (ITT Br. at 8). Mr. Levy is not named as a plaintiff is the present CAC.

10

action on August 17, 2007.[8]

     ITT argues that Reale's demand on the Board forecloses any other plaintiff from arguing demand excusal, and cites as its primary authority a completely inapposite decision, <u>Boeing v. Shrontz</u>, 1992 Del. Ch. LEXIS 84 (Del. Ch. Apr. 20, 1992). In <u>Boeing</u>, there was no finding that the two derivative plaintiffs were acting independently when one made a demand and the other asserted that demand was excused. Rather, the court perceived the two as acting in concert, attempting to pursue a strategy that would "cover all the bases." <u>Id.</u> at *16. Thus, in those unique circumstances, the court precluded asserting of demand futility. <u>Id.</u>[9]

     Where, as here, plaintiffs and their counsel did not act in concert to "have it both ways," but acted independently, a demand by one does not bar the other from asserting demand futility. <u>See</u>, <u>e.g.</u>, <u>Avacus Partners, L.P. v. Brian</u>, 1990 Del. Ch. LEXIS 178, at *28-31 (Del. Ch. Oct. 24, 1990)(finding demand futility even though defendants argued that such a finding was precluded

---

     [8]     Although Indiana, unlike some states, does not require demand, the Indiana Supreme Court noted in a recent opinion that the Model Business Corporation Act drafted by the ABA provides that when a demand is made a shareholder should "wait ninety days after a demand is made...before filing suit..." <u>In re Guidant S'holders Deriv. Litig.</u>, 841 N.E.2d 571, 574 (Ind. 2006). Here, Reale waited over 120 days to file his case. It is now almost nine months since Reale made his demand, but ITT has still failed to initiate action against the wrongdoers identified by him. ITT is still purportedly investigating the matter even though it spent years investigating this matter prior to the entry of its March 2007 guilty plea.

     [9]  <u>Boeing</u> also featured another unique fact, not present here. After one of the two *Boeing* plaintiffs made his demand, the Boeing Board of Directors fully investigated the claims and rejected them. The shareholder thereafter never alleged that the Board's decision to refuse the demand was in any way wrongful. *Id.* at *14. By contrast here, Reale asserts that ITT has wrongfully failed to take action on his demand, and demonstrates herein that the matter was referred to the not disinterested SLC and a special counsel who specializes in working for insurance companies to defeat claims of the very nature asserted here. <u>See</u> <u>infra</u>, at 16-19. A refusal by ITT to bring the claims alleged herein would indeed be wrongful. Moreover, here Piven filed her "demand excused" allegations *prior to* any demand made by Reale, whereas in <u>Boeing</u> demand was made *simultaneously* with a claim that demand was futile.

by another shareholder having made a demand on the Board). <u>Avacus</u> was recently followed in <u>In re FirstEnergy S'holder Deriv. Litig.</u>, 320 F. Supp. 2d 621, 626 (N.D. Ohio 2004)(holding that the equities do not weigh in favor of "one shareholder being able to bind all other shareholders based on a demand of which the other shareholders had no knowledge. In such a situation, the shareholders arguing demand futility have not ceded the absence of facts supporting a finding of futility").[10] <u>Accord</u>, <u>Miller v. Loucks</u>, 1992 U.S. Dist. LEXIS 16966 (N.D. Ill. Nov. 5, 1992)("Defendants argue that Plaintiff Miller's demand on the board not only bars Plaintiff Gold from asserting demand futility, but operates as an admission of the board's disinterest and independence. The Delaware Court, however, specifically refused to attach such a preclusive effect to another shareholder's demand. ... We must analyze the merits of each Plaintiff's claim separately.").[11]

   The fact that the "demand made" and "demand excused" cases have been consolidated into one pleading for the convenience of the parties and the Court does not change the underlying rights of the parties under long-standing principles of federal law. Consolidation exists so that similar claims may be *litigated* together, but is not designed to prejudice constituent claims,

---

  [10] The <u>FirstEnergy</u> court also rejected an argument that the formation of a special committee to review the claims showed demand was not futile: "Finally, Defendants suggest that FirstEnergy's creation of an 'independent committee' to investigate the derivative claims raised by Plaintiffs undermines Plaintiffs' assertion of demand futility. The Court finds this unconvincing and concludes that the creation of the committee *only supports Plaintiffs' futility assertion*. By empowering the committee to determine whether to pursue the litigation, the Directors imply that they are not disinterested and suggest that demand on them would have been futile." <u>Id.</u> at 626-27 (emphasis added).

  [11] In line with these decisions, Judge Kram of this Court allowed "demand made" and "demand excused" cases to proceed simultaneously. <u>See</u> <u>In re AOL Time Warner Shareholder Litig.</u>, Master File No. 02 CV 6302 (S.D.N.Y)(SWK), Pre-Trial Order No. 2, dated May 26, 2004 and Opinion and Order, dated May 26, 2004, at 2 ("the Court does believe that bifurcation of the shareholder derivative claims into 'demand' and 'no demand' cases, due to the distinct factual and legal issues involved, is appropriate"). Exs. B and C to Harwood Dec.

or change their nature.  As the Supreme Court said in <u>Johnson v. Manhattan Ry. Co.</u>, 289 U.S. 479,

479 (1933), "[consolidation of suits does not merge suits into single action or change rights of

parties" or "make those who are parties in one suit parties in another."  <u>Id.</u> at 497.

   Thus, under <u>Johnson</u>, the jurisdictional and pleading allegations of each constituent

action must be viewed separately.  <u>See</u> <u>Katz v. Realty Equities Corp.</u>, 521 F.2d 1354, 1359 (2d Cir.

1975) (the use of a consolidated complaint greatly simplifies the proceedings, but "the consolidated

complaint *does not supersede the individual complaints* and does not impermissibly merge the rights

or defenses of the various parties.")(emphasis supplied); <u>Cole v. Schenley Indus. Inc.</u>, 563 F.2d 35,

38 (2d Cir. 1977)("Rights are unaffected even though a consolidated complaint is filed."); <u>Holland</u>

<u>& Knight v. Deatley</u>, 2007 WL 2253272, at *2 (E. D. Wash. July 31, 2007)(even the consolidation

of a diversity case and non-diversity case into a single consolidated pleading does not "destroy

diversity in [each individual] action.").[12]

   For all the foregoing reasons, therefore, ITT's argument (ITT Br. at 11-12) that

"plaintiffs have conceded that demand is not excused" must be rejected.

---

  [12]   The Federal Rules also provide that parties may plead alternative theories in one
complaint. Fed. R. Civ. P. 8(e)(2).  <u>See</u> <u>Ascher v. Target Corp.</u>, 2007 WL 3287441, at *13-14
(S.D.N.Y. Oct. 15, 2007)("the Court cannot construe one claim as an admission against another
alternative or inconsistent claim.")(citation omitted).  Here, the plaintiffs are not even asserting
alternative theories: Reale asserts that demand was made and not sufficiently addressed; while Piven
asserts that demand is futile**.**  Consistent with <u>Ascher</u>, and the authority cited therein, what Reale
asserts cannot be used to disadvantage plaintiff Piven, and <u>vice</u> <u>versa</u>.

**B.** **The Appointment Of A Conflicted And Not Disinterested**
**Special Committee Does Not Justify The Dismissal**
**Of This Action, Or Provide Good Cause For Issuing A Stay**

As noted, a demand letter was sent by Reale to the Board of Directors on April 12, 2007. The letter described conduct that ITT had already fully investigated, and indeed was the subject of both a guilty plea, and a highly detailed 35-page criminal Statement of Facts. In the Plea Agreement ITT admitted it was "in fact guilty." ¶ 1. ITT conceded that this Statement of Facts contained an accurate account of the activities of not only the Manager Defendants, but also of the John Doe law firm which aided them in concealing these matters from federal authorities. The criminal plea was accompanied by harsh criticism from the government. When the U.S. Attorney announced ITT's guilty plea, he noted in his press release, referenced at ¶¶ 1, 4, 5, and 7, that ITT fought the government's investigation, and attempted "to essentially run out the clock on the statute of limitations."

Plaintiff Reale was likewise concerned that certain of the underlying claims might be time barred if he failed to take prompt action, and was aware of the U.S. Attorney's assertion that ITT had already delayed in responding to these claims. On June 11, 2007, sixty days after the demand letter was sent, Reale's counsel received a one sentence letter advising that the Board had not even begun any substantive consideration, but was just "in the process" of retaining counsel to help it do so. No mention was made in that letter of the formation of an SLC. (Affidavit of David Elbaum, Exhibit K.)

More than 120 days after his initial demand letter, and nothing having occurred to give him reason to believe ITT would act anytime soon, Reale filed his "demand made" complaint on August 17, 2007 against the Director Defendants and several John Doe defendants, in the hope

14

of avoiding loss of claims as time barred.  Even then, ITT fought the disclosure of the John Doe

defendants' identities, thereby preventing service and tolling.  It took the Court's intervention at the

October 5, 2007 hearing to ensure their disclosure and that ITT would secure tolling agreements

(which it eventually did).  It is now almost nine months since Reale sent his demand letter and there

is still no indication of when, if ever, ITT will complete its investigation of matters it already

thoroughly investigated and to which it entered a guilty plea and paid fines and penalties of $100

million.

Under Indiana law, formation of a special committee is no ground for dismissal of

a demand made derivative action.  Rather, Ind. Code Ann. § 23-1-32-2 provides:

> *Whether or not a demand for action was made,* if the corporation commences
> an investigation of the charges made in the demand or complaint (including
> an investigation commenced under section 4 of this chapter), the court *may*
> stay any proceeding until the investigation is completed. (Emphasis added).

Thus, Section 23-1-32-2 does not call for the dismissal of this action because of a

Board investigation, but rather only empowers the Court to enter a discretionary stay.  In reply,

realizing that there is no present ground for a dismissal of the demand made claims under Indiana

law, ITT may switch tactics, and request an indefinite stay.  But such a stay would be inappropriate

for several reasons.

First, Ind. Code Ann. § 23-1-32-4 provides that a committee composed entirely of

three "disinterested persons" may investigate and make recommendations regarding derivative

litigation that the Court may consider (provided these recommendations are made in "good faith").

The three members of the ITT committee are not disinterested. A director is "disinterested," if,

among other reasons, he or she:

(1) Has not been made a party to a derivative proceeding seeking to

15

> assert the right or remedy in question, or has been made a party but only on the basis of a frivolous or insubstantial claim or for the sole purpose of seeking to disqualify the director or other person from serving on the committee;
>
> (2) is able under the circumstances to render a determination in the best interests of the corporation. ...

Ind. Code Ann. § 23-1-32-4(d))(1).

Second, even if ITT could establish that the SLC and its counsel, who is discussed infra at 17-19, are disinterested (which they cannot), there is no reason for a stay here to await their decision. A stay would only delay this litigation while plaintiffs await a report entitled to no deference. Cf. In re Bank of N.Y. Deriv. Litig., 2000 WL 1708173, at *2 (S.D.N.Y. Nov. 14, 2000) (refusing to grant any stay where court found that "substantial questions exist as to whether the members of the SLC are truly independent and disinterested."); Biondi v. Scrushy, 820 A.2d 1148 (Del. Ch. 2003)(same). ITT already investigated the underlying facts once in connection with the criminal proceedings, and concluded it was guilty. Doing so again, as it now purports to, is a cynical effort to delay placing blame where it belongs - on the Director Defendants and others for wrongful conduct that led to corporate penalties of $100 million.

### 1.    The Special Committee Members are Not Disinterested

The Amended Complaint details a prolonged, pervasive scheme to violate laws necessary to our nation's security. Not only did Board members consciously fail in their duty to monitor and oversee such activities, they aggravated the harm to ITT by permitting management to stonewall the criminal investigation in an attempt to "essentially run out the clock on the statute of limitations." Such misconduct easily states a claim for bad faith fiduciary duty breach.

Each member of the SLC, Director Defendants Crawford, LeBoeuf and MacInnes,

16

has been on the Board for many years, and it was on their watch that all or a substantial part of the alleged wrongdoing occurred. Under Ind. Code Ann. § 23-1-32-4, these three directors cannot be considered "disinterested" unless the claims against them are frivolous or insubstantial, or they have been named as defendants solely to prevent them from serving on a special committee. The claims against them are far from frivolous, but are well-grounded in fact and law. They are named as defendants because they were Board members at the time the wrongdoing occurred, and abdicated their fiduciary responsibilities, not "for the sole purpose" of preventing them from serving on the SLC. Under Ind. Code Ann. § 23-1-32-4(d)(1), therefore they are not "disinterested."

Courts should naturally be leery when directors set themselves up to be judges in their own cause. As the Second Circuit observed in <u>Joy v. North</u>, 692 F.2d 880, 888 (2d Cir. 1982) (applying Connecticut law):

> The reality is . . . that special litigation committees created to evaluate the merits of certain litigation are appointed by the defendants to that litigation. It is not cynical to expect that such committees will tend to view derivative actions against the other directors with skepticism. Indeed, if the involved directors expected any result other than a recommendation of termination at least as to them, they would probably never establish the committee.

**2.    There is Reasonable Doubt as to Whether
        Special Counsel can Act in this Matter
        with the Requisite Degree of Impartiality**

The selection of special counsel in this matter raises additional serious questions as to the disinterestedness of the Special Committee. Ordinarily, large companies facing derivative suits retain a retired jurist or a multinational firm to act as special counsel. <u>Cf.</u> <u>Atkins v. Topp Comm, Inc.</u>, 874 So. 2d 626, 628 (Fla. App. 4th Dist. 2004)(approving investigation conducted by a retired judge, who had been accepted by both sides and had no ties to either party). Such special counsel, while not wholly impervious to political and business considerations in taking on the

assignment, is ordinarily well-established or diversified enough to withstand the fallout from any course of action they may wish to pursue. By contrast here, special counsel Susan Brune, while undoubtedly a person of outstanding moral character, leads a relatively new and growing firm that might not easily weather talk amongst the defense bar and the insurance industry that its name partner had the "poor judgment" to recommend proceedings against the prominent defendants named here. This assertion is highlighted at Ms. Brune's website profile, which emphasizes her success on behalf of defendants in cases much like this one, stating:

> She recently obtained a dismissal with prejudice for a large law firm accused of breaching fiduciary duties and favorable outcomes for individuals and companies in securities fraud, breach of contract and other commercial cases.

That such work is emphasized on her web page underscores its importance for Ms. Brune. Assignments of this nature often come from insurance companies, or as referrals from larger firms. It would have to be on any defense practitioner's mind whether an adverse recommendation in this ITT matter will have future consequences. In weighing the disinterestedness of directors or counsel charged with reviewing derivative suits, "[t]he issue is not their integrity but their objectivity and impartiality, both in fact and in perception." Klein v. FPL Group, Inc., 2004 WL 302292, at *20 (S.D. Fla. Feb. 5, 2004). In In re Oracle Corp. Deriv. Litig., 824 A.2d 917, 938 (Del. Ch. 2003), the court noted that its task was to ensure that the "decision [regarding derivative litigation] is based on

18

the corporate merits of the subject before the board rather than extraneous considerations or influences." In <u>Oracle</u>, the Delaware Chancery Court concluded that special committee members with close ties to Stanford University could not evaluate claims against other directors also closely aligned with that institution. Concluding that these social and institutional connections would "be on the mind" of the directors during their investigation, the court determined such persons not sufficiently impartial because they could not be expected to "put aside personal considerations that are ordinarily influential in daily behavior." <u>Id.</u> at 947. Likewise here, despite what might be special counsel's best intentions, it is asking too much to expect her to ignore completely the adverse business implications of making an "unpopular" decision in this matter.

### C.    Plaintiffs Adequately Plead Demand Futility

Under Indiana law, a shareholder may sue derivatively on behalf of a corporation without first making a demand when it would be futile to do so. <u>Ind. Code Ann. § 23-1-32-2</u> (West 2005); <u>In re Guidant</u>, 841 N.E.2d at 572-74. Each demand futility case must be analyzed and scrutinized according to its own set of unique facts taking into account the totality of the circumstances and the competing interests and considering the allegations collectively, as a whole. <u>Harris v. Carter</u>, 582 A.2d 222, 229 (Del. Ch. 1999); <u>Bergstein v. Texas Int'l, Co.</u>, 453 A.2d 467 (Del. Ch. 1982).

### 1.    The CAC Satisfies The Rales Standard

Plaintiffs respectfully submit that the CAC satisfies the Delaware Supreme Court's standard for demand futility established in <u>Rales</u>, <u>supra</u>. In <u>Rales</u>, the court held that where a derivative plaintiff challenges board failure to fulfill its fiduciary duties through inaction, as distinguished from exercise of its business judgment as required by <u>Aronson v. Lewis</u>, 473 A.2d 805

(Del. 1984), the relevant inquiry is whether the plaintiff has alleged with particularity facts that "create a reasonable doubt that ... the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." Rales, 634 A.2d at 934. Under the "reasonable doubt"[13] standard, plaintiffs are not required to prove at the pleading stage that the directors were interested, but, rather, must only allege with particularity facts that would create a reasonable doubt that a majority[14] of the members of the board of directors are independent and disinterested. Brehm v. Eisner, 746 A.2d 244 (Del. 2000); Grimes v Donald, 673 A.2d 1207, 1217 & n.17 (Del. 1996); Rales, 634 A.2d at 933; Aronson, 473 A.2d at 814.

Where potential liability is not a "mere threat," but instead rises to the level of "substantial likelihood," directors' status as defendants may serve as the basis of a finding of demand futility.[15] Aronson, 473 A.2d at 815; Baxter, 654 A.2d at 1270 (Del. Ch. 1995).

Here, the CAC establishes a "substantial likelihood" that defendants will be held liable for their fiduciary breaches. The CAC alleges that defendants, through their inaction, allowed

---

[13]    "Reasonable doubt" is not a scientific term. Harris, 582 A.2d at 229. The determination is made based on an accumulation of all relevant facts and no specific fact pattern is required to be plead. Id.

[14]    Here, where ITT has a nine member Board, plaintiffs demonstrate that there is reasonable doubt that at least five members of the Board are sufficiently independent and disinterested to fairly consider a demand.

[15]    ITT claims that its so-called exculpatory charter provision would eliminate the liability of the defendant directors. ITT Br. at 16. Not so. Breaches of fiduciary duties other than the duty of care cannot be exempted by way of a charter provision and can still disable the directors from considering a demand fairly despite a so-called exculpatory charter provision. In re Abbott Labs. Deriv. S'holders Litig., 325 F.3d 795, 810 (7th Cir. 2003); In re Baxter S'holder Litig., 654 A.2d 1268, 1270 (Del. Ch. 1995), 654 A.2d at 1270; Emerald Partners v. Berlin, 726 A.2d 1215, 1223-24 (Del. 1999). "Directors are not protected under [an exculpatory charter] provision when a complaint alleges facts that infer a breach of loyalty or good faith." Abbott, 325 F.3d at 810 (citing Emerald Partners, 787 A.2d at 94).

20

serious violations of law to occur over a more than a ten-year period, that ultimately caused massive damage to the Company thereby. The Director Defendants were required to exercise good faith oversight over the Company regarding compliance with applicable law, rules and regulations. Guttman v. Huang, 823 A.2d 506 (Del. Ch. 2003). However, the Board, including the members of the Audit and Corporate Responsibility Committees, who were specifically chartered to exercise that oversight, failed to exercise that fiduciary duty. Indeed, even though: (a) in 1998 Company employees documented violations of law taking place over the course of several years (¶ 67), (b) those practices were only partially revealed to the government in 2000 (albeit in an incomplete and evasive fashion) with the assistance of outside counsel (¶ 64), and (c) a government investigation was commenced in 2001 (¶ 57), the Board continued to allow the illegal practices to continue through 2006. ¶ 128.

ITT's attempt to downplay its criminal violations by claiming the night vision unit's operations did not warrant specific Board oversight, since it only accounted for 4.2% of the Company's revenues, falls flat. The Board's oversight failures concerned the Company's handling of secret and otherwise sensitive information of the United States military, from which ITT Defense made about 84% of its sales and revenues. ITT Ex. A at 4. As the Company's public filings make clear, ITT's government contracts are subject to government termination. Id. Indeed, as a result of its guilty plea ITT has become subject to automatic statutory "debarment" from future export licenses. ¶ 133. Thus, the ramifications of violating applicable legal restrictions when dealing with sensitive military equipment are far greater than ITT claims. Defendants' failures here not only jeopardized the lives of American soldiers on the battlefield, but also jeopardized the Company's ability to serve its shareholders' interests by even contracting with the government for production

of such sensitive military equipment and generating revenues therefrom. ITT's cavalier attitude to more than 4% of its revenue stream is emblematic of the cavalier attitude taken by the Director Defendants in their oversight of the night vision unit. That unit's operations required good faith oversight by the Director Defendants, but they recklessly cast aside that obligation.

In this regard, this action is on all fours with In re Veeco Instruments, Inc. Sec. & Deriv. Litig., 434 F. Supp. 2d 265 (S.D.N.Y. 2006), where Judge McMahon found demand excused in a similar situation. In Veeco, the corporation also violated United States export control laws. Even after those violations were brought to the company's attention, however, the export control law violations continued. Given the importance of the export business to the company, and that violation of those laws could lead to fines and suspension of export privileges, the court found demand excused because the plaintiffs had pled sufficiently that the corporation's internal controls were wholly inadequate and ineffective, and the directors had violated their duty of loyalty subjecting them to a substantial likelihood of liability. Here, the Company was aware by, at the latest, 2000 that it violated the ITAR; by 2001 it knew it was under investigation by the government; by 2004 it had entered into a consent decree with the government; yet as of 2006 it continued its criminal conduct. Given the importance of the Company's ability to perform work on secret or otherwise sensitive military projects, these failures of oversight were not in good faith. In short "'[t]he problem . . . was in [ITT's] culture . . . the willful self blinding of company officials.'" ¶ 46. Here, just as in Veeco, the Director Defendants' failure to oversee properly illegal corporate activities demonstrates a breach of loyalty subjecting them to a substantial likelihood of liability.

    2.    **The Board's Inaction in the Face of Red Flags Raises a Substantial Likelihood of Liability**

The Director Defendants were required to exercise their fiduciary duties in good

22

faith; failure to do so was in breach of their duty of loyalty to the Company and its stockholders. Guttman, 823 A.2d at 506. Defendants' inaction in the face of repeated warning signs of inadequate internal controls, operational deficiencies, and violations of laws and regulation breaches their fiduciary duties to take appropriate steps to ensure compliance with applicable laws. Caremark, (supra) (board's sustained and systematic failure to exercise oversight, including the failure to ensure that a reasonably informed reporting system is in place, is grounds for director liability). Director liability for such a breach may arise from "an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss." Id. at 967; see also Graham v. Allis-Chalmers Mfg. Co., 188 A.2d 125, 130 (Del. 1963) ("the question of whether a corporate director has become liable for losses to the corporation through neglect of duty is determined by the circumstances. If he has ... refused or neglected cavalierly to perform his duty as a director, or has ignored either willfully or through inattention obvious danger signs of employee wrongdoing, the law will cast the burden of liability upon him.").

To satisfy its fiduciary duties, the board must implement an information and reporting system which "is in concept and design adequate to assure the board that appropriate information will come to its attention in a timely manner as a matter of ordinary operations, so that it may satisfy its responsibility." Caremark, 698 A.2d at 971. The board's lack of good faith in establishing a compliance program will be proven if there is "a sustained or systematic failure of the board to exercise oversight." Id. Thus, plaintiffs may satisfy their pleading burden by demonstrating that the directors "ignored 'red flags' indicating misconduct in defiance of their duties." David B. Shaev Profit Sharing Account v. Armstrong, 2006 WL 391931, at * 5 (Del. Ch. Feb. 13, 2006); see also In re SFBC Int'l, Inc. Sec. & Deriv. Litig., 495 F. Supp. 2d 477, 486 (D.N.J. 2007) ("directors have

exposed themselves to liability by allegedly ignoring particularly flagrant and reprehensible wrongdoing, which unquestionably resulted in 'a potentially life threatening situation'").

The directors' sustained or systematic failure to exercise oversight may be demonstrated by the significant magnitude and duration of the illegal activities. In such circumstances, when the scheme was undetected by the Board "demand futility is ordinarily found." In re Oxford Health Plans, 192 F.R.D. at 117. In McCall v. Scott, 239 F.3d 808, 823 (6th Cir. 2001), amended on denial of rehearing by McCall v. Scott, 250 F.3d 997 (6th Cir. 2001), the court found that the directors breached their fiduciary duties through their sustained failure to act against the corporation's systematic health care fraud occurring over the course of about two years. The court cast aside defendants' protestations of being unaware of the fraud – echoed by ITT here – by pointing to certain red flags, including, among others, a federal investigation, audit information, and ongoing practices by the corporation from which their conscious disregard of their duties could be inferred. Id. at 819-820. Here, ITT's criminal conduct, not addressed by the Board, even included an outside law firm aiding and abetting ITT to mislead the State Department as to the duration of ITT's criminal conduct and the time at which its employees became aware of such conduct. ¶¶ 61-69. The CAC also specifically charges ITT with failure to establish a system to ensure compliance with relevant federal export laws. ¶ 58. This failure prevented the Director Defendants from having in place procedures to prevent the myriad of criminal violations, described in detail (¶¶ 61-128), leading to the $100 million in imposed penalties.

Likewise, the Seventh Circuit, in In re Abbott Labs., 325 F.3d at 808, found that the "magnitude and duration" of the violations of law were sufficient to establish demand futility stating: "continuing violations of federal regulations over a period of six years cannot be

24

minimized." Here, plaintiffs' allegations are even more forceful in that they took place over more

than a ten-year period – well beyond the duration of the violations in <u>Oxford</u>, <u>McCall</u>, or <u>Abbott</u> -

and resulted in the first conviction of a major defense contractor under the Arms Export Control Act

of 1976, as well as one of the largest penalties ever imposed in a criminal case.  ¶ 136.

      In support of the motion to dismiss, ITT relies heavily upon the decision to dismiss

in <u>Stone v. Ritter</u>, <u>supra</u>.  However, <u>Stone</u> is entirely inapposite since the plaintiffs there did not

allege that the directors "knew or should have known that violations of law were occurring."[16]  911

A.2d at 364.  In other words, the plaintiffs conceded that there were no "red flags" before the

directors.  <u>Id.</u>  Here, plaintiffs have alleged the opposite: that the directors were or should have been

aware that the violations of law were occurring due to the numerous red flags before them.  <u>See</u>, <u>e.g.</u>,

<u>SFBC</u>, 495 F. Supp. 2d at 485 (In finding demand futility the court considered that "the Complaint

... alleges endemic mismanagement of the company, raising plenty of red flags concerning the

improper and even possibly illegal practices in which the company was engaged.").  Indeed, the

basis for the allegations in the CAC exceed those under which the complaint in <u>SFBC</u> was sustained.

Not only does the CAC allege endemic  mismanagement of ITT, but, based on the charges of a

senior agent of the Defense Department Criminal Investigative Service, ITT"s "'serious violations'

ran deep and '[t]he problem that we encountered was in the culture – <u>the willful self blinding of</u>

<u>company officials.</u>'" ¶ 46 (emphasis added).

---

[16]    The decision in <u>Stone</u> is further inapposite here because the <u>Stone</u> court was persuaded as to the quality of the corporation's internal constrol system by the report of an independent consultant, which concluded that the corporation had a reasonable reporting system, devoted significant resources to its compliance program and put into place numerous systems to ensure compliance.  There is no such independent report here.  Indeed, there was no reporting system function as required by <u>Stone</u>. Rather, defendant Loranger has frankly admitted to the "gaps" in ITT's compliance program.  ¶ 47.

Defendants' reliance on <u>Ferre v. McGrath</u>, 2007 WL 1180650, at *9 (S.D.N.Y. Feb. 16, 2007) is also misplaced because, in that case, the Court noted that the violations of law "had to be brought to light by outsiders!" <u>Id.</u> Here, ITT was well aware of the violations of law by at least 2000, when it admitted some of them to the State Department and tried to cover up others. ¶¶ 62-69. Thus, ITT cannot claim that it was unaware of the violations of law until uncovered by outsiders. Moreover, the alleged violations of law in <u>Ferre</u> concerned the improper certification of only 17 students as eligible for a Tuition Assistance Program and not illegal conduct of the magnitude and duration as alleged here.[17]

### 3. The Continuing Criminal Investigation Demonstrates the ITT Directors' Lack of Disinterest

The government has been careful to note that despite accepting ITT's guilty plea, its criminal investigation has not yet been completed. ¶ 134. Should the Board bring suit, it could subject itself not only to possible civil liability, but also to criminal sanctions. Clearly, the Board cannot make a decision on this matter with the required level of disinterestedness. <u>See</u>, <u>e.g.</u>, <u>In re FirstEnergy</u>, 320 F. Supp. 2d AT 625-26 (FirstEnergy subject of pending criminal investigation and civil lawsuits; permitting directors themselves to bring suit "could adversely impact the Directors' defenses in these actions. Considering the potential personal liability the Directors face in these pending investigations and lawsuits, Plaintiffs could not reasonably expect the Directors to bring suit against themselves."). While ITT cites a few cases to the effect that simply being named as a

---

[17]    For the same reasons defendants face a substantial likelihood of liability for failure to supervise, they face same for gross mismanagement, a separate cause of action. <u>See</u>, <u>Clark v. Lacy</u>, 376 F.3d 682, 686-87 (7th Cir. 2004) (gross mismanagement, based on same issues, "different cause of action").

defendant in a derivative complaint is insufficient to establish a lack of disinterest, those cases are inapposite here since the Director Defendants remain under the specter of the continuing government investigation that may result in criminal charges against them.  ¶ 134.

Moreover, while courts have held that directors are not necessarily disabled from reviewing their own conduct, here it cannot be seriously contended that directors of a military contracting firm dependent upon contracts with the United States military could fairly consider charges that they put American soldiers engaged in active combat operations at risk.

### 4. There Is a Substantial Likelihood of Liability for the Audit Committee and Corporate Responsibility Committee Defendants

Further bolstering plaintiffs' demand futility claims is the fact that seven of ITT"s eight "outside" directors sit on the Board committees with charters requiring oversight for the Company's compliance with applicable laws, the Company's Code of Conduct and compliance therewith by employees, and the effectiveness of the Company's internal controls, i.e., the Corporate Responsibility Committee (¶¶ 29-30) and the Audit Committee ¶¶ 31-32.  These directors have all served on the Board for all or nearly all of the duration of the government investigation while criminal conduct occurred.  ¶¶ 14-22.

Defendants Crawford, Gold, Hume and Tambakeras' service on the Corporate Responsibility Committee (¶ 29) and defendants Hake, Gold, Hamre and LeBoeuf's service on the Audit Committee (¶ 31) raise a substantial likelihood of their liability and demonstrate their lack of disinterest.  See, e.g., Abbott Labs, 325 F.3d at 808 (Audit Committee members responsible for "assessing any risks involved in regulatory compliance"); In re Veeco, 434 F. Supp. 2d at 278 (Audit

27

Committee members' failure to exercise oversight subjected them to a substantial likelihood of liability). Defendant Loranger's management position with ITT demonstrates that he is not sufficiently independent or disinterested to fairly consider a demand. Rales, 634 A.2d at 937; Guttman, 823 A.2d at 505.

### 5.    Demand On The John Doe Defendants Is Excused

Under Delaware law, in a derivative complaint against a third party, a corporation must affirmatively assert whether it approves or disapproves of the continuation of derivative litigation. Kaplan v. Peat, Marwick, Mitchell & Co., 540 A.2d 726, 730, 731 (Del. 1988); Spiegel v. Buntrock, 571 A.2d 767, 775 (Del. 1990) (citing Kaplan). A corporation's failure to assert an affirmative position concerning the prosecution of a derivative action against a third party is "tacit approval" for its continuation. Kaplan, 540 A.2d at 731 ("Chase's current position of neutrality must be viewed as tacit approval for the continuation of the litigation.") (emphasis added). Thus, a nominal corporate defendant's "current position of neutrality excuses Plaintiffs' failure to make demand as required by Chancery Court Rule 23.1." Id. (emphasis added).

Here, ITT is engaged in a protracted SLC procedure that has so far failed to decide whether to proceed against the John Doe Defendants. Without the Company's unequivocally stated position, it has not "properly exercised [its] business judgment" because the demand futility test "presupposes that the corporation has taken a hostile position regarding the litigation." Kaplan, 540 A.2d at 732. Demand on the Board is, therefore, excused as to the claims against the John Doe Defendants.

## CONCLUSION

For the reasons cited herein, defendants' motion to dismiss should be denied in its entirety.

DATED: December 28, 2007

**HARWOOD FEFFER LLP**

By:      **/s/Robert I. Harwood**
Robert I. Harwood (RH–3286)
Samuel K. Rosen (SR–3287)
488 Madison Avenue
New York, New York 10022
Tel. (212) 935-7400

Chairman, Plaintiffs' Executive Committee

**ABBEY SPANIER RODD
   & ABRAMS, LLP**
Judith Spanier (JS-5065)
Orin Kurtz (OK-7334)
212 East 39th Street
New York, New York 10016
Tel.: (212) 889-3700

**PASKOWITZ & ASSOCIATES**
Laurence D. Paskowitz (LP- 7324)
60 East 42nd Street
New York, New York 10165
Tel.: (212) 685-0969

**WEISS & LURIE**
James E. Tullman
551 Fifth Avenue
New York, New York 10176
Telephone: (212) 682-3025

Plaintiffs' Counsel

29